**TEXACO, INC., Appellant,**

v.

**PENNZOIL, CO., Appellee.**

**No. 01–86–0216–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 12, 1987.

Rehearings Denied April 24 and May 26, 1987.

Joseph D. Jamail, Jamail & Kolius, John L. Jeffers, G. Irvin Terrell, Randall A. Hopkins, Baker & Botts, W. James Kronzer, Law Offices of W. James Kronzer, Harry M. Reasoner, Vinson & Elkins, Houston, Luther H. Soules, III, Soules & Reed, San Antonio, Royal H. Brin, Jr., Thomas C. Unis, Strasburger & Price, Dallas, Louis S. Muldrow, Waco, for appellee.

Before WARREN, JACK SMITH and SAM BASS, JJ.

## OPINION

WARREN, Justice.

This is an appeal from a judgment awarding Pennzoil damages for Texaco's tortious interference with a contract between Pennzoil and the "Getty entities" (Getty Oil Company, the Sarah C. Getty Trust, and the J. Paul Getty Museum).

The jury found, among other things, that:

(1) At the end of a board meeting on January 3, 1984, the Getty entities intended to bind themselves to an agreement providing for the purchase of Getty Oil stock, whereby the Sarah C. Getty Trust would own 4/7th of the stock and Pennzoil the remaining 3/7th; and providing for a division of Getty Oil's assets, according to their respective ownership if the Trust and Pennzoil were unable to agree on a restructuring of Getty Oil by December 31, 1984;

(2) Texaco knowingly interfered with the agreement between Pennzoil and the Getty entities;

(3) As a result of Texaco's interference, Pennzoil suffered damages of $7.53 billion;

(4) Texaco's actions were intentional, willful, and in wanton disregard of Pennzoil's rights; and,

(5) Pennzoil was entitled to punitive damages of $3 billion.

Russell H. McMains, McMains & Constant, Corpus Christi, Gibson Gayle, Jr., James B. Sales, Fulbright & Jaworski, Richard B. Miller, Richard P. Keeton, Miller, Keeton, Bristow & Brown, Houston, William R. Edwards, Edwards & Terry, Corpus Christi, for appellant.

The main questions for our determination are: (1) whether the evidence supports the jury's finding that there was a binding contract between the Getty entities and Pennzoil, and that Texaco knowingly induced a breach of such contract; (2) whether the trial court properly instructed the

jury on the law pertinent to the case; (3) whether the evidence supported the jury's damage awards; (4) whether the trial court committed reversible error in its admission and exclusion of certain evidence; (5) whether the conduct and posture of the trial judge denied Texaco a fair trial; and (6) whether the judgment violates certain articles of the United States Constitution.

Though many facts are disputed, the parties' main conflicts are over the inferences to be drawn from, and the legal significance of, these facts. There is evidence that for several months in late 1983, Pennzoil had followed with interest the well-publicized dissension between the board of directors of Getty Oil Company and Gordon Getty, who was a director of Getty Oil and also the owner, as trustee, of approximately 40.2% of the outstanding shares of Getty Oil. On December 28, 1983, Pennzoil announced an unsolicited, public tender offer for 16 million shares of Getty Oil at $100 each.

Soon afterwards, Pennzoil contacted both Gordon Getty and a representative of the J. Paul Getty Museum, which held approximately 11.8% of the shares of Getty Oil, to discuss the tender offer and the possible purchase of Getty Oil. In the first two days of January 1984, a "Memorandum of Agreement" was drafted to reflect the terms that had been reached in conversations between representatives of Pennzoil, Gordon Getty, and the Museum.

Under the plan set out in the Memorandum of Agreement, Pennzoil and the Trust (with Gordon Getty as trustee) were to become partners on a ³/₇ths to ⁴/₇ths basis respectively, in owning and operating Getty Oil. Gordon Getty was to become chairman of the board, and Hugh Liedtke, the chief executive officer of Pennzoil, was to become chief executive officer of the new company.

The Memorandum of Agreement further provided that the Museum was to receive $110 per share for its 11.8% ownership, and that all other outstanding public shares were to be cashed in by the company at $110 per share. Pennzoil was given an option to buy an additional 8 million shares

to achieve the desired ownership ratio. The plan also provided that Pennzoil and the Trust were to try in good faith to agree upon a plan to restructure Getty Oil within a year, but if they could not reach an agreement, the assets of Getty Oil were to be divided between them, ³/₇ths to Pennzoil and ⁴/₇ths to the Trust.

The Memorandum of Agreement stated that it was subject to approval of the board of Getty Oil, and it was to expire by its own terms if not approved at the board meeting that was to begin on January 2. Pennzoil's CEO, Liedtke, and Gordon Getty, for the Trust, signed the Memorandum of Agreement before the Getty Oil board meeting on January 2, and Harold Williams, the president of the Museum, signed it shortly after the board meeting began. Thus, before it was submitted to the Getty Oil board, the Memorandum of Agreement had been executed by parties who together controlled a majority of the outstanding shares of Getty Oil.

The Memorandum of Agreement was then presented to the Getty Oil board, which had previously held discussions on how the company should respond to Pennzoil's public tender offer. A self-tender by the company to shareholders at $110 per share had been proposed to defeat Pennzoil's tender offer at $100 per share, but no consensus was reached.

The board voted to reject recommending Pennzoil's tender offer to Getty's shareholders, then later also rejected the Memorandum of Agreement price of $110 per share as too low. Before recessing at 3 a.m., the board decided to make a counterproposal to Pennzoil of $110 per share plus a $10 debenture. Pennzoil's investment banker reacted to this price negatively. In the morning of January 3, Getty Oil's investment banker, Geoffrey Boisi, began calling other companies, seeking a higher bid than Pennzoil's for the Getty Oil shares.

When the board reconvened at 3 p.m. on January 3, a revised Pennzoil proposal was presented, offering $110 per share plus a $3 "stub" that was to be paid after the sale of a Getty Oil subsidiary ("ERC"), from the

excess proceeds over $1 billion. Each shareholder was to receive a pro rata share of these excess proceeds, but in any case, a minimum of $3 per share at the end of five years. During the meeting, Boisi briefly informed the board of the status of his inquiries of other companies that might be interested in bidding for the company. He reported some preliminary indications of interest, but no definite bid yet.

The Museum's lawyer told the board that, based on his discussions with Pennzoil, he believed that if the board went back "firm" with an offer of $110 plus a $5 stub, Pennzoil would accept it. After a recess, the Museum's president (also a director of Getty Oil) moved that the Getty board should accept Pennzoil's proposal provided that the stub be raised to $5, and the board voted 15 to 1 to approve this counter-proposal to Pennzoil. The board then voted themselves and Getty's officers and advisors indemnity for any liability arising from the events of the past few months. Additionally, the board authorized its executive compensation committee to give "golden parachutes" (generous termination benefits) to the top executives whose positions "were likely to be affected" by the change in management. There was evidence that during another brief recess of the board meeting, the counter-offer of $110 plus a $5 stub was presented to and accepted by Pennzoil. After Pennzoil's acceptance was conveyed to the Getty board, the meeting was adjourned, and most board members left town for their respective homes.

That evening, the lawyers and public relations staff of Getty Oil and the Museum drafted a press release describing the transaction between Pennzoil and the Getty entities. The press release, announcing an agreement in principle on the terms of the Memorandum of Agreement but with a price of $110 plus a $5 stub, was issued on Getty Oil letterhead the next morning, January 4, and later that day, Pennzoil issued an identical press release.

On January 4, Boisi continued to contact other companies, looking for a higher price than Pennzoil had offered. After talking briefly with Boisi, Texaco management called several meetings with its in-house financial planning group, which over the course of the day studied and reported to management on the value of Getty Oil, the Pennzoil offer terms, and a feasible price range at which Getty might be acquired. Later in the day, Texaco hired an investment banker, First Boston, to represent it with respect to a possible acquisition of Getty Oil. Meanwhile, also on January 4, Pennzoil's lawyers were working on a draft of a formal "transaction agreement" that described the transaction in more detail than the outline of terms contained in the Memorandum of Agreement and press release.

On January 5, the Wall Street Journal reported on an agreement reached between Pennzoil and the Getty entities, describing essentially the terms contained in the Memorandum of Agreement. The Pennzoil board met to ratify the actions of its officers in negotiating an agreement with the Getty entities, and Pennzoil's attorneys periodically attempted to contact the other parties' advisors and attorneys to continue work on the transaction agreement.

The board of Texaco also met on January 5, authorizing its officers to make an offer for 100% of Getty Oil and to take any necessary action in connection therewith. Texaco first contacted the Museum's lawyer, Lipton, and arranged a meeting to discuss the sale of the Museum's shares of Getty Oil to Texaco. Lipton instructed his associate, on her way to the meeting in progress of the lawyers drafting merger documents for the Pennzoil/Getty transaction, to not attend that meeting, because he needed her at his meeting with Texaco. At the meeting with Texaco, the Museum outlined various issues it wanted resolved in any transaction with Texaco, and then agreed to sell its 11.8% ownership in Getty Oil.

That evening, Texaco met with Gordon Getty to discuss the sale of the Trust's shares. He was informed that the Museum had agreed to sell its shares to Texaco. Gordon Getty's advisors had previously warned him that the Trust shares might be "locked out" in a minority position if Texa-

co bought, in addition to the Museum's shares, enough of the public shares to achieve over 50% ownership of the company. Gordon Getty accepted Texaco's offer of $125 per share and signed a letter of his intent to sell his stock to Texaco, as soon as a California temporary restraining order against his actions as trustee was lifted.

At noon on January 6, Getty Oil held a telephone board meeting to discuss the Texaco offer. The board voted to withdraw its previous counter-proposal to Pennzoil and unanimously voted to accept Texaco's offer. Texaco immediately issued a press release announcing that Getty Oil and Texaco would merge.

Soon after the Texaco press release appeared, Pennzoil telexed the Getty entities, demanding that they honor their agreement with Pennzoil. Later that day, prompted by the telex, Getty Oil filed a suit in Delaware for declaratory judgment that it was not bound to any contract with Pennzoil. The merger agreement between Texaco and Getty Oil was signed on January 6; the stock purchase agreement with the Museum was signed on January 6; and the stock exchange agreement with the Trust was signed on January 8, 1984.

### INSUFFICIENCY OF THE EVIDENCE

In Points of Error 46 through 56, Texaco contends that the evidence at trial was legally and factually insufficient to support the jury's answers to Special Issues 1 and 2.

The parties agree that in our review, we are required to apply the substantive law of New York and the procedural law of Texas.

There are two standards of review for questions attacking the sufficiency of the evidence: (1) legal insufficiency and (2) factual insufficiency review. In reviewing legal insufficiency points or "no evidence" points, we must consider only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences that may properly be drawn from that evidence, and disregarding all contrary or conflicting evidence. *King v. Bauer*, 688

S.W.2d 845 (Tex.1985); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965). A "no evidence" point must be sustained if we find a complete absence of evidence of probative force or only a scintilla of evidence to support the finding, or if the evidence tending to support the finding must be disregarded because it is legally incompetent. If there is more than a scintilla of probative evidence to support the finding, the point must be overruled. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361 (1960).

In reviewing factual insufficiency points, we must consider all of the evidence in the record that is relevant to the fact finding being challenged. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). We must sustain a "factual insufficiency" point if we determine that the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. *Id.*, 150 Tex. at 664–65, 244 S.W.2d at 661; Calvert, 38 Tex.L.Rev. 361.

Texaco argues first that there was no evidence or there was insufficient evidence to support the jury's answers to Special Issue No. 1. The jury found that the Trust, the Museum, and Getty Oil Company intended to bind themselves to an agreement with Pennzoil containing certain enumerated terms at the end of the Getty Oil Company board meeting on January 3, 1984. Texaco claims that not only is there insufficient evidence of any intent to be bound but also that the "agreement" referred to in Special Issue No. 1 is too indefinite to be a legally enforceable contract.

Second, Texaco asserts that the evidence is legally and factually insufficient to support the jury's answer to Special Issue No. 2, which inquired whether Texaco knowingly interfered with any agreement that the jury had found between Pennzoil and the Getty entities. Texaco contends that there is insufficient evidence that it had actual knowledge of a legally enforceable contract, or that Texaco actively induced a breach of the alleged contract. Texaco further asserts that the alleged contract was

not valid and enforceable, because it was based on a mutual mistake, because it would violate SEC Rule 10b–13 and the statute of frauds, and because it would be a breach by Gordon Getty and by the Getty Oil directors of their fiduciary duties; thus, Texaco argues, the alleged contract will not support a tort action for inducement of breach.

## SPECIAL ISSUE NO. 1

Texaco contends that under controlling principles of New York law, there was insufficient evidence to support the jury's finding that at the end of the Getty Oil board meeting on January 3, the Getty entities intended to bind themselves to an agreement with Pennzoil.

Pennzoil responds that the question of the parties' intent is a fact question, and the jury was free to accept or reject Texaco's after-the-fact testimony of subjective intent. Pennzoil contends that the evidence showed that the parties intended to be bound to the terms in the Memorandum of Agreement plus a price terms of $110 plus a $5 stub, even though the parties may have contemplated a later, more formal document to memorialize the agreement already reached. Pennzoil also argues that the binding effect of the Memorandum of Agreement was conditioned only upon approval of the board, not also upon execution of the agreement by a Getty signator.

Under New York law, if parties do not intend to be bound to an agreement until it is reduced to writing and signed by both parties, then there is no contract until that event occurs. *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970). If there is no understanding that a signed writing is necessary before the parties will be bound, and the parties have agreed upon all substantial terms, then an informal agreement can be binding, even though the parties contemplate evidencing their agreement in a formal document later. *Municipal Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 417 N.Y.S.2d 218, 220, 390 N.E.2d 1143, 1145 (1979); *R.G. Group, Inc.*

*v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984).

If the parties do intend to contract orally, the mere intention to commit the agreement to writing does not prevent contract formation before execution of that writing, *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985), and even a failure to reduce their promises to writing is immaterial to whether they are bound. *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952).

However, if either party communicates the intent not to be bound before a final formal document is executed, then no oral expression of agreement to specific terms will constitute a binding contract. *Winston*, 777 F.2d at 80; *R.G. Group*, 751 F.2d at 74.

Thus, under New York law, the parties are given the power to obligate themselves informally or only by a formal signed writing, as they wish. *R.G. Group*, 751 F.2d at 74. The emphasis in deciding when a binding contract exists is on intent rather than on form. *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

It is the parties' expressed intent that controls which rule of contract formation applies. To determine intent, a court must examine the words and deeds of the parties, because these constitute the objective signs of such intent. *Winston*, 777 F.2d at 80; *R.G. Group*, 751 F.2d at 74. Only the outward expressions of intent are considered—secret or subjective intent is immaterial to the question of whether the parties were bound. *Porter v. Commercial Casualty Insurance Co.*, 292 N.Y. 176, 54 N.E.2d 353 (1944).

Several factors have been articulated to help determine whether the parties intended to be bound only by a formal, signed writing: (1) whether a party expressly reserved the right to be bound only when a written agreement is signed; (2) whether there was any partial performance by one party that the party disclaiming the contract accepted; (3) whether all essential terms of the alleged contract had been

agreed upon; and (4) whether the complexity or magnitude of the transaction was such that a formal, executed writing would normally be expected. *Winston,* 777 F.2d at 80; *R.G. Group,* 751 F.2d at 76.

Evaluating the first factor, Texaco contends that the evidence of expressed intent not to be bound establishes conclusively that there was no contract at the time of Texaco's alleged inducement of breach. Texaco argues that this expressed intent is contained in (1) the press releases issued by the Getty entities and Pennzoil, which stated that "the transaction is subject to execution of a definitive merger agreement"; (2) the phrasing of drafts of the transaction agreement, which Texaco alleges "carefully stated that the parties' obligations would become binding only 'after the execution and delivery of this Agreement'"; and (3) the deliberate reference by the press releases to the parties' understanding as an "agreement in principle."

■ In its brief, Texaco asserts that, as a matter of black letter New York law, the "subject to" language in the press release established that the parties were not then bound and intended to be bound only after signing a definitive agreement, citing *Banking & Trading Corp. v. Reconstruction Finance Corp.,* 147 F.Supp. 193, 204 (S.D.N.Y.1956), *aff'd,* 257 F.2d 765 (2d Cir. 1958). The court in that case stated that "if the agreement is expressly subject to the execution of a formal contract, this intent must be respected and no contract found until then." However, the court went on to say that where intent is less sharply expressed, the trier of fact must determine it as best he can. *Id.* at 204–05. Although the intent to formalize an agreement is some evidence of an intent not to be bound before signing such a writing, it is not conclusive. *Id.* at 204. The issue of when the parties intended to be bound is a fact question to be decided from the parties' acts and communications. *Id.; see Chromalloy American Corp. v. Universal Housing Systems of America, Inc.,* 495 F.Supp. 544, 550 (S.D.N.Y.1980), *aff'd,* 697 F.2d 289 (2d Cir.1982).

The press release issued first by Getty, then by Pennzoil, on January 4, 1984, stated:

Getty Oil Company, The J. Paul Getty Museum and Gordon Getty, as Trustee of the Sarah C. Getty Trust, announced today that they have agreed in principle with Pennzoil Company to a merger of Getty Oil and a newly formed entity owned by Pennzoil and the Trustee.

In connection with the transaction, the shareholders of Getty Oil ... *will* receive $110 per share cash plus the right to receive a deferred cash consideration in a formula amount. The deferred consideration *will* be equal to a pro rata share of the ... proceeds, in excess of $1 billion, ... of ERC Corporation, ... and *will* be paid upon the disposition. In any event, under the formula, each shareholder *will* receive at least $5 per share within five years.

Prior to the merger, Pennzoil *will* contribute approximately $2.6 billion in cash and the Trustee and Pennzoil *will* contribute the Getty Oil shares owned by them to the new entity. Upon execution of a definitive merger agreement, the ... tender offer by a Pennzoil subsidiary for shares of Getty Oil stock *will* be withdrawn.

The agreement in principle also provides that Getty Oil *will* grant to Pennzoil an option to purchase eight million treasury shares for $110 per share.

The transaction is *subject to* execution of a definitive merger agreement, approval by the stockholders of Getty Oil and completion of various governmental filing and waiting period requirements.

Following consummation of the merger, the Trust *will* own ⁴/₇ths of the ... stock of Getty Oil and Pennzoil *will* own ³/₇ths. The Trust and Pennzoil have also agreed in principle that following consummation of the merger they *will* endeavor in good faith to agree upon a plan for restructuring Getty Oil [within a year] and that if they are unable to reach such an agreement then they *will* cause a division of assets of the company. (Emphasis added.)

Any intent of the parties not to be bound before signing a formal document is not so clearly expressed in the press release to establish, as a matter of law, that there was no contract at that time. The press release does refer to an agreement "in principle" and states that the "transaction" is subject to execution of a definitive merger agreement. But the release as a whole is worded in indicative terms, not in subjunctive or hypothetical ones. The press release describes what shareholders *will* receive, what Pennzoil *will* contribute, that Pennzoil *will* be granted an option, etc.

The description of the transaction as subject to a definitive merger agreement also includes the need for stockholder approval and the completion of various governmental filing and waiting requirements. There was evidence that this was a paragraph of routine details, that the referred to merger agreement was a standard formal document required in such a transaction under Delaware law, and that the parties considered these technical requirements of little consequence.

There is also an arguable difference between a "transaction" being subject to various requirements and the formation of the agreement itself being dependent upon completion of these matters. In *F.W. Berk & Co. v. Derecktor*, 301 N.Y. 110, 92 N.E.2d 914 (1950), cited in Texaco's brief, the defendant's very acceptance of the plaintiff's order was made subject to the occurrence of certain events. The court defined the phrase "subject to" as being the equivalent of "conditional upon or depending on" and held that making the acceptance of an offer subject to a condition was not the kind of assent required to make it a binding promise. However, making the acceptance of an offer conditional, or expressly making an agreement itself conditional, is a much clearer expression of an intent not to be bound than the use of the more ambiguous word "transaction."

Other cases cited by Texaco involved writings that specifically stated that no party would be committed until a written contract was executed. *See, e.g., Reprosystem, B.V.*, 727 F.2d at 260 (draft agree-

ments clearly stated that formal execution was required before the contract would have any binding effect); *Chromalloy American Corp.*, 495 F.Supp. at 547–48 (letter of intent stated that neither party would be committed until a contract was executed). Yet, despite the clear language of reservation in those cases, the parties' intent to be bound was still evaluated as a question of fact to be determined from all the circumstances of the case. *Reprosystem, B.V.*, 727 F.2d at 261–62; *Chromalloy American Corp.*, 495 F.Supp. at 550.

So it is here. Regardless of what interpretation we give to the conditional language in the press release, we conclude that it did not so clearly express the intent of the parties not to be bound to conclusively resolve that issue, as Texaco asserts.

■ Texaco also contends that explicit language of reservation in drafts of Pennzoil's transaction agreement indicates the parties' expressed intent not to be bound without a signed writing. Texaco asserts that "Pennzoil's lawyers carefully stated that the parties' obligations would become binding only 'after the execution and delivery of this Agreement.'"

That assertion is not accurate. In fact, "after the execution and delivery of this Agreement" was merely used as an introductory phrase before each party's obligations were described, e.g., after the execution and delivery of this Agreement, Pennzoil shall terminate the tender offer; ... Pennzoil and the Company shall terminate all legal proceedings; ... the Company shall purchase all shares held by the Museum; etc. Other clauses in the transaction agreement did not contain that phrase, e.g., the Company *hereby* grants to Pennzoil the option to purchase up to 8 million shares of treasury stock; *on or prior to the effective date*, Pennzoil and the Trustee shall form the merging company; etc.

A reasonable conclusion from reading the entire drafts is that the phrase "after the execution and delivery of this Agreement" was used chiefly to indicate the timing of various acts that were to occur, and not to impose an express precondition to

the formation of a contract. *Compare Reprosystem, B.V.*, 727 F.2d at 262 ("when executed and delivered," the agreement would become "a valid and binding agreement"). Again, the language upon which Texaco relies does not so clearly express an intent not to be bound to resolve that issue or to remove the question from the ambit of the trier of fact.

Next, Texaco states that the use of the term "agreement in principle" in the press release was a conscious and deliberate choice of words to convey that there was not yet any binding agreement. Texaco refers to defense testimony that lawyers for Getty Oil and the Museum changed the initial wording of the press release from "agreement" to "agreement in principle" because they understood and intended that phrase to mean that there was no binding contract with Pennzoil.

Texaco cites *Mine Safety Appliance Co. v. Energetics Science, Inc.*, No. 75 Civ. 4925, slip op. at 3, n. 2 (S.D.N.Y., Feb. 5, 1980), an unreported case where the court in dicta characterized an agreement in principle as "a far cry from a final contract." However, the court in that case acknowledged that intent to be bound was a fact issue. A motion to declare an alleged agreement binding and enforceable was denied, because the court found that a question of material fact had been raised on whether the non-movants intended to be bound. In another of Texaco's cited cases, *Debreceni v. Outlet Co.*, 784 F.2d 13, 18 (1st Cir.1986), an *offer* was subject to the execution of definitive agreements of sale, and the agreement itself provided that it would become a binding obligation only after execution. Applying New York law, the court stated that the parties would not be bound until a written agreement was executed *if that was their intention.*

Pennzoil and Texaco presented conflicting evidence at trial on the common business usage and understanding of the term "agreement in principle." Texaco's witnesses testified that the term is used to convey an invitation to bid or that there is no binding contract. Pennzoil's witnesses testified that when business people use

"agreement in principle," it means that the parties have reached a meeting of the minds with only details left to be resolved. There was testimony by Sidney Petersen, Getty Oil's chief executive officer, that an "agreement in principle" requires the parties to proceed to try to implement the details of the agreement in good faith, and that that was the case with the agreement in principle with Pennzoil.

 The jury was the sole judge of the credibility of the witnesses and was entitled to accept or reject any testimony it wished, as well as to decide what weight to give the testimony. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist] 1984, writ ref'd n.r.e.). There was sufficient evidence at trial on the common business usage of the expression "agreement in principle" and on its meaning in this case for the jury reasonably to decide that its use in the press release did not necessarily establish that the parties did not intend to be bound before signing a formal document.

A second factor that may indicate whether the parties intended to be bound only by a signed, formal writing is whether there was partial performance by one party that the party disclaiming the contract accepted. *Winston*, 777 F.2d at 80; *R.G. Group*, 751 F.2d at 76.

Texaco asserts that there was no partial performance that would indicate an intent to be bound, but conversely, that the conduct of the parties here was inconsistent with the existence of a binding contract.

Texaco points out that Pennzoil amended its tender offer statement with the SEC on January 4, stating its intent to withdraw the tender offer "if" a definitive merger agreement was executed. Pennzoil filed a copy of the press release to update its SEC statement. Texaco claims that Pennzoil would have been required to withdraw the tender offer under SEC rule 10b–13, 17 C.F.R. § 240.10b–13 (1985), if a binding contract had existed on that date. These contentions will be discussed later in this opinion. Texaco also argues that Getty Oil and the other Getty entities demonstrated a belief that no contract existed yet by ac-

tively soliciting other bids for the purchase of Getty Oil and by representing to Texaco that they were free to deal.

Pennzoil points out that Texaco's alleged interference with Pennzoil's agreement occurred scarcely 48 hours after the agreement came into existence, and there was very little time for any performance under the agreement to have occurred. Pennzoil asserts that there was affirmative partial performance nevertheless, in that representatives of Pennzoil and the Trust worked to coordinate the issuance of a joint press release, as provided by the Memorandum of Agreement upon approval of the plan, and also in that Pennzoil made arrangements to have $1 billion in cash available for the payment of the Museum's shares in escrow.

Other than the preliminary financial arrangements made by Pennzoil, we find little relevant partial performance in this case that might show that the parties believed that they were bound by a contract. However, the absence of relevant part performance in this short period of time does not compel the conclusion that no contract existed. Texaco has pointed out that there was some conduct inconsistent with the existence of an intent to be bound to a contract. But partial performance, and on the other hand, conduct that is inconsistent with an intent to be bound, are again merely circumstances that the finder of fact could consider in reaching a decision on whether the parties intended to be bound. The evidence on the parties' conduct was presented to the jury, which could either accept or reject the inferences the parties asked it to draw from these facts.

The next factor showing intent to be bound is whether there was agreement on all essential terms of the alleged agreement. Texaco contends that numerous items of "obvious importance" were still being negotiated at the time Pennzoil claims a contract had been formed.

First, Texaco asserts that there was no agreement on which party would buy the Museum's stock. Pennzoil contends that its contract was formed on January 3, and that intent to be bound must be determined as of that date. The jury specifically found, in response to Special Issue No. 6, that at the end of the January 3 board meeting, the Getty Oil Company, the Museum, the Trust, and Pennzoil each intended to be bound to an agreement that provided that Getty Oil would purchase the Museum's shares forthwith as provided in the Memorandum of Agreement. There is evidence in the record to support this finding.

The Copley notes of the Getty Oil board meeting (made by Ralph Copley, General Counsel, and Secretary of the Board of Getty Oil) reflect that at the board meeting on January 3, all but one of Getty's directors voted to accept "the Pennzoil proposal," provided that the price being paid per share was $110 plus a minimum $5 stub. The testimony is sharply conflicting on exactly what the "Pennzoil proposal" was that the board approved, as are the inferences that could be drawn from the record of that board meeting.

Texaco's witnesses testified that the Getty board approved only a price proposal by Pennzoil, a basis upon which to negotiate further, and not the other terms originally presented to the board in the Memorandum of Agreement, which Texaco contends was rejected by the board and never considered again after that first vote. Pennzoil's evidence showed that the only "Pennzoil proposal" before the board was the terms contained in the Memorandum of Agreement, which among other things provided that Getty Oil was to buy the Museum's shares. The Memorandum of Agreement was signed by representatives of Pennzoil and of the Museum and the Trust, holders of a majority of Getty's shares, and was subject only to approval of the board of Getty Oil. The terms described in the press release issued by the Getty entities and then by Pennzoil the next day correspond to those contained in the Memorandum of Agreement except for the higher price term.

It was the jury's task to judge the credibility of the witnesses, to resolve conflicts in the factual evidence, and to decide which inferences to draw from the evidence presented. *LeMaster v. Fort Worth Transit Co.*, 138 Tex. 512, 160 S.W.2d 224

(1942). The reviewing court may not substitute its own opinion for that of the jury on these matters. We find that there was sufficient evidence to support the jury's finding that at the end of the Getty Oil board meeting on January 3, the parties had reached agreement on Getty's purchase of the Museum's shares.

There was evidence that the parties were made aware, on January 4, that Getty's purchase of the Museum's shares might trigger a tax penalty applicable to sales of stock between charitable trusts and related entities. It was agreed that this possibility had to be explored, and further discussions developed the alternative of having Pennzoil, rather than Getty Oil, buy the Museum's shares. The Museum's attorney drafted an escrow agreement to effect Pennzoil's purchase of those shares. There was testimony that Pennzoil also began making arrangements to have the necessary cash available in escrow.

There is sufficient evidence to refute Texaco's assertion that the question of who would buy the Museum's shares was a significant open issue that the parties had not agreed upon at the time Pennzoil contends, and the jury found, the parties intended to be bound. Nor does the conflicting evidence of events after January 3 compel the conclusion that the parties considered it a problem that Pennzoil, rather than Getty Oil, would be buying the Museum's shares.

There was evidence that the Museum's main concerns were price protection and that its shares would be purchased at once. The Museum's attorney suggested that any potential tax problem could be avoided by having Pennzoil buy its shares, and she drafted an escrow agreement for effecting this. Pennzoil's witnesses testified that Pennzoil did not object to this change of mechanics from the original agreement. Under the alleged agreement, Pennzoil was to purchase 24 million shares, and Pennzoil's CEO testified that it made no difference to Pennzoil *which* 24 million shares it bought. Although one of Getty's attorneys had expressed an objection to Pennzoil's buying the Museum shares, he also object-

ed to Getty Oil itself buying those shares, as provided in the Memorandum of Agreement. There was concern, he said, that if Pennzoil and the Trust acquired control of Getty before buying all outstanding shares, the remaining public shares would not be bought at the same price. However, the Memorandum of Agreement and the press release both stated the same price to be paid to all selling shareholders. There was also testimony that the attorneys representing Getty Oil, the Museum, and the Trust agreed on January 5 that it was better to have Pennzoil rather than Getty buy the Museum's shares.

■ Texaco lists the extent of the Museum's "top up" price protection as another open issue showing the lack of the parties' intent to be bound.

The "top up" provision in the Memorandum of Agreement guaranteed that the Museum would receive a higher price per share than specified if anyone buying at least 10 percent of the stock paid a higher price for those shares. This provision effectuated the Museum's requirement of price protection for the sale of its Getty shares, should Pennzoil or the company pay another shareholder a higher price. Pennzoil's president acknowledged that Pennzoil was bound to the "top up" clause in the Memorandum of Agreement, which was signed by Pennzoil and the Museum, and which Pennzoil alleges became a binding contract upon its approval, with a higher price term, by the Getty board on January 3. Though no "top up" clause appeared in the first draft of the transaction agreement, such provisions were contained in subsequent drafts. The evidence as a whole does not support Texaco's contention that the parties did not reach agreement on price protection for the Museum, or that it remained a significant open issue.

■ Next, Texaco argues that the parties never resolved a number of questions relating to the payment of Getty's first quarter dividend and to the $5 stub that was to be part of the consideration for the Getty Oil shares. The stub represented the minimum payment shareholders were to re-

ceive within 5 years from the excess proceeds from the sale of ERC.

Getty's outside counsel, Winokur, testified that open issues remained on who would control the sale, who would guarantee payment of the stub in the event of liquidation, how "net proceeds" would be defined, and what ERC's dividend policy would be under the new ownership. Pennzoil points out that the Copley notes of the board meeting do not show that the Getty Oil board expressed any concern over the mechanics of the ERC sale before it approved the Pennzoil proposal on January 3. Pennzoil's CEO testified that none of the parties ever brought up these matters at all before the agreement was made, and that Pennzoil was never told that resolution of such questions was essential to the agreement. There was evidence that the Getty entities' main concern was the price that shareholders would receive for their shares, and that questions over the exact mechanics of achieving that price were no obstacle to reaching agreement on the transaction.

Nor does the evidence show that Getty's first quarter dividend was an important unresolved issue. There was evidence that Pennzoil did not object to paying the dividend, and that there were customary ways of handling such questions in a merger situation. Pennzoil considered the amount involved insignificant in relation to the magnitude of the entire transaction. The jury was entitled to resolve the contradicting testimony on the significance of these matters and to decide the implications on the question of the parties' intent.

▆ Texaco also asserts, again based on the testimony of its witness Winokur, that the parties never reached agreement on whether the definitive agreement would ensure that once Pennzoil and the Trust acquired control, they could not avoid the commitment to purchase the remaining outstanding public shares.

Pennzoil's witnesses testified that Pennzoil considered itself bound to the terms of the Memorandum of Agreement after the Getty board approved the transaction on January 3. The Memorandum of Agree-

ment was signed by representatives of Pennzoil, the Trust, and the Museum before it was presented to the Getty board. The terms of the Memorandum of Agreement provided for the purchase of all outstanding shares at the same price.

As stated above, there was conflicting evidence on whether the board approved the transaction contemplated by the Memorandum of Agreement with a higher price term, or whether, as Texaco contends, it approved only a price proposal that was to form the basis for further negotiations. The press release issued the morning after the board meeting listed essentially the same terms as the Memorandum of Agreement, with the exception of price per share, in describing the transaction agreed upon in principle by the parties. All selling shareholders were to receive the same price. There was evidence that the board was concerned chiefly with the price per shares it could achieve for all the shareholders of Getty, and not with the mechanics of the transaction.

There was sufficient evidence for the jury to believe that the board approved more than just a price proposal, i.e., the Memorandum of Agreement terms modified by a higher price term. The jury could reasonably infer that, by those terms, Pennzoil and the Trust had agreed to pay the same price for all outstanding shares. There was very little evidence, other than Winokur's conjecture, that Pennzoil sought any "out" to its obligations under the agreement conflicting with the interests expressed by Getty.

▆ Finally, Texaco contends that Pennzoil never agreed to honor Getty's employee benefit plans and provide adequate termination provisions.

There was testimony that Pennzoil did not anticipate terminating any employees, because Getty Oil was to continue in existence and would require all its employees under the new ownership of Pennzoil and the Trust. Given that scenario, there was no urgency in including provisions for employee termination benefits in the Memorandum of Agreement, press release, or

transaction agreement drafts, according to Pennzoil's evidence. Pennzoil's CEO testified that, given that there were no plans to fire anyone, there was no necessity to include termination benefits in the agreement, and that it was a "non-problem." Standard provisions on employee benefits were in fact drafted by one of the Getty attorneys and were sent over to Pennzoil's lawyers for incorporation into the transaction agreement.

 There was sufficient evidence for the jury to conclude that the parties had reached agreement on all essential terms of the transaction with only the mechanics and details left to be supplied by the parties' attorneys. Although there may have been many specific items relating to the transaction agreement draft that had yet to be put in final form, there is sufficient evidence to support a conclusion by the jury that the parties did not consider any of Texaco's asserted "open items" significant obstacles precluding an intent to be bound.

The fourth factor that Texaco discusses as showing that the parties did not intend to be bound before executing a formal contract is the magnitude and complexity of the transaction. There is little question that the transaction by which Getty Oil was to be taken private by the Trust and Pennzoil involved an extremely large amount of money. It is unlikely that parties to such a transaction would not have expected a detailed written document, specifically setting out the parties' obligations and the exact mechanics of the transaction, whether it was to be executed before the parties intended to be bound or only to memorialize an agreement already reached.

We agree with Texaco that this factor tends to support its position that the transaction was such that a signed contract would ordinarily be expected before the parties would consider themselves bound. However, we cannot say, as a matter of law, that this factor alone is determinative of the question of the parties' intent.

The trial of this case lasted many weeks, with witnesses for both sides testifying extensively about the events of those first days of January 1984. Eyewitnesses and expert witnesses interpreted and explained various aspects of the negotiations and the alleged agreement, and the jury was repeatedly made aware of the value of Getty Oil's assets and how much money would be involved in the company's sale. There was testimony on how the sale of the company could be structured and on the considerations involved in buying and restructuring, or later liquidating, the company. But there was also testimony that there were companies that in the past had bound themselves to short two-page acquisition agreements involving a lot of money, and Getty's involvement banker testified that the Texaco transaction included "one page back-of-the-envelope kinds of agreements" that were formalized. The Memorandum of Agreement containing the essential terms of the Pennzoil/Getty agreement was only four pages long.

Although the magnitude of the transaction here was such that normally a signed writing would be expected, there was sufficient evidence to support an inference by the jury that that expectation was satisfied here initially by the Memorandum of Agreement, signed by a majority of shareholders of Getty Oil and approved by the board with a higher price, and by the transaction agreement in progress that had been intended to memorialize the agreement previously reached.

 The record as a whole demonstrates that there was legally and factually sufficient evidence to support the jury's finding in Special Issue No. 1 that the Trust, the Museum, and the Company intended to bind themselves to an agreement with Pennzoil at the end of the Getty Oil board meeting on January 3, 1984. Point of Error 46 is overruled.

 Texaco next claims that even if the parties intended to bind themselves before a definitive document was signed, no binding contract could result because the terms that they intended to include in their agreement were too vague and incomplete to be enforceable as a matter of law. Texaco attacks the terms, found by the jury, of the alleged agreement as being so uncertain as

to render the alleged contract fatally indefinite.

Where a question of the parties' intent is determinable by written agreement, the question is one of law for the court. *Marinas of the Future, Inc. v. City of New York*, 87 A.D.2d 270, 450 N.Y.S.2d 839, 844 (App.Div.1982). As discussed above, however, the parties' intent here is not conclusively discernible from their writings alone; therefore, extrinsic evidence of relevant events is properly considered on the question of that intent. *St. Regis Paper Co. v. Hubbs & Hastings Paper Co.*, 235 N.Y. 30, 138 N.E. 495 (1923). Further, the case at bar is distinguishable from those cited by Texaco that involved writings stating specifically that certain essential terms were "to be agreed upon" in the future. *See, e.g., Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 436 N.Y. S.2d 247, 417 N.E.2d 541 (1981); *Willmott v. Giarraputo*, 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959).

For a contract to be enforceable, the terms of the agreement must be ascertainable to a reasonable degree of certainty. *Candid Productions, Inc. v. International Skating Union*, 530 F.Supp. 1330, 1333 (S.D.N.Y.1982). The question of whether the agreement is sufficiently definite to be enforceable is a difficult one. The facts of the individual case are decisively important. *Mason v. Rose*, 85 F.Supp. 300, 311 (S.D.N. Y.1948), *aff'd*, 176 F.2d 486 (2d Cir.1949). "The agreement need not be so definite that all the possibilities that might occur to a party in bad faith are explicitly provided for, but it must be sufficiently complete so that parties in good faith can find in the agreement words that will fairly define their respective duties and liabilities." *Id.* On review, the agreement must be sufficiently definite for the court to be able to recognize a breach and to fashion a remedy for that breach. *Candid Productions, Inc.*, 530 F.Supp. at 1333–34.

Texaco does not assert that a specific essential term was completely omitted from the agreement, but rather alleges very briefly why the terms of the agreement found by the jury are fatally incomplete. Texaco cites to the lack of description of the mechanics of various aspects of the transaction, e.g., how and when the determined price would be paid to shareholders, how the agreed stock ownership ratio was to be achieved, how a potential tax penalty on Getty's purchasing the Museum shares would be resolved, and what limitations, if any, existed on the option granted to Pennzoil to buy 8 million shares of Getty Oil stock.

Texaco's attempts to create additional "essential" terms from the mechanics of implementing the agreement's existing provisions are unpersuasive. The terms of the agreement found by the jury are supported by the evidence, and the promises of the parties are clear enough for a court to recognize a breach and to determine the damages resulting from that breach. Point of Error 47 is overruled.

## SPECIAL ISSUE NO. 2

Texaco's next points of error concern the jury's finding in Special Issue No. 2 that Texaco knowingly interfered with the agreement, if so found, between Pennzoil and the Getty entities. Texaco contends that the evidence is legally and factually insufficient to show that Texaco had actual knowledge of any agreement, that it actively induced breach of the alleged contract, and that the alleged contract was valid and capable of being interfered with.

First, Texaco asserts that Pennzoil failed to prove that Texaco had actual knowledge that a contract existed.

New York law requires knowledge by a defendant of the existence of contractual rights as an element of the tort of inducing a breach of that contract. *Hornstein v. Podwitz*, 254 N.Y. 443, 173 N.E. 674 (1930). However, the defendant need not have full knowledge of all the detailed terms of the contract. *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980); *Gold Medal Farms, Inc. v. Rutland County Co-operative Creamery, Inc.*, 10 A.D.2d 584, 9 A.D.2d 473, 195 N.Y.S.2d 179, 185 (App.Div.1959).

There is even some indication that a defendant need not have an accurate understanding of the exact legal significance of the facts giving rise to a contractual duty, but rather may be liable if he knows those facts, but is mistaken about whether they constitute a contract. *Restatement (Second) of Torts* § 766, comment i (1977); *see Entertainment Events, Inc. v. Metro-Goldwyn-Mayer Inc.*, No. 74 Civ. 2959, slip op. at 15 (S.D.N.Y., May 31, 1978).

For example, the commentary to the Restatement (Second) of Torts describes the knowledge requirement as follows:

> *Actor's knowledge of other's contract.* To be subject to liability ... the actor must have knowledge of the contract with which he is interfering.... [I]t is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty ... If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and believes that the agreement is not legally binding....

Sec. 766, comment i. New York's highest court has followed the principles and precepts embodied in the Restatement in this developing area of tort law. *See, e.g., Guard-Life Corp.*, 50 N.Y.2d 183, 428 N.Y. S.2d 628, 406 N.E.2d 445.

 The element of knowledge by the defendant is a question of fact, and proof may be predicated on circumstantial evidence. *See American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597 (S.D.N.Y.1971). Since there was no direct evidence of Texaco's knowledge of a contract in this case, the question is whether there was legally and factually sufficient circumstantial evidence from which the trier of fact reasonably could have inferred knowledge.

Texaco argues that the writings known to Texaco and the verbal assurances it was given are matters of undisputed fact that do not add up to actual knowledge of a binding contract. It states that the only written evidence known to Texaco was the Memorandum of Agreement, the January 4 press release, and the January 2 "Dear Hugh" letter from Gordon Getty to Hugh Liedtke, Pennzoil's CEO. Texaco contends that these writings confirm the absence of a binding agreement.

First, it argues that the only reasonable conclusion that Texaco could draw from inconsistencies in the Memorandum of Agreement and the subsequent press release was that there was no binding agreement. Texaco points out that the Memorandum of Agreement provides for Pennzoil to amend its tender offer, but the press release states that Pennzoil was to withdraw the tender offer. The Memorandum of Agreement contains a price of $110 per share, whereas the press release states a price of $110 plus a $5 stub. Finally, Texaco argues that the failure of the press release to report who would buy the Museum shares was inconsistent with the Memorandum of Agreement's provision for Getty Oil's purchase of those shares.

Pennzoil responds that a comparison of the Memorandum of Agreement with the press release compels the conclusion that the Memorandum of Agreement was approved by the Getty Oil board with a price increment. We disagree that either of the parties' interpretations is the only possible interpretation of these two writings. Where different inferences may reasonably be drawn from the evidence, the question is one for the jury. *LeMaster v. Fort Worth Transit Co.*, 138 Tex. 512, 160 S.W.2d 224.

 Based on the other evidence at trial, different inferences could have been drawn from the fact that the press release did not state exactly the same information contained in the Memorandum of Agreement. One of Getty's lawyers testified that the Memorandum was phrased in such a way as to be "the last word," binding on Getty Oil. Before it was ever presented to the board, the Memorandum of Agreement had been signed by Pennzoil and representatives of the Trust and the Museum, who together owned a majority of the stock of Getty. The Memorandum of Agreement, which was written to become binding upon Getty Oil board approval, was presented to the board, and on the morning after the board meeting, the Getty press release announced that the Getty entities had reached

an agreement in principle with Pennzoil on essentially the same terms as the Memorandum of Agreement, but listed a higher price to be paid per share. The press release appeared on the Dow Jones "broad tape" under the headline "Getty Oil Announces Merger."

Though defense witnesses testified that Texaco was told that the board had completely rejected the Memorandum of Agreement, the jury did not have to believe this testimony and could reasonably have decided that when Texaco compared the two writings, it saw that the Memorandum of Agreement had been approved by the board after a renegotiation of the price and a change in the structure of effectuating the purchase of Getty (amending versus withdrawing the tender offer). Nor is the press release's silence on who would buy the Museum's shares a fatal inconsistency. Silence generally implies consistency rather than contradiction.

■ Texaco also asserts that the fact that the Memorandum of Agreement was expressly subject to board approval, along with the fact that the document's signature line for Getty Oil was blank, were unmistakable signals to Texaco that the Memorandum of Agreement was not a final contract. We agree such an inference could arise.

However, we find that a contrary inference is also reasonable, given the other evidence in this case. The discussion above, pertaining to a comparison of the Memorandum of Agreement with the Getty press release, is also applicable to Texaco's contentions here. There was testimony that the Memorandum of Agreement was written in such a way as to become binding upon board approval. Getty's press release announcing the transaction between Pennzoil and the Getty entities, and outlining basically the Memorandum of Agreement terms, was issued the next morning after the board meeting. Since the price announced in the press release was higher, it was not surprising that Getty Oil, after presumably negotiating that higher price, did not sign the original Memorandum of Agreement, which would have given share-

holders a lower price per share. But the jury could reasonably infer from the Getty announcement of the terms of the agreement in principle reached with Pennzoil, that the terms of the Memorandum of Agreement had been approved by the board with a higher price. It was for the jury to decide what weight to give to the evidence, and where conflicting inferences were possible from the evidence, it was the jury's task to choose between them. *LeMaster*, 138 Tex. 512, 160 S.W.2d 224.

■ Texaco's next contention is that the unambiguous wording of the press release, i.e., the "subject to" and agreement "in principle" language, demonstrated that there was no contract. We disagree that the press release is unambiguous, and our discussion above of the press release's use of the terms: agreement "in principle," and "subject to" a definitive agreement, applies equally here. That language did not in itself preclude the existence of a contract, nor a jury finding of Texaco's knowledge of one.

■ Next, Texaco acknowledges that it was given the "Dear Hugh" letter from Gordon Getty to Pennzoil's CEO along with other writings relevant to the dealings with Pennzoil. But Texaco claims that the Trust's advisors indicated that the letter did not restrict the Trust's freedom to go forward with Texaco. The "Dear Hugh" letter was dated January 2, 1984, and was signed by Gordon Getty as trustee. It stated:

Dear Hugh:

This is to confirm the understanding between us relating to the Plan dated January 2, 1984 that is being presented to the Board of Getty Oil Company today.

Subject only to my fiduciary obligations, I agree that I will support the Plan before the Board and will oppose any alternative proposals or other arrangements submitted to the Board that do not provide for your participation in Getty Oil Company on the same basis as outlined in the Plan.

Subject only to my fiduciary obligations, if the Board does not approve the Plan

today, I will execute a Consent to remove that board and to replace the directors with directors who will support the best interests of the shareholders, as reflected in the Plan.

Subject only to my fiduciary obligations, I will also use my best efforts to urge the J. Paul Getty Museum to execute a Consent to the same effect....

Texaco contends that because the letter contained the reservation that its promises were "subject only to [Gordon Getty's] fiduciary duties," it did not give Texaco notice of any binding contractual relations. There was testimony that the advisors of Gordon Getty and the Trust told Texaco that the Trust was free to deal and that the letter was not an obstacle, because it contained the restrictive "subject only to my fiduciary obligations."

At the very least, the letter reaffirms other evidence that indicated how important the decisions made at the January 2-3 Getty board meeting were to the question of whether there was a contract with Pennzoil, and implies what the likely outcome of the board vote was. The letter was signed by a shareholder who, as trustee, controlled over 40 percent of the company's voting stock. It confirmed an understanding between Pennzoil and the trustee that the latter would not only support the Memorandum of Agreement before the board of Getty Oil and oppose any other proposals that would not include Pennzoil, but that he would also execute a Consent to remove the board and replace the directors if the Pennzoil plan was not approved. Under Delaware law, the holders of a majority of a company's stock could agree in writing to take action binding on the board without formal board approval.

Given the Trust's large ownership percentage in Getty, the jury could reasonably decide that Texaco knew that the "Dear Hugh" letter's promises were not insignificant on whether the Pennzoil proposal had been approved. In late autumn of 1983, the well-publicized dissension between Gordon Getty and members of the Getty Oil board resulted in the Trust and Museum executing a previous Consent, which amended Getty Oil's bylaws to require that all significant board action, including agreements to merge or to sell Getty's assets, had to have the approval of 14 of 16 directors. There was testimony that the company had been a candidate for a takeover struggle even before the Consent, but that that further confirmed and publicized it. Since Gordon Getty had so recently executed a Consent to resolve his difficulties with the Getty board, and specifically his conflicts with Getty CEO Sidney Petersen, a reader of the "Dear Hugh" letter would know that the promise of a Consent was not an idle threat, but rather made Gordon Getty's undertaking to obtain board approval for the Pennzoil plan much more certain.

Texaco acknowledges that the writings it saw relating to a possible agreement with Pennzoil were the Memorandum of Agreement, the press release, and the "Dear Hugh" letter. Based on these documents, it is clear that Getty board approval was a critical element in determining whether the Getty entities had a binding agreement with Pennzoil. Texaco's evidence of its lack of knowledge about what decisions were made at the January 2-3 board meeting must be contrasted with the circumstantial evidence that could have persuaded the jury that Texaco was aware that the Pennzoil proposal had been approved.

Texaco contends that it received repeated verbal assurances, both by principals and representatives of the Getty entities, that there was no binding contract with Pennzoil and that the Getty entities were free to deal with Texaco.

On January 3, one of Getty Oil's investment advisors, Geoffrey Boisi, called Texaco to say that the Getty board would meet that day and to get an expression of interest in Getty's sale. Boisi stated that Getty was seeking bids from potential purchasers other than Pennzoil. Texaco expressed its interest in receiving more information, and Boisi agreed to keep Texaco informed.

Texaco called Boisi back early on the next morning, when the Getty press release was issued and appeared on the Dow

Jones broad tape under the headline "Getty Oil Announces Merger." Boisi had not yet arrived for work when Texaco called, so he returned the call later that morning "as a courtesy" to explain the appearance of the announcement concerning Pennzoil. There was testimony that Texaco expressed heightened interest in Getty's sale. Boisi testified that he told Texaco that the agreement in principle with Pennzoil was subject to execution of a definitive agreement, that no definitive agreement had been signed yet, that there was just a handshake on price with other issues still open, and that there was no binding deal with Pennzoil.

Texaco's chairman, John McKinley, testified that Texaco talked to two investment banking firms that day, First Boston and Morgan Stanley, who wanted to represent Texaco in making a bid for Getty, and that they all knew that the situation was open for bids. Getty's investment bankers called Texaco back on the afternoon of January 4 and told McKinley again that Getty wanted to receive bids and would be pleased to receive a proposal from Texaco.

There was testimony that on January 4 and 5, Getty's CEO, another Getty director, and the Museum's lawyer, all stated to Texaco that there was no deal yet with Pennzoil, that no definitive contract had been signed, that Getty was not bound yet, that open issues remained in the negotiations with Pennzoil, and that Getty and the Museum were free to hear an offer. There was testimony that when Texaco made its offer on the evening of January 5, Gordon Getty and his advisors stated that the Trust also had no binding agreement with Pennzoil. There was also testimony that Texaco was assured again during final negotiations on its definitive agreement, which contained indemnities against any liability to Pennzoil, that the Getty board had rejected the Memorandum of Agreement and that there was no binding contract with Pennzoil.

Texaco asserts that this evidence shows that it made repeated efforts, in the absence of any duty to do so, to determine whether an offer would interfere with any pre-existing contract. Texaco witnesses testified that Texaco was repeatedly told that there was no binding contract with Pennzoil, and it accepted those assurances.

Pennzoil responds that there was legally and factually sufficient evidence to support the jury's finding of knowledge, because the jury could reasonably infer that Texaco knew about the Pennzoil deal from the evidence of (1) how Texaco carefully mapped its strategy to defeat Pennzoil's deal by acting to "stop the train" or "stop the signing"; (2) the notice of a contract given by a January 5 Wall Street Journal article reporting on the Pennzoil agreement—an article that Texaco denied anyone at Texaco had seen; (3) the knowledge of an agreement that would arise from comparing the Memorandum of Agreement with the Getty press release; (4) the demands made by the Museum and the Trust for full indemnity from Texaco against any claims by Pennzoil arising out of the Memorandum of Agreement; and (5) the Museum's demand that, even if the Texaco deal fell through, the Museum would be guaranteed the price Pennzoil had agreed to pay for the Museum's shares. Pennzoil contends that these circumstances indicated Texaco's knowledge of Pennzoil's deal too strongly to be overcome by Texaco's "self-serving verbal protestations at trial" that Texaco was told and believed that there was no agreement.

First, Pennzoil argues that an inference of Texaco's knowledge of its agreement arises from Texaco's carefully mapped strategy to dismantle each component of the Pennzoil deal. Pennzoil speculates that if Texaco had believed that there was no binding contract, it would have simply announced a public tender offer for 100 percent of Getty's shares. But a tender offer would not bring in all of Getty's stock if Pennzoil already had a binding agreement (the signed Memorandum of Agreement, approved by the Getty board with a higher price term) with the Trust and the Museum, who together held a majority of Getty shares. This would mean that Texaco could acquire only the remaining public shares through a tender offer and would be left with a minority interest in Getty Oil. So instead, Pennzoil argues, Texaco devel-

oped a strategy to approach first the Museum, then the Trust, and finally the Getty board, with a higher price than Pennzoil had agreed to pay to persuade them to avoid that deal.

There was evidence that the public announcement of Getty's agreement in principle with Pennzoil had attracted Texaco's attention and prompted it to move quickly. Top executives of Texaco cut short their vacations and returned to New York because of Texaco's interest in Getty, and Texaco assembled its in-house financial planning group on January 4. A series of meetings were held throughout the day to study the Getty situation and Pennzoil's part in it. There were indications that the structure of the Pennzoil plan was examined in detail, and Texaco notes showed calculations on such matters as the price per barrel of Getty oil that Pennzoil would be paying and on Pennzoil's financing of this purchase. Getty's press release was reviewed, and extensive notes were made on "who pays and who gets what" under the Pennzoil plan.

Other Texaco notes admitted into evidence implied that Texaco believed it had "24 hours" to "stop the train" and "take care of Liedtke [Pennzoil's CEO]." Texaco's chairman testified that "the train" probably meant Pennzoil, and that "stop" meant that prompt action was necessary. Texaco recognized that under the Pennzoil plan, if an agreement on restructuring couldn't be reached within one year, Getty's "assets [were] to be divided!" (emphasis in original Texaco note).

There was evidence that Texaco had strong motivation to acquire Getty's extensive oil reserves. Texaco's own proven reserves had been declining steadily, and its recent exploration and development costs had been the highest in the industry. Texaco witnesses explained that the high finding costs were attributable mainly to a recent increase in exploration investment and that over a longer period, its average finding costs were much lower. But there was also evidence that it would be much less expensive for Texaco to buy Getty's large proven reserves than to find such reserves on its own. The purchase of Getty Oil would and did double Texaco's worldwide oil reserves. Texaco knew that under the Pennzoil plan, Getty's valuable reserves were to be divided between the Trust and Pennzoil if that partnership did not work out within one year.

On January 4, Texaco decided that it wanted to pursue its interest in Getty, but also decided that it needed outside advice on strategy and tactics. It retained First Boston, an aggressive investment banking firm that already had contacts with the Museum's counsel, Martin Lipton. On the evening of January 4, a number of strategy meetings were held to discuss how Texaco could best acquire Getty Oil.

There was evidence that Texaco considered Lipton to be a "key person" in its strategy, and that the Museum had to be approached first. Lipton had previously represented Texaco and knew McKinley and Texaco's lawyers and investment bankers. Once Texaco secured the Museum shares, it planned to "talk to Gordon."

Texaco notes indicate that it knew that there would be a "problem to get Gordon on base first." Texaco knew that under the Trust instrument, the trustee was authorized to sell its Getty Oil shares only to avoid a loss. Texaco also knew that Gordon Getty did not want the Trust's shares to be in a minority position at Getty Oil, and Texaco's notes read: "create concern that he [Gordon Getty] will take a loss"; "if there's a tender offer and Gordon doesn't tender, then he could wind up with [worthless] paper"; and finally, "pressure."

Texaco's last step was to get the Getty board's support. Texaco knew that many Getty board members were hostile to Gordon Getty, and Texaco had a report that Getty did not like Pennzoil's price. But Texaco also knew that the board could not take major corporate action, since the Consent, without the agreement of 14 of 16 directors, and some directors owed loyalty to Gordon Getty. It was therefore important to secure the agreement with the Trust and the Museum before Texaco's proposal went to the Getty board.

**802**

We find that an inference could arise that Texaco had some knowledge of Pennzoil's agreement with the Getty entities, given the evidence of Texaco's detailed studies of the Pennzoil plan, its knowledge that some members of the Getty board were not happy with Pennzoil's price, and its subsequent formulation of strategy to "stop the [Pennzoil] train" and "take care of Liedtke."

■ Pennzoil contends that the jury could also draw an inference of Texaco's knowledge of its agreement from the evidence relating to a Wall Street Journal article dated January 5. That article reported on the terms of the Pennzoil/Getty merger and referred to an "agreement" 17 times.

In answer to an interrogatory, Texaco swore that no one working on matters related to Getty Oil or Pennzoil had seen the Wall Street journal article. Pennzoil argues that the jury could have disbelieved this representation that no one at Texaco had read the article, published in a major daily business newspaper, about the company that Texaco wanted to acquire.

This is an acceptable inference, given the evidence. Texaco's president, Alfred De-Crane, testified that he read the Wall Street Journal regularly, but he did not recall whether he read the article about the Getty/Pennzoil agreement on January 5. Getty's investment advisor, Boisi, testified that Texaco's chairman, McKinley, "may have" mentioned the article to him in their conversations. McKinley testified that several people at Texaco took the Wall Street Journal at the office, but that his own copy was delivered to his home. He testified that he did not see the article, and claimed that it was not mentioned at the Texaco board meeting that day, although the status of Pennzoil's negotiations with Getty was discussed by the board. Based on this testimony, the jury could reasonably have believed that the testimony of some of these witnesses was less than truthful, and that someone at Texaco connected with these events had seen the article, and that Texaco thus had further knowledge of the Pennzoil agreement.

■ Finally, Pennzoil points out that certain demands made by the Museum and the Trust also gave Texaco knowledge of their contractual obligations to Pennzoil.

The Museum demanded, as a condition of any sale of its shares to Texaco, full indemnity against any liability to Pennzoil arising from the Memorandum of Agreement. It also refused to give any written representation or warranty that selling its shares to Texaco would not result in a breach of the Memorandum of Agreement. Finally, the Museum insisted that, even if the Texaco purchase of Getty was not consummated, Texaco had to guarantee that the Museum would be paid a minimum price of $112.50 (the present value of Pennzoil's price of $110 plus a $5 stub to be paid within five years) for its shares. Texaco's witnesses testified that these demands were accompanied by assurances that the Museum had no binding contract with Pennzoil, but other evidence showed that the Museum refused to sell its shares unless these conditions were met.

Texaco's president, DeCrane, testified that when he saw the draft of Texaco's definitive agreement, he asked specifically about the indemnity and whether relevant documents had been reviewed. He said that his counsel told him that Texaco's only exposure would be litigation fees. When he asked about the warranty clause, he was told that the Museum's refusal to give a full warranty was consistent with what Texaco had been told about the Museum's position.

Texaco's chairman testified that it was a matter of concern to him that the Museum would not warrant its sale of stock against Pennzoil claims, but that Texaco accepted it that way. McKinley testified that it alerted him to check with his legal advisors, who reassured him. There is no evidence that Texaco received any statement in writing from any of the parties that they were free to deal with Texaco.

The jury could reasonably infer that Texaco was given knowledge of the Pennzoil agreement from this evidence. Though an indemnity does not necessarily imply liabili-

ty, Texaco was confronted here with the parties' specific demands for protection against claims by Pennzoil, with the refusal to warrant that the sale to Texaco would not breach the Memorandum of Agreement, and with the requirement that the Museum be guaranteed the Pennzoil price if Texaco's purchase was not consummated. The evidence showed that the Museum and the Trust considered these conditions essential, and that Texaco knew that they would not sell their shares without such protection.

Finally, Texaco cites *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597, as controlling authority to show that Pennzoil did not prove the required element of knowledge of a contract here. Though many of the facts of that case appear to be similar to the instant one, we find the case at bar to be distinguishable. Pennzoil correctly points out that the question of the defendant's knowledge is one of fact, and the holding in *American Cyanamid* was based on certain findings of fact. One defendant there was held to be not liable because the only information it was found to have possessed showed on its face that there was no binding contract. The plaintiff had contended that certain background negotiations between the parties made an incomplete writing a binding contract, but that defendant was found to have no knowledge of those circumstances.

Here, Texaco presented evidence that it was told repeatedly that Pennzoil had no binding agreement with the Getty interests. But there was other circumstantial evidence, as discussed above, from which the jury could conclude that Texaco did indeed have knowledge of the parties' obligations to Pennzoil.

The jury was not required to accept Texaco's version of events in this case, and this Court may not substitute its own interpretation of the evidence for the decision of the trier of fact. There was legally and factually sufficient evidence to support an inference by the jury that Texaco had the required knowledge of an agreement. Point of Error 49 is overruled.

The second major issue Texaco raises under Special Issue No. 2 is that the evidence was legally and factually insufficient to show that Texaco actively induced breach of the alleged Pennzoil/Getty contract.

A necessary element of the plaintiff's cause of action is a showing that the defendant took an active part in persuading a party to a contract to breach it. *State Enterprises, Inc. v. Southridge Cooperative Section 1, Inc.*, 18 A.D.2d 226, 238 N.Y.S.2d 724 (App.Div.1963). Merely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. *P.P.X. Enterprises, Inc. v. Catala*, 17 A.D.2d 808, 232 N.Y.S.2d 959 (App.Div.1962). It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise. *State Enterprises, Inc.*, 238 N.Y.S.2d at 726; *Cosmopolitan Film Distributors, Inc. v. Feuchtwanger Corp.*, 226 N.Y.S.2d 584, 591 (Sup.Ct.1962). The issue of whether a defendant affirmatively took steps to induce the breach of an existing contract is a question of fact for the jury. *See State Enterprises, Inc.*, 238 N.Y.S.2d at 726.

Texaco contends that it did not actively procure the alleged breach and that the required inducement did not occur. Texaco argues that it merely responded to a campaign of active solicitation by Getty Oil and the Museum, who were dissatisfied by the terms of Pennzoil's offer.

There was testimony that on January 2, Getty's investment advisor, Boisi, was instructed to seek a higher price for Getty's shares than Pennzoil had offered. Early on the morning of January 3, Boisi contacted Texaco's president, DeCrane, among others, to tell him that the Getty Oil board was meeting that day and to get a specific expression of interest in Getty's sale. DeCrane told Boisi that Texaco was interested in more information and to keep him informed.

That afternoon, Boisi told the Getty board of directors that he had been calling

other potential bidders and that some of those contacts had expressed interest in Getty's sale. After the board recessed, Boisi talked with some of the board members in more detail about his conversations and told them he thought that Getty could get more than Pennzoil's $110 per share.

Later in the evening on January 3, despite Boisi's report of other interest in Getty, the board of Getty Oil voted 15 to 1 to accept "the Pennzoil proposal," provided that the price per share be increased to $110 plus a minimum $5 stub. Pennzoil accepted the higher price, and the board was told that Pennzoil had accepted its counter-proposal. Yet, one of Getty's directors testified, for the defendant, that the board's consensus at that time was to encourage the overall bidding process. Petersen, the chairman of Getty, told Boisi to continue to search for a better price.

On January 4 Texaco called Boisi early in the morning. Getty Oil issued its press release that morning, and it appeared on the Dow Jones broad tape under the headline "Getty Oil Announces Merger." Boisi was not in his office yet, but returned the call later that morning to explain the press release. Boisi testified that he told DeCrane that the Getty board had voted on a price with Pennzoil; that no definitive merger contract had been signed yet, so there was no binding agreement; and that open issues remained for negotiation. Boisi testified that Texaco expressed a heightened degree of interest in Getty, and Texaco's witnesses testified that Texaco's interest in Getty increased as Texaco got more information.

As discussed above, Texaco assembled its in-house financial planning group, which worked all day on January 4 to study Getty and the Pennzoil situation and then reported to management. The evidence of Texaco's strong motivation to acquire Getty's reserves, given Texaco's own declining reserves and high finding costs, is also relevant here. There was testimony that in the afternoon of January 4, Texaco decided to pursue its interest in Getty, and it hired First Boston investment bankers to advise it on the most effective strategy to purchase Getty. Meetings with Texaco executives and First Boston advisors continued through the evening.

There was testimony for Texaco that on January 4, other representatives of the Getty entities told Texaco that Getty Oil wanted to receive bids and would be pleased to hear a proposal from Texaco. These representatives included one of Getty's directors, another Getty advisor from its investment bankers Goldman Sachs, and Getty's chairman. There was testimony that Texaco and its advisors were told that there were other potential competitors for Getty and that Texaco should put its "best shot" forward.

The evidence discussed above on Texaco's calculated formulation and implementation of its ideal strategy to acquire Getty is also inconsistent with its contention that it was merely the passive target of Getty's aggressive solicitation campaign and did nothing more than to accept terms that Getty Oil and the Museum had proposed. The evidence showed that Texaco knew it had to act quickly, and that it had "24 hours" to "stop the train." Texaco's strategy was to approach the Museum first, through its "key person" Lipton, to obtain the Museum's shares, and then to "talk to Gordon." It knew that the Trust instrument permitted Gordon Getty to sell the Trust shares only to avoid a loss, and it knew of the trustee's fear of being left in a powerless minority ownership position at Getty Oil. Texaco notes indicated a deliberate strategy to "create concern that he will take a loss"; "if there's a tender offer and Gordon doesn't tender, then he could wind up with paper"; and "pressure." This evidence contradicts the contention that Texaco passively accepted a deal proposed by the other parties.

Texaco then implemented its plan by contacting the Museum's lawyer, Lipton, arranging for a meeting on the evening of January 5 to discuss an offer by Texaco for Getty Oil. Lipton ordered his associate, on her way to join the meeting of attorneys drafting Pennzoil's transaction agreement, to not attend that meeting, because he needed her assistance in the meeting with

Texaco. At the Texaco meeting, Lipton reviewed an outline of points that the Museum wanted covered in any sale of its Getty shares to Texaco; for example, it wanted price protection and an indemnity against any claim brought by Pennzoil. Texaco agreed to the Museum's demands, and the Museum agreed to sell. Lipton testified that though he asked repeatedly about price, the Texaco officers at that time would say only that Texaco's chairman, McKinley, wanted to do the talking about price.

Texaco then contacted the Trust to arrange for a meeting between Texaco's chairman, McKinley, and Gordon Getty, the trustee. There was evidence that the initial meeting did not go well, and Lipton was asked to go over to Gordon Getty's hotel suite to speak with the trustee. Lipton testified that he went over because all the parties wanted to act together, and it was his understanding from Texaco that it wanted the Museum, the Trust, and the company to each "desire" a proposal from Texaco and express that desire. After talking to Gordon Getty, Lipton joined the Texaco people in the lobby and told them that the trustee did want to receive a proposal. When McKinley went back to Gordon Getty's suite, the trustee accepted Texaco's offer before McKinley could even name the price. Texaco initially offered the Getty entities $125 per share, compared to Pennzoil's price of $110 plus a $5 stub (present value $112.50), and eventually paid $128 per share.

Texaco argues that its testimony shows that Getty Oil and the Museum were the real moving forces that eventually led to the Texaco contract. However, we find that there is legally and factually sufficient evidence in the record to support the jury's finding that Texaco actively induced the breach of the Getty entities' agreement with Pennzoil.

▇▇▇▇ Texaco also contends that Getty's shopping for bids constituted a breach of an implied "no-shop" provision of Pennzoil's alleged contract before Texaco ever entered the picture. We reject this contention. It was no defense that Getty was not happy with the Pennzoil price, or might have been dissatisfied with the agreement. *See Gold Medal Farms, Inc.,* 195 N.Y.S.2d at 185. We overrule Points of Error 48 and 50, contending that there was no evidence or factually insufficient evidence to support the jury's finding that Texaco knowingly induced the breach of Pennzoil's agreement.

## VALIDITY OF THE CONTRACT

Texaco's last contention regarding the sufficiency of the evidence is that Pennzoil failed to prove that the alleged contract was valid and enforceable, so there could be no interference. Texaco argues that the alleged contract would have violated SEC Rule 10b–13; that it would have violated state law governing fiduciary duties of directors, controlling stockholders, and trustees; that it would have been unenforceable because of mutual mistake; and that it would have violated the statute of frauds.

Pennzoil responds that because it made a prima facie showing that it had a binding contract, it was Texaco's burden to affirmatively plead and prove any defense that challenged the validity of that contract. Tex.R.Civ.P. 94, 279; *see, e.g., Mabry v. Priester,* 161 Tex. 173, 338 S.W.2d 704 (1960) (illegality); *Durham v. Uvalde Rock Asphalt Co.,* 599 S.W.2d 866, 869 (Tex.Civ. App.—San Antonio 1980, no writ) (mutual mistake); *Mann v. Fender,* 587 S.W.2d 188 (Tex.Civ.App.—Waco 1979, writ ref'd n.r. e.); (statute of frauds). Pennzoil argues that Texaco waived its defenses based on invalidity because it failed to plead some of them and failed to obtain jury findings to support the defenses it did plead.

Rule 94, Texas Rules of Civil Procedure, requires the defendant to plead and prove affirmative defenses such as fraud, estoppel, illegality, statute of frauds, and any other matter constituting an avoidance or affirmative defense. Unless the affirmative defense is established as a matter of law, the burden is also on the defendant to obtain jury findings to establish the necessary elements of its affirmative defense. *See, e.g., Oilwell Division, United States*

*Steel Corp. v. Fryer*, 493 S.W.2d 487, 490 (Tex.1973).

We find that Texaco has waived its claim of mutual mistake, *Durham*, 599 S.W.2d at 869, and insufficiency under the statute of frauds, Tex.R.Civ.P. 94, because these affirmative defenses were not properly alleged in Texaco's amended trial pleadings. In its appellate brief, Texaco alleges generally that a mutual mistake about the possible tax treatment of the Museum's shares would have made the agreement unenforceable. Texaco's amended pleading alleges only a mistake by Pennzoil and Gordon Getty, and not one mutually shared by all the parties. There was also no request for a jury issue on the question of mistake, nor was the statute of frauds asserted in Texaco's operative pleadings. These contentions are waived, and Points of Error 55 and 56 are overruled.

Illegality as an affirmative defense is not limited to contracts prohibited by law, but also includes contracts rendered unenforceable because of some failure to comply with the law. *Mabry*, 161 Tex. at 176., 338 S.W.2d at 706.

Texaco contends that the alleged contract would have been void as violating SEC Rule 10b–13, which provides that once a party has publicly announced a tender offer, the offeror may not buy stock of the target company, except through the tender offer, for as long as the tender offer remains open. 17 C.F.R. § 240.10b–13 (1985). Texaco alleges that any contract made in violation of the rule is void.

Texaco points out that even under Pennzoil's version of the facts, Pennzoil allegedly contracted to buy the Museum's shares immediately and the public shares later at $110 plus a $5 stub per share—a higher price than the $100 tender offer price—at a time when the tender offer was still open. Texaco claims that this constituted a per se violation of the rule, whether or not any shareholder received a special benefit from the purchase occurring outside the tender offer. But Texaco also argues that the Museum did receive a sub-

stantial benefit that the public shareholders did not, in that it was to have received payment for its shares "immediately," which could possibly have been months before the public shareholders would be paid. Texaco contends that this timing difference could have amounted to millions of dollars in interest, and it was exactly this kind of treatment favoring large shareholders that the SEC rule was designed to prevent.

Rule 10b–13 was promulgated to protect the interests of shareholders who have already tendered their shares pursuant to a publicly announced tender offer, by prohibiting the offeror from making purchases outside the tender offer on different terms. *Wellman v. Dickinson*, 475 F.Supp. 783, 833 (S.D.N.Y.1979), *aff'd*, 682 F.2d 355 (2d Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *Heine v. Signal Companies, Inc.*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) par. 95,898 (S.D.N.Y. March 4, 1977). In particular, the rule seeks to prevent outside purchases by the offeror at a different price than that stated in the tender offer. *Wellman*, 475 F.Supp. at 833.

The rule itself provides a mechanism by which an exemption from its coverage can be obtained. In subsection (d), it provides that the rule will not prohibit a transaction if the Commission, upon written request or on its own motion, exempts the transaction as not constituting a manipulative, fraudulent, or deceptive device, act, or practice as comprehended by the purpose of the section. 17 C.F.R. § 10b–13(d). The emphasis is thus on applying the rule to further its stated purposes.

Although Texaco is not a party whom the rule is intended to protect in any way, it complains that Pennzoil's transaction violated the rule, was automatically void for that reason, and therefore could not give rise to an action for tortious interference. The express exemption provision of the rule negates the suggestion that *any* infraction of the rule automatically makes the transaction void. If the transaction is only voidable, Texaco has no standing to assert the rule, and we may not speculate

on whether a proper party would have successfully asserted it.

We disagree with Texaco's contention that it was irrelevant that Pennzoil might have obtained an exemption from the prohibitions of the rule, because it did not. Pennzoil had no control over the timing of Texaco's interference with its agreement with Getty entities. If an exemption had been obtained, the rule would not have prevented the purchase of Getty shares outside the tender offer, and Texaco's argument about the invalidity of the agreement for this reason fails.

With the purpose of rule 10b–13 in mind, we note that the agreement called for the same price to be paid per share for all selling shareholders, and that these terms were announced to the public in the press release and appeared in newspaper articles two weeks before the date Pennzoil would have been able to begin buying any tendered shares under the original $100 tender offer. There was testimony that the Museum, and indeed all parties, insisted that all shareholders were to be treated equally in the Pennzoil transaction, and that the parties all proceeded on this assumption. Pennzoil points out that if the Museum had been paid for its shares before the public shareholders, any benefit that it might have received from having its shares purchased sooner would have been offset by payment of Getty's first quarter dividend to those remaining shareholders. There was testimony that there were customary ways of handling the payment of regular dividends in a merger situation.

In any event, Pennzoil amended its SEC tender offer statement on January 4 to incorporate the information about its agreement with the Getty entities contained in the press release and to state that the tender offer at $100 would be withdrawn upon the execution of the definitive merger contract. Texaco's contention in Point of Error 51 that the alleged contract would have been void under rule 10b–13 is overruled.

Next, Texaco claims that the alleged contract would have violated Delaware state law governing the fiduciary duties of various parties. Texaco contends that agreeing to a contract that provided for the sale of Getty at a "bargain basement" price would have been a breach by Gordon Getty of his fiduciary duty as a controlling shareholder, and also a breach by the Getty Oil directors of their fiduciary duty to Getty stockholders.

Gordon Getty, as trustee, owned approximately 40.2 percent of the shares of Getty Oil. In addition to the fact that this does not constitute legal "control" of the corporation, the record does not support Texaco's implication that Gordon Getty had de facto control of Getty Oil, in spite of the Trust's large ownership percentage. On the contrary, the record evinces Gordon Getty's continual conflicts with the Getty Oil board of directors and management, which acted independently of and sometimes without the knowledge of Gordon Getty.

The jury found, in response to a special issue, that the agreed price was a fair price for the Getty shares. There was evidence that at the January 2 Getty Oil board meeting, the Trust and Museum had both been willing to sell at $110 or above. The Trust and the Museum had received opinions from their investment bankers that $110 plus the minimum $5 stub was a fair price. Prior to that board meeting, there had been discussions of having the company itself propose a self-tender to its shareholders at $110 per share to respond to Pennzoil's $100 tender offer.

█ Though the Getty entities eventually sold to Texaco at a higher price per share than they had agreed to accept from Pennzoil, that fact alone does not prove that selling to Pennzoil would have been a breach of fiduciary duty to the minority shareholders. There was evidence that public minority stockholders, with no direct claim to a company's assets, are primarily interested in the return on their investment, i.e., in realizing a profit from the increase in market value of their shares. Pennzoil's price represented a significant premium over the previous trading price of Getty's shares.

The test of fairness in a merger situation is that a minority shareholder receives the substantial equivalent in value of what he had before. *Sterling v. Mayflower Hotel Corp.*, 33 Del.Ch. 293, 93 A.2d 107, 114 (1952). Thus, the fairness of the price that the public minority shareholders received is not to be judged by the pro rata value of Getty's assets, as Texaco implies, but rather by the value of the shares in the hands of those minority shareholders, who had no direct right to the company's assets. In the two years before the Pennzoil agreement, Getty stock had traded at $83 per share or less, and the jury found that $110 plus the $5 stub was a fair price. Agreeing to sell to Pennzoil at this price did not constitute a breach of fiduciary duty to the minority shareholders.

Finally, Texaco argues that the Getty directors had an obligation to exercise informed business judgment and to maximize Getty Oil's sale value, based on the information available to them. It claims that agreeing to any implied no-shop provision or good faith obligation to complete negotiations with Pennzoil would have breached its duty to get the highest price possible for the Getty Oil shares.

Under Delaware law, the directors of a corporation owe a fiduciary duty of care to the corporation and its shareholders in carrying out their managerial roles. *Smith v. Van Gorkom*, 488 A.2d 858, 872–73 (Del.1985). The business judgment rule is based on a presumption that in making a business decision, the directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. *Id.* at 872. Whether the board's business judgment is an informed one depends on whether the directors informed themselves prior to making a business decision, of all material information reasonably available to them. *Id.* Additionally, if a board takes anti-takeover measures, there is always the suspicion that the board may be acting primarily in its own interests and not in those of the corporation and shareholders. *Revlon v. MacAndrews & Forbes Holding Inc.*, 506 A.2d 173, 180 (Del., 1986). Absent an abuse of discretion, the judgment of directors in making a business decision will be respected by the courts. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984).

The evidence supports the jury finding that the agreed price between Pennzoil and the Getty entities was a fair one. There is also sufficient evidence that the directors were informed on the other aspects of the transaction and exercised their business judgment in approving the Pennzoil proposal. A majority of Getty's shareholders had approved the transaction before it was presented to the board. Getty's investment advisor informed the board that he had been calling other companies and had received some indications of interest, though he had no specifics at that time. In smaller meetings with some individual board members, Texaco's name was mentioned as a possible bidder. When the meeting resumed, the board decided to present a higher price to Pennzoil, which had agreed to go that high if the board came back "firm." The board approved Pennzoil's proposal, provided that the price be raised to $110 plus a $5 stub. The board also voted themselves indemnities and "golden parachutes." Pennzoil accepted and conveyed its acceptance to the board, which then adjourned. One of Pennzoil's lawyers testified that after the meeting, he shook hands with some of the Getty directors, who congratulated him on their deal. Investment advisors for the Trust and Museum gave fairness opinions on the Pennzoil price. Getty itself announced the terms of the transaction in a press release the next morning.

The evidence shows that the board made an informed decision to enter the agreement with Pennzoil. It had notice of other companies' interest, but there is some evidence that the board might have thought it more prudent to commit to a sure thing, rather than to speculate on whether other offers would eventually materialize. Getty's CEO was quoted in Fortune magazine some months later, "it was a bird-in-the-handish situation. We approved the deal but we didn't favor it." Once the agreement was made, Getty could

not evade it, citing fiduciary duty, just because a higher offer came along. *See Smith,* 488 A.2d at 888. Points of Error 52, 53, and 54 are overruled.

## ALLEGED ERRORS IN THE COURT'S CHARGE

Texaco's first 45 points of error complain of the court's jury charge. These 45 points fall into three basic categories: (1) points asserting that the special issues assume a disputed fact; (2) points asserting that the instructions are improperly "personalized" to the parties and evidence; and (3) points asserting that the instructions prejudice Texaco.

Initially, Texaco claims that the trial court erred in improperly commenting on the case to the jury panel ("this is the largest civil case ever filed in Harris County"), in refusing its requested instruction to ameliorate the harm, and alternatively in refusing to grant Texaco's motion for mistrial.

During voir dire, the trial court made the following statements:

> But *this isn't your average civil case. This is the largest civil case ever filed in anyone's knowledge in Harris County.* And you prospective jurors are here to be examined by the attorneys and by myself to see whether you will be the ones who will hear *the largest case ever filed in Harris County.* At this time, I am going to ask the attorneys—

MR. KEETON: Your Honor, may we approach the bench?

(Conference at the bench)

MR. KEETON: Your Honor, on behalf of Texaco, we object to the continued reference of largest case. You will note that the agreed statement has struck that because that has a—

THE COURT: I have not mentioned the amount.

MR. KEETON: I understand, but you said it's the largest case, Your Honor, that's ever been filed in Harris County. That tends, in our view, to give credence to the claim, and we ask the Court to refrain from such statements, if your Honor please, and to adhere to what is stated in the agreed statement, please.

MR. JAMAIL: I don't see that you are prohibited from saying what you want to say. This statement is something different than what you are talking about—

MR. KEETON: We view, Your Honor, that as a comment by the Court that we think is not proper.

THE COURT: I think that's a fair request. I will abide by that.

MR. KEETON: Thank you, Your Honor.

MR. MILLER: We would like also, Your Honor, for—in view of the Court's comments, for the Court to advise the jury that when he says this is the largest case, what he means is that this is a case in which the largest damages are being claimed, and it may or may not be the largest case when the case is over with.

MR. JAMAIL: Your Honor, I object to that.

THE COURT: Mr. Miller, I think that if I do that, it will just throw the spotlight on it. That will bring us right back to the largest case.

MR. MILLER: The only thing we want to be sure is that the jury, the fact that a large number of jurors having been summoned is not because of the size of the case; is because of the length of the case, the length that it is likely to last, and it has nothing to do with the amount of damages.

THE COURT: I am not going to tell them about the amount of damages.

In other words, the amount of the punitive damages. I am merely going to tell them the rest of it which is the length of the case.

MR. MILLER: That's fine. We want our objection but—

MR. KEETON: Well, Your Honor, I want to make a formal motion for mistrial because of the comment that has been made up to now and let's get another panel.

THE COURT: Your motion—your oral motion for mistrial is denied.

A presiding judge is vested with broad discretion in the manner in which he controls the trial of the case. Thus, reversal should not be ordered absent a showing of impropriety, probable prejudice, and the rendition of an improper verdict. *Texas Employers Insurance Association v. Draper*, 658 S.W.2d 202, 209 (Tex.App.—Houston [1st Dist.] 1983, no writ).

■ In the instant case, the remarks were made prior to jury selection. Texaco has failed to show how such remarks prejudiced it in this trial. Consequently, we cannot say that the remarks amounted to such a denial of Texaco's rights as was reasonably calculated to cause and probably did cause rendition of an improper judgment. Tex.R.App.P. 81(b)(1); *see Meat Producers, Inc. v. McFarland*, 476 S.W.2d 406, 414 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.).

■ Further, Texaco's first point is not argued in any of its grouped briefing points, and Texaco cites no authority to support this point. Tex.R.Civ.P. 414(e) (now Tex.R.App.P. 74(f)) requires a party to include such discussion of the authorities as is deemed necessary to make the points complained of clear. Texaco's failure to cite to any authority constitutes a waiver of the point. *O'Dowd v. Johnson*, 666 S.W.2d 619, 620 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

Texaco's first point of error is overruled.

■ In its second point of error, Texaco claims that Special Issue No. 3 (damages) improperly assumes that Texaco "knowingly interfer[ed]" with an agreement, thus suggesting an affirmative answer to Special Issue No. 2.

Special Issue No. 3 asked the jury the following:

What sum of money, if any, do you find from a preponderance of the evidence would compensate Pennzoil for its actual damages, if any, suffered as a direct and natural result of Texaco's knowingly interfering with the agreement between Pennzoil and the Getty entities, if any? Answer in dollars and cents.

Texaco objects to the omission of conditional language after the phrase "knowingly interfering." It contends that as worded, Special Issue No. 3 assumes a disputed fact, i.e., that Texaco "knowingly interfer[ed]" with the agreement between the Getty entities and Pennzoil; this disputed fact was the subject of Special Issue No. 2. At trial, Texaco objected to Special Issue No. 3, in part, on the following ground:

The issue should have the phrase "after interfering, if it did so" because the issue is submitted to the jury without predicate and is otherwise a comment on the weight of the evidence suggesting that Texaco had, in fact, knowingly interfered with the agreement.

Pennzoil responds that the omission of any words of condition, such as "Texaco's knowingly interfering, if you have so found," (as suggested by the court) was inadvertent. The trial judge expressed his desire to include such language; however, when typed, the issue failed to include the requested language, and no objection was apparently lodged until Texaco filed its written objections to the charge on November 14, 1985.

Nonetheless, Pennzoil responds that Special Issue No. 3 does not assume a fact because (1) the "if any" language contained at the end of the sentence modifies the entire phrase "Texaco's knowingly interfering with the agreement between Pennzoil and the Getty entities"; therefore, the *entire phrase* is made conditional; and (2) even if Special Issue No. 3 were construed grammatically as an assumption of the fact of Texaco's interference, the error, if any, was harmless.

It is arguable that the "if any" language used in the issue modifies the entire verbal (gerund) phrase: "Texaco's knowingly interfering with the agreement between Pennzoil and the Getty entities."

In the instant case, the phrase "Texaco's knowingly interfering with the agreement between Pennzoil and the Getty entities" is a gerund phrase. "[I]nterfering" is the gerund used as the object of the preposition "of," which precedes the possessive noun "Texaco's." The final "if any" is a

phrase modifying the *entire* gerund phrase, thereby making conditional the fact of Texaco's "knowingly interfering with the agreement...." We do not agree that Special Issue No. 3 assumes the disputed issue of fact as alleged by Texaco.

Additionally, Tex.R.Civ.P. 277 provides that the court in its charge shall not "comment directly on the weight of the evidence or advise the jury of the effect of their answers." Thus, special issues are to be framed so as to avoid assuming the truth of a material, controverted issue of fact. *Alvarez v. Missouri-Kansas-Texas Railroad Co.,* 683 S.W.2d 375, 377 (Tex.1984). However, even if the wording of a special issue constitutes an implied comment, not every such comment is cause for reversal. *Id.; Mason v. Yellow Cab & Baggage Co.,* 153 Tex. 344, 269 S.W.2d 329, 330 (1954); *Texas Employers Insurance Association v. McKay,* 146 Tex. 569, 210 S.W.2d 147, 149 (1948). To warrant reversal, the comment must be one that "was reasonably calculated to cause and probably did cause rendition of an improper judgment...." Tex.R.App.P. 81(b)(1); *Alvarez,* 683 S.W.2d at 377. To determine whether an alleged error in the charge is reversible, this Court must consider the pleadings, evidence, and the charge in its entirety. *Island Recreational Development Corp. v. Republic of Texas Savings Association,* 710 S.W.2d 551 (Tex.1986).

Reversal is not mandated where under the circumstances of the case, including the charge as a whole, the force of the comment may be so weak that it is either not a comment at all or may be said to be harmless. *Mason,* 269 S.W.2d at 330.

In *Texas Employers Insurance Association v. McKay,* 146 Tex. 569, 210 S.W.2d 147, the court was faced with a similar problem. In *McKay,* the alleged comment consisted of a reference to the plaintiff's "injury," without the qualifying phrase "if any" in a defensive issue. Appellant asserted that the use of "injury" without the conditional "if any" assumed the existence of a disputed fact. The court was "satisfied from the very terms of the charge itself, considered as a whole, that the error

... was not one which ... was reasonably calculated to cause and probably did cause the rendition of an improper judgment.... Tex.R.Civ.P. 434 [ (repealed) (now Tex.R. App.P. 81(b)) ]."

The reviewing court based its holding on the following: (1) the court gave an elaborate preliminary admonition to the jury to answer the issues upon the general instructions and the evidence; (2) the court gave full definitions to guide the jury in its determination of the issues; (3) the court gave separate special issues regarding injuries sustained; and (4) the use of the conditional language "if any" was present 14 separate times in 12 issues and prior to the offending issue. Finally, the court noted that the repetition of "injury, if any" obviously emphasized the undetermined status of the injury question. *See also Alvarez,* 683 S.W.2d at 377 (issue constituted a harmless comment, which was not a proper ground for reversal).

■ As previously noted, in viewing the charge as a whole, the final "if any" conditional language of Special Issue No. 3 reasonably appears to qualify the entire phrase "Texaco's knowingly interfering with the agreement between Pennzoil and the Getty entities." Consequently, the jury could not assume this fact. Additionally, the trial court here, as in *McKay,* gave preliminary instructions to the jury to "consider only the evidence introduced" in arriving at their answers. Also, before the jury ever reached the contested Special Issue No. 3, it was required to answer Special Issue No. 2. Special Issue No. 2, with accompanying instructions, inquired whether Texaco "knowingly interfered with the agreement between Pennzoil and the Getty entities ...?" Unless plaintiff obtained an affirmative answer to Special Issue No. 2, its answer to Special Issue No. 3 was meaningless. Finally, Special Issue No. 4, the charge's other reference to Texaco's conduct, conditioned "Texaco's actions" with the "if any" language. As in *McKay,* every other mention of Texaco's "interference," except for Special Issue No. 3, contained the conditional language, thereby in-

dicating that the court was not assuming that disputed issue of fact.

Special Issue No. 3 could have been better worded. However, as articulated by the Texas Supreme Court, "in an already complicated field like that of special issues, we cannot strain too hard for perfection without ultimate damage to the whole jury system in civil cases." *Alvarez*, 683 S.W.2d at 378 (quoting *Mason*, 269 S.W.2d at 331).

Point of Error No. 2 is overruled.

In Points of Error 3 through 6, Texaco contends that the trial court erred in submitting Special Issue No. 1.

Special Issue No. 1 asked:

Do you find from a preponderance of the evidence that at the end of the Getty Oil board meeting of January 3, 1984, Pennzoil and each of the Getty entities, to wit, the Getty Oil Company, the Sarah C. Getty Trust and the J. Paul Getty Museum, intended to bind themselves to an agreement that included the following terms:

a. all Getty Oil shareholders except Pennzoil and the Sarah C. Getty Trust were to receive $110 per share, plus the right to receive a deferred cash consideration from the sale of ERC Corporation of at least $5 per share within five years;

b. Pennzoil was to own 3/7ths of the stock of Getty Oil and the Sarah C. Getty Trust was to own the remaining 4/7ths of the stock of Getty Oil; and

c. Pennzoil and the Sarah C. Getty Trust were to endeavor in good faith to agree upon a plan for restructuring Getty Oil on or before December 31, 1984, and if they were unable to reach such agreement then they would divide the assets of Getty Oil between them also on a 3/7ths-4/7ths basis.

Answer: "We do" or "We do not."

The accompanying instructions to the Special Issues No. 1 state:

1. An agreement may be oral, it may be written or it may be partly written and partly oral. Where an agreement is fully or partially in writing, the law provides that persons may bind themselves to that agreement even though they do not sign it, where their assent is otherwise indicated.

2. In answering Issue No. 1, you should look to the intent of Pennzoil and the Getty entities as outwardly or objectively demonstrated to each other by their words and deeds. The question is not determined by the parties' secret, inward, or subjective intentions.

3. Persons may intend to be bound to an agreement even though they plan to sign a more formal and detailed document at a later time. On the other hand, parties may intend not to be bound until such a document is signed.

4. There is no legal requirement that parties agree on all the matters incidental to their agreement before they can intend to be bound. Thus, even if certain matters were left for future negotiations, those matters may not have been regarded by Pennzoil and the Getty entities as essential to their agreement, if any, on January 3. On the other hand, you may find that the parties did not intend to be bound until each and every term of their transaction was resolved.

5. Every binding agreement carries with it a duty of good faith performance. If Pennzoil and the Getty entities intended to be bound at the end of the Getty Oil board meeting of January 3, they were obliged to negotiate in good faith the terms of the definitive merger agreement and to carry out the transaction.

6. Modification or discussions to modify an agreement may not defeat or nullify a prior intention to be bound. Parties may always, by mutual consent and understanding, add new provisions spelling out additional terms that were not included in their original agreement.

In Point of Error No. 3, Texaco contends that Special Issue No. 1 improperly assumes that the three listed terms (a–c) constitute the sole essential terms to the alleged "agreement," thereby commenting on the weight of the evidence. Texaco alleges that by its wording, Special Issue No. 1 allowed the jury to return an affirmative answer on the contract element (intent

to be bound) even if there were other terms essential to any of the parties and not yet agreed upon. Additionally, Texaco argues that Special Issue No. 1 should have asked whether the three listed elements were the *only* essential terms to the contract and if not, whether there were other essential terms.

Under New York law, parties are free to enter into a binding contract without "memorializing their agreement in a fully executed document." *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985). This right to contract orally remains although the parties contemplate a formal writing to evidence their agreement; consequently, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution. *Id.; R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984). The intent of the parties determines the time of the contract formation. *Winston*, 777 F.2d at 80.

In determining whether the parties intended to enter a contractual agreement, New York law applies an objective test, looking "to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Brothers Electrical Contractors, Inc. v. Beam Construction Corp.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999, 1001 (1977). Several factors are relied upon when ascertaining intent:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract usually committed to writing.

*Winston*, 777 F.2d at 80.

In the instant case, the question of whether the parties had agreed to all the essential terms is one of the factors considered in determining the controlling issue, submitted by Special Issue No. 1, i.e., whether the parties intended to be bound to their agreement at the conclusion of the January 3, 1984 board meeting. Texaco's argument erroneously focuses on the three listed elements and dismisses the fact that as worded, Special Issue No. 1 presents a broad submission of that controlling issue of the case.

By its argument, Texaco ignores the fact that Tex.R.Civ.P. 277, as amended in 1973, authorizes the trial court, in its discretion, to submit controlling issues broadly. *Island Recreational Development Corp.*, 710 S.W.2d at 554; *Lemos v. Montez*, 680 S.W.2d 798, 801 (Tex.1984). The trial court is not required to submit each fact question separately and distinctly. *Alvarez*, 683 S.W.2d at 377.

Issues that are merely evidentiary should not be submitted. Making the distinction between evidentiary and controlling issues rests within the discretion of the court and will not be disturbed on appeal, unless there is a showing of probable harm. *Stalder v. Bowen*, 373 S.W.2d 824, 828 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r. e.).

Additionally, Tex.R.Civ.P. 277 states in pertinent part:

> It shall be discretionary with the Court whether to submit separate questions with respect to each element of a case or to submit issues broadly. It shall not be objectionable that a question is general or includes a combination of elements or issues.

In Special Issue No. 1, the jury was asked a controlling question in the case—whether Pennzoil and the Getty entities had an intent to be bound. By its broad submission and accompanying explanatory instructions, Special Issue No. 1 required the jury to determine that all elements essential to the agreement had been resolved, including the three listed elements, before the jury could answer affirmatively.

The trial court did not err in submitting Special Issue No. 1 broadly, as is authorized by Tex.R.Civ.P. 277.

In Points of Error 4 through 6, Texaco argues that the assumption established in Special Issue No. 1, that the three listed elements constitute the sole elements to

the contract formation, is aggravated by the use of the word "agreement" in a manner that signals that an "agreement" is less than a "binding contract." Consequently, Texaco requested: (1) that the word "agreement" be defined as "a legally binding agreement consisting of a meeting of the minds of the agreeing parties to all essential terms and conditions and to which agreement the parties then intend to be bound," and (2) that the word "contract" be substituted for "agreement" and defined as "a legally binding agreement consisting of a meeting of the minds of the contracting parties to all essential terms and conditions and to which agreement the parties then intend to be bound." These requests were refused and objections to their omission were overruled.

Texaco's basic argument is that the court's refusal to substitute "contract" for "agreement" and its refusal to give a "proper legal definition" to "agreement" left the jury with no guidance as to what the words and phrases mean.

Definitions of terms used in a charge are proper when they would aid the jurors. Since jurors are presumed to have average intelligence, the court is not required to convert the charge into a dictionary. *Texas Employers Insurance Association v. Hamor*, 97 S.W.2d 1041, 1041 (Tex.Civ.App.—Amarillo 1936, no writ). Ordinary words used in their common meaning need not be defined. *West Texas State Bank v. Tri-Service Drilling Co.*, 339 S.W.2d 249, 256 (Tex.Civ.App.—Eastland 1960, writ ref'd n.r.e.).

█ In the instant case, the accompanying instructions present the applicable New York law regarding contract formation. Additionally, the word "agreement" was before the jury as an ordinary word, used in its ordinary meaning, pursuant to the trial court's charge:

> When words are used in this Charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition which you are bound to accept in place of any other definition or meaning.

Consequently, no definition for the word "agreement" was necessary. *Mann v. Fender*, 587 S.W.2d 188, 199 (Tex.Civ.App.—Waco 1979, writ ref'd n.r.e.) ("oral agreement" was not used in any special issue in a particular legal sense); *West Texas State Bank*, 339 S.W.2d at 256 ("approve" and "agree" are words of common usage).

█ Additionally, Texaco's objection to the use of "agreement" on the grounds that it allowed the jury "to find such an agreement, without finding a binding agreement" was properly overruled, as was its requested definitions of "agreement" and alternatively, "contract," as "legally binding agreement[s]." Whether an agreement is legally enforceable or binding is a question of law; therefore, the jury may not be called upon to construe the legal effect of an instrument. *Trinity University Insurance Co. v. Ponsford Brothers*, 423 S.W.2d 571, 575 (Tex.1968); *Wirtz v. Orr*, 533 S.W.2d 468, 471 (Tex.Civ.App.—Eastland 1976, writ ref'd n.r.e.).

The trial court is afforded considerable discretion in determining what issues and instructions are proper in submitting its charge. Tex.R.Civ.P. 277; *Members Mutual Insurance Co. v. Muckelroy*, 523 S.W.2d 77, 83 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). Generally, the trial court should submit appropriate instructions, when requested. However, the failure to do so is not reversible error per se. Tex.R.Civ.P. 277; *Island Recreational Development Corp.*, 710 S.W.2d at 555.

█ Special Issue No. 1 properly submitted the controlling issue of "intent to be bound." When the totality of the case is considered, we find no reversible error. See *Island Recreational Development Corp.*, 710 S.W.2d at 555. Texaco's Points of Error 3 through 6 are overruled.

In its next four points of error (7 through 10) Texaco claims that Special Issue No. I (intent to be bound) and Instruction No. I improperly emphasize Pennzoil's "Contract" theory. The specific points read as follows:

**Point of Error No. 7:**
The trial court erred in refusing Texaco's Requested Special Issue No. 100 (intent

to be bound) and instead submitting Special Issue No. 1, since Texaco's requested special issue was the proper inquiry.

**Point of Error No. 8:**

The trial court erred in refusing Texaco's Requested Special Issue No. 101–D (intent to be bound without approval of a definite merger agreement) and instead submitting Special Issue No. 1, since Texaco's requested special issue was the proper inquiry.

**Point of Error No. 9:**

The trial court erred in overruling Texaco's objection to Special Issue No. 1, and in denying Texaco's motions for judgment and judgment n.o.v., because Special Issue No. 1 fails to inquire as to the existence of a present intention to be bound.

**Point of Error No. 10:**

The trial court erred in submitting Instruction No. 1 to Special Issue No. 1 (agreement may be oral or written) over Texaco's timely objection that the instruction improperly suggests that the parties to the alleged agreement did not intend to insist upon a written contract before being bound, directly commenting on the weight of the evidence.

In points of error 7 and 8, Texaco contends that the trial court erred in refusing its Requested Special Issues Nos. 100 and 101–D, which it argues were the "proper" issues. Requested Special Issues No. 100 and 101–A asked:

**Special Issue No. 100**

Do you find from a preponderance of the evidence that the Getty Oil Company, the Museum, the Trust, and Pennzoil at the end of the Getty Oil Company Board of Director's meeting on January 3, 1984, each intended to be bound to a contract without all the parties executing a written definitive merger agreement?

Answer "Yes" for each entity below which did intend to be bound without an executed definitive merger agreement. Otherwise, answer "No."

Getty Oil Company: _____
The Museum: _____

The Trust: _____
Pennzoil: _____

**Special Issue No. 101–A**

Do you find from a preponderance of the evidence that a written definitive Merger Agreement was submitted to the Getty Oil Company Board of Directors on or before January 3, 1984?

Answer "Yes" or "No." _____

Pennzoil points out that Texaco has failed to brief these points of error. Texaco has filed a cross-reference with this Court in which it asserts that Points 7–8 are argued at pages 17–19, and 23–24 of its brief. However, our reading of these pages negates its contention.

■ Points of error that are not supported by argument and authorities are waived. Tex.R.App.P. 74(f); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 934 (Tex.1983); *O'Dowd v. Johnson*, 666 S.W.2d 619, 620 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Having failed to brief points 7–8, Texaco has waived any allegation of error, but in the interest of judicial economy we will consider its argument.

■ In determining whether alleged error in the jury charge is reversible, this Court must consider the pleadings, the evidence, and the charge in its entirety. Error is reversible only if, "when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment." *Island Recreational Development Corp.*, 710 S.W.2d at 555; Tex.R.App.P. 81(b)(1).

In the instant case, the controlling issue of intent to be bound was broadly submitted in Special Issue No. 1. Instruction No. 3 states:

Persons may intend to be bound to an agreement even though they plan to sign a more formal and detailed document at a later time. On the other hand, parties may intend not to be bound until such a document is signed.

Under Texas law, the trial court has considerable discretion in deciding which issues are proper. Tex.R.Civ.P. 277; *Members Mutual Insurance Co.*, 523 S.W.2d at 83. Pursuant to rule 277, where the broad form of submission is adopted, as here, "the extent of the jury's consideration of the elements comprising the controlling issue becomes a matter of evidence and argument, subject to appropriate instruction of the court." *Members Mutual Insurance Co.*, 523 S.W.2d at 82.

Texaco's requested issues consist of evidentiary elements that are subsumed within the controlling issue submitted, Special Issue No. 1, "intent to be bound." Whether the parties intended to be bound without executing a definitive agreement and whether a definitive agreement was submitted to be board on January 3 are factors to be considered in determining intent. *See Winston*, 777 F.2d at 80.

The court here elected to submit broadly the controlling issue of "intent to be bound." Consequently, all of the elements comprising "intent to be bound," including those requested above, were a matter of evidence and argument, subject to the appropriate instructions given here, e.g., Instruction No. 3. *See Members Mutual Insurance Co.*, 523 S.W.2d at 82.

In light of the totality of the circumstances, the denial of the requested issues did not amount to a denial of Texaco's rights as was reasonably calculated to cause the rendition of an improper judgment. *See Island Recreational Development Corp.*, 710 S.W.2d at 555. Points of Error 7 and 8 are overruled.

Texaco argues in Point of Error No. 9 that the phrase "intended to bind themselves to an agreement," contained in Special Issue No. 1, is ambiguous. Consequently, it allowed the jury to return an affirmative answer even if it found an "agreement to agree," which is unenforceable under New York law. Specifically, Texaco contends that Special Issue No. 1 fails to establish a definite time frame as to *when* the parties, Pennzoil and the Getty entities, would be bound.

Special Issue No. 1 asks, in pertinent part:

Do you find from a preponderance of the evidence that *at the end of the Getty Oil board meeting of January 3, 1984*, Pennzoil and each of the Getty entities, to wit, the Getty Oil Company, the Sarah C. Getty Trust and the J. Paul Getty Museum, *intended to bind* themselves to an agreement that included the following terms.... (Emphasis added.)

Texaco's argument is without merit because it fails to consider the fact that the phrase, "at the end of the Getty Oil Board meeting of January 3, 1984," clearly establishes the "time frame" of *when* the parties intended to bind themselves, i.e., the intent to be bound was established at the end of the board meeting on January 3, 1984.

Additionally, Instruction Nos. 3–5 focus the jury's attention on the time frame in question, the end of the January 3, 1984 meeting. These instructions read as follows:

3. Persons may intend to be bound to an agreement even though they plan to sign a more formal and detailed document *at a later time.* On the other hand, parties *may intend not to be bound until such a document is signed.*

4. There is no legal requirement that parties agree on all the matters incidental to their agreement before they can intend to be bound. Thus, even if certain matters were left for future negotiations, those matters may not have been regarded by Pennzoil and the Getty entities as essential to *their agreement, if any, on January 3.* On the other hand, you may find that the parties *did not intend to be bound until each and every term of their transaction was resolved.*

5. Every binding agreement carries with it a duty of good faith performance. If Pennzoil and the Getty entities intended to be bound *at the end of the Getty Oil board meeting of January 3,* they were obliged to negotiate in good faith the terms of the definite merger agreement and to carry out the transaction. (Emphasis added.)

In its 10th point of error, Texaco contends that the defects in Special Issue No.

1 are aggravated by the following Instruction No. 1:

### Instruction No. 1

An agreement may be oral, it may be written or it may be partly written and partly oral. Where an agreement is fully or partially in writing, the law provides that persons may bind themselves to that agreement even though they do not sign it, where their assent is otherwise indicated.

Texaco argues that the instruction suggests that the parties did not intend to insist upon a written contract prior to being bound, and therefore, it is a direct comment on the weight of the evidence, i.e., that the parties intended to be bound on January 3, 1984, although they had no written agreement.

Tex.R.Civ.P. 277 provides in pertinent part:

In submitting the case, the court shall submit such explanatory instructions and definitions as shall be proper to enable the jury to render a verdict.

\* \* \* \* \* \*

... [T]he court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers where it is properly a part of an explanatory instruction or definition.

While the trial court may not comment on the weight of the evidence, "it may incidentally comment where the comment is necessary or proper as part of an explanatory instruction or definition." *Mader v. Aetna Casualty & Surety Co.*, 683 S.W.2d 731, 733 (Tex.App.—Corpus Christi 1984, no writ). Trial courts have considerable discretion in deciding which instructions are necessary and proper. *Johnson v. Whitehurst*, 652 S.W.2d 441, 449 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). However, an improper comment on the weight of the evidence occurs in either an instruction or an issue when the trial court indicates an opinion about the accuracy of the facts in inquiry. *Armes v. Campbell*,

603 S.W.2d 249, 251 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.).

In the instant case, we find is nothing in the language of Instruction No. 1 that suggests the court's opinion on whether the parties did or did not intend to be bound at the end of the January 3, 1984 meeting. Instruction No. 1 instructs the jury about the applicable law. *See Winston*, 777 F.2d at 80. However, even if an incidental comment were implied, such comment was permissible pursuant to Tex.R. Civ.P. 277. When the totality of the case is considered, i.e., the pleadings, evidence, and the charge in its entirety (particularly the remaining instructions given in connection with Special Issue No. 1), there is no reversible error.

Texaco's 9th and 10th points of error are overruled.

In its 11th, 12th, and 13th points of error, Texaco claims that Instruction No. 2 to Special Issue No. 1 (intent to be bound) improperly instructs the jury that they "should" consider only Pennzoil's evidence.

The points of error follow:

**Point of Error No. 11:**

The trial court erred in submitting Instruction No. 2 to Special Issue No. 1 (parties' intent should be determined from their words and deeds manifested to each other) over Texaco's timely objection that the instruction improperly limits the jury's consideration to those items, directly commenting on the weight of the evidence.

**Point of Error No. 12:**

The trial court erred in refusing Texaco's request for, and overruling Texaco's objection to the omission of, Texaco's Requested Instruction D (factors relevant to intention to be bound) because the instruction correctly states the law and is proper.

**Point of Error No. 13:**

The trial court erred in overruling Texaco's objection to Instruction No. 2 to Special Issue No. 1 (intent to be bound) and denying Texaco's Requested Instruction A (determine intent from words, deeds, *and* circumstances).

Texaco contends that Instruction No. 2 to Special Issue No. 1 is legally flawed because it mandates, through the use of the word "should" and the phrase "to each other," that the jury limit its consideration to evidence favorable to Pennzoil. Instruction No. 2 states:

> In answering Issue No. 1, you *should* look to the intent of Pennzoil and the Getty entities as outwardly or objectively demonstrated *to each other* by their words and deeds. The question is not determined by the parties' secret, inward, or subjective intentions.

(Emphasis added.)

*Webster's New Collegiate Dictionary* defines "should" (as used in this instruction) as expressing an obligation, propriety, or expediency.

In the instant case, the term "should" instructs the jury that it is "obliged" or "compelled" to look to the intent of Pennzoil and the Getty entities as manifested by their words and deeds to each other. Texaco asserts that the court erroneously included words of limitations, "to each other," which mandate the jury's consideration of manifestations of intent between the parties only, and preclude the consideration of manifestations of intent to other parties such, as (1) a rule 14D–1 filing with the SEC, and (2) certain post-board meeting conversations between Getty and Texaco on January 4–6, 1984.

While the instruction limits the jury's consideration of evidence to manifestations of intent made "to each other," thereby excluding evidence of meetings between only Texaco and Getty, unknown to Pennzoil, the instruction does not preclude the jury from considering the evidence of intent, such as the press releases and the SEC filing, that was made public.

Under New York law, it is well established that the existence of a binding contract is not dependent upon the subjective intent of the parties. *Brown Brothers Electrical Contractors, Inc.*, 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999. Rather, it is the objective manifestations of the intent of the parties, as expressed by words and deeds, that determine whether the parties have actually entered into a contract. *Id.*, 393 N.Y.S.2d at 352, 361 N.E.2d at 1001; *see also Winston*, 777 F.2d at 80; *R.G. Group, Inc.*, 751 F.2d at 74.

"[M]utual assent must be manifested by *one party to the other....*" *Porter v. Commercial-Casualty Insurance Co.*, 292 N.Y. 176, 54 N.E.2d 353, 356 (1944) (emphasis added). The Restatement (Second) of Contracts, § 19(2) states: "The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know *that the other party may infer from his conduct that he assents.*" (Emphasis added.)

The instruction allows the jury to consider all overt, objective manifestations while denying consideration of secret or subjective manifestations. The SEC filing and the press release were outward, objective manifestations; conversations between Texaco and Getty, to which Pennzoil was not a party, were subjective, secret manifestations that were properly precluded from consideration.

Texaco's argument is without merit.

Texaco next contends in Points of Error 12 and 13 that the trial court erred in refusing its request for and in overruling its objection to the omission of Requested Instructions A and D.

The requested instructions state:

### Requested Instruction A

In answering Issue No. 1 you may look to the intent of Pennzoil, the Trust, the Museum and the Getty Oil Company as manifested by their words and deeds and by the existing circumstances.

### Requested Instruction D

You are instructed that, although an oral or unsigned written agreement may be a binding contract if the parties so intend, it is not binding if any party intends to be bound to a contract only if there is a complete written document containing all the terms which have been agreed to and which document has been signed by all the parties. In such instance, none of

the parties will be bound until the signing occurs, even when all the parties have otherwise agreed on all the essential terms of the proposed contract.

Various factors are relevent to the determination of whether or not any of the parties intended to be bound without or prior to execution of a written definitive agreement. No single factor is decisive, but each provides significant guidance. Among the factors you may consider as evidence of intent to be bound only after execution of a written agreement are: (1) whether a party reserved the right to be bound only when a written agreement is signed, either orally during negotiations or in drafts of documents that condition the making of a binding agreement upon execution of the document; (2) whether there were any open issues that remained to be negotiated or settled; (3) whether the contract concerns complex and substantial business matters; and, (4) whether the situation is such that signed written agreements are standard or customary.

Texaco argues that by not including instructions that the jury should consider "all surrounding circumstances," particularly the four listed in Requested Instruction D, the court limited the jury's consideration of all relevant evidence and focused the jury's attention upon evidence favorable to Pennzoil.

It is noted that at trial, Texaco propounded Requested Instruction D, which was refused, and then filed specific objections to the refusal. In both instances, the requested instruction listed the following as one of the four circumstances to be considered: "(3) whether the contract concerns complex and substantial business matters." However, on appeal, Texaco argues that these four factors should have been submitted, but omits the number (3) factor and substitutes the following: "(b) whether there was partial performance indicative of agreement...."

■ Objections made on appeal that do not conform to those made at trial are waived. *Conner v. Bean,* 630 S.W.2d 697, 701 (Tex.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). As Texaco's argument regarding Requested Instruction D does not conform to its objection at trial, it is waived. However, for the reasons previously stated, we will discuss and consider Texaco's complaint.

Tex.R.Civ.P. 277 provides that the trial court "shall submit such explanatory instructions and definitions as shall be proper *to enable the jury to render a verdict....*" Explanatory instructions are the tools that aid the jury in rendering a just and proper verdict, and as such, should be submitted when in the sole discretion of the trial judge, they will help the jury to understand the meaning and effect of the law and the presumption thereby created. *Southern Pacific Transportation Co. v. Garrett,* 611 S.W.2d 670, 674 (Tex.Civ.App.—Corpus Christi 1980, no writ).

■ Under New York law, the intent of the parties is discerned by looking to the parties' words and deeds that constitute objective signs in a given set of circumstances. *See Winston,* 777 F.2d at 80. Restatement (Second) of Contracts § 27 comment C (1981) suggests eight factors that "may be helpful in determining whether a contract has been concluded....":

> The extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations.

These may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." *Id.*

In our case, Texaco chose only four of the suggested eight factors to be submitted

to the jury. Additionally, the four listed in Texaco's requested instruction are not the four often suggested in the case law. (It omitted "partial performance.") Finally, Texaco's requested "by the existing circumstances" language had the potential of allowing the jury erroneously to consider secret, subjective intentions.

Given these considerations and the trial court's broad discretion in submitting instructions, there was no reversible error in the court's denial of Requested Instructions A and D.

Texaco's Points of Error 11, 12, and 13 are overruled.

In its 14th point of error, Texaco argues that Instruction No. 4 to Special Issue No. 1 is misleading, incomplete, and a direct comment on the weight of the evidence. Specifically, it contends that Instruction No. 4: (1) fails to inform the jury that before there can be a contract, the parties have to agree to all *material* matters; (2) fails to inform the jury that if any element considered by any party is left for future consideration, there is no contract; (3) fails to inform the jury that even if the parties intend to be bound before resolution of "each and every" item, they cannot be bound until there is a resolution of "each and every" *material* item of the agreement; and (4) personalizes the parties, which personalization "nudges" the jury to adopt Pennzoil's position.

Instruction No. 4 states:

There is no legal requirement that parties agree on all the matters incidental to their agreement before they can intend to be bound. Thus, even if certain matters were left for future negotiations, those matters may not have been regarded by Pennzoil and the Getty entities as essential to their agreement, if any, on January 3. On the other hand, you may find that the parties did not intend to be bound until each and every term of their transaction was resolved.

At trial, Texaco objected as follows:

Instruction No. 4 is a direct comment on the weight of the evidence and is there-fore improper because it personalizes the instruction to the party's case and thereby unduly emphasizes evidence favorable to Pennzoil.

■■■ We first note that Texaco's argument on appeal is different from its trial objection. As noted previously, it is well-settled that a party is confined to the objection made at trial and that he will not be allowed to enlarge his complaint on appeal. Tex.R.Civ.P. 274; *Perez v. Baker Packers*, 694 S.W.2d 138, 141–42 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Conner*, 630 S.W.2d at 701. Consequently, Texaco has waived all allegations of error regarding Instruction No. 4, except for the complaint of "personalization."

■■■ Texaco contends that Special Issue No. 1 fails to inquire whether there was agreement on all *material* issues and that Instruction No. 4 fails to tell the jury that there must be agreement on all *material* terms and that the parties cannot be bound until resolution of each *material* item. New York law does not contemplate such a specific formalistic rule:

Under the Uniform Commercial Code [2–204(3)], if the parties have intended to contract, and if an appropriate remedy may be fashioned, a contract for sale does not fail for indefiniteness if terms, even important terms, are left open ... It is no longer true that dispute over *material* terms inevitably prevents formation of a binding contract. What is true ... is that when a dispute over *material* terms manifests a lack of intention to contract, no contract results.

*J. Baranello & Sons v. Hausmann Industries, Inc.*, 571 F.Supp. 333, 340–41 (E.D.N.Y.1983) (emphasis added); *see also* Restatement (Second) of Contracts § 33 comment A ("[T]he actions of the parties may show conclusively that they intended to conclude a binding agreement even though one or more terms are missing or are left to be agreed upon."); *Kleinschmidt Division of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 395 N.Y.S.2d 151, 152, 363 N.E.2d 701,

702 (1977) ("A contract for sale does not fail for indefiniteness if terms, even important terms, are left open."); *V'Soske v. Barwick*, 404 F.2d 495, 500 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), ("[A]ll terms contemplated ... need not be fixed with complete ... certainty for a contract to have legal efficacy."); *Camrex Contractors v. Reliance Marine Applicators, Inc.*, 579 F.Supp. 1420, 1427 (E.D.N.Y.1984); *Reprosystem, B.V.*, 522 F.Supp. at 1275 ("[W]hile there is no enforceable agreement if the parties have not agreed on the essential terms, ... in New York and across the country a binding contract can be formed despite 'material open issues.' ").

■ Texaco also argues that Instruction No. 4 should have informed the jury that if any matter left for future negotiations was considered essential by any party, there was no contract.

Instruction No. 4 advises the jury that a contract can exist even though the parties have left certain "incidental" matters for future negotiations. It goes on to say that even if certain matters left for future negotiations, those matters may not have been regarded by the parties as *essential* to their agreement, if any. (Emphasis added.) This implies that essential items could not be left open. The instruction is a correct statement of the law and of the facts that Pennzoil, as plaintiff, had to prove. There is no requirement that the court additionally instruct the jury specifically on the converse, i.e., that a contract does not exist if essential items are left for future negotiations. *Group Life & Health Insurance Co. v. Turner*, 620 S.W.2d 670, 674 (Tex. App.—Dallas 1981, no writ) (no requirement that an affirmative statement be stated negatively). Additionally, the final sentence ("[o]n the other hand, you may find that the parties did not intend to be bound until each and every term of their transaction was resolved") clearly supplies relief to Texaco's objection by advising the jury that the parties here may not have intended to be bound until all terms were resolved.

■ Finally, Texaco contends that Instruction No. 4 "personalizes" the parties, which personalization impermissibly "nudges" the jury to adopt Pennzoil's position that any terms to be negotiated after the January 3, 1984 board meeting were merely "incidental" to the contract. (Again, we note that this is the *only* argument properly preserved on appeal under this point of error). Texaco's complaint here is with the second sentence of Instruction No. 4: "Thus, even if certain matters were left for future negotiations, those matters may not have been regarded by Pennzoil and the Getty entities as essential to their agreement, if any, on January 3."

We note that Texaco cites no authority directly on point that would support its argument that the "personalization" here was improper.

Courts frequently "personalize" or "individualize" the charge so as to make the law contained in the charge applicable to the facts in the case and more easily understood by the jury. *See Herrera v. Balmorhea Feeders, Inc.*, 539 S.W.2d 84, 88 (Tex. Civ.App.—El Paso 1976, writ ref'd n.r.e.). Problems arise when the instruction deviates from "enabl[ing] the jury to render a verdict," Tex.R.Civ.P. 277, to actually misstating the law or misguiding the jury. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87 (Tex.1973). The following cases, cited by Texaco, evidence such improper and impermissible deviations:

1. *Lemos v. Montez*, 680 S.W.2d 798. (The court held that in light of the fact that the supreme court had previously defined "unavoidable accident," an appended definition of the term impermissibly "tilted" or "nudged" the jury thereby commenting on the weight of the evidence.)

2. *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449, 453 (Tex.1978). (It is impermissible to marshal the facts or parties' contentions into an instruction and then to instruct the jury to find for one party if it believed certain facts to be true.)

3. *Owen Development Co. v. Calvert,* 157 Tex. 212, 302 S.W.2d 640, 643 (1957). (An issue, which tied the jury to a 31–day time period, singled out and gave prominence to the testimony of an interested witness.)

4. *McLeroy v. Stocker,* 505 S.W.2d 615, 618 (Tex.Civ.App.—Houston [1st Dist.] 1974, no writ). (An instruction on "unavoidable accident," which appeared on a page preceding the first special issue, was probably considered by the jury as a direction to first consider the question of unavoidable accident, thereby commenting on the weight of the evidence.)

Our case is distinguishable from these cases. Instruction No. 4 is a true statement of the law; it personalizes the law to the parties without misleading the jury. Consequently, we find no error that was reasonably calculated to prejudice Texaco.

Texaco's 14th point of error is overruled.

In its 15th and 31st points of error, Texaco claims that Instruction No. 5 to Special Issue No. 1 (intent to be bound) is a "surplus" instruction that improperly emphasizes Pennzoil's "duty to negotiate" theory.

Instruction No. 5 states:

Every binding agreement carries with it a duty of good faith performance. If Pennzoil and the Getty entities intended to be bound at the end of the Getty Oil board meeting of January 3, they were obliged to negotiate in good faith the terms of the definitive merger agreement and to carry out the transaction.

Texaco objected to Instruction No. 5 as follows:

Instruction No. 5 is an improper instruction because it does not assist the jury in its consideration of its answer to Special Issue No. 1. It is irrelevant to the inquiry posed in Special Issue No. 1 as to whether the parties intended to be bound. Instead, this is merely a judicial comment to negate Texaco's evidence indicating no intention to be bound by virtue of the ongoing negotiations. It assumes a finding of some prior intention

to be bound since only in those circumstances does any obligation to negotiate in good faith arise. No such instruction need or should be given.

Texaco presents four basic arguments: (1) the instruction misstates New York law; (2) it is unnecessary surplusage; (3) it comments on the weight of the evidence because it assumes the existence of a binding contract; and (4) it attempts to avoid New York law that allegedly holds that an agreement in principle, subject to the execution of definitive documents, is not an enforceable contract.

Texaco first argues that Instruction No. 5 is a misstatement of the law because it erroneously converts the post-contractual duty of "good-faith performance" into a pre-contractual duty of "good-faith negotiation." It urges that this instruction abrogates its defense (to the tort of interference with prospective contractual relations) by erasing the distinction between pre-contractual and post-contractual conduct.

Tex.R.Civ.P. 277 provides that the trial court may give such explanatory instructions and definitions as shall be proper to enable the jury to render a verdict. A "proper" instruction is one that assists the jury and is legally correct. *First State Bank & Trust Co. v. George,* 519 S.W.2d 198, 207 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). An instruction that misstates the law or misleads the jury would not meet this standard. *Jackson,* 499 S.W.2d at 90.

Under New York law, there exists a duty of good faith and fair dealing that is read into every contract and requires a party not to act in a manner that defeats the purpose of the agreement. *Candid Productions, Inc.,* 530 F.Supp. at 1334–35. "Where the parties are under a duty to perform that is definite and certain the courts will enforce a duty of good faith, including good faith negotiation, in order that a party not escape from the obligation he has contracted to perform." *Teachers Insurance & Annuity Association of America v. Butler,* 626 F.Supp. 1229,

1231–32 (S.D.N.Y.), *stay granted,* 803 F.2d 61 (2d Cir.1986).

█ In the instant case, the "duty of good faith performance" language contained in Instruction No. 5 is stated to arise *from the parties' agreement.* It is worded clearly, instructing the jury that a duty of good faith performance on the part of the Getty entities and Pennzoil arose post-contractually, i.e., only if the jury found an intent to be bound on January 3. Thus, Instruction No. 5 is not a misstatement of the law.

Texaco next argues that Instruction No. 5 is mere surplusage because nothing in Special Issue No. 1 (intent to be bound) relates to a "good faith duty to negotiate," and consequently, this is the precise type of instruction that has been condemned by the Texas Supreme Court.

While trial courts are authorized to submit instructions that will enable the jury to reach a verdict, they should refuse to submit unnecessary instructions even if they are correct statements. *Samsel v. Diaz,* 659 S.W.2d 143, 144 (Tex.App.—Corpus Christi 1983, no writ); *First State Bank & Trust Co.,* 519 S.W.2d at 207. The submission of unnecessary instructions may be so prejudicial that it requires reversal. *Boaz v. White's Auto Store,* 141 Tex. 366, 172 S.W.2d 481 (1943); *Samsel,* 659 S.W.2d at 145.

█ Instruction No. 5 is a correct statement of the law. It was submitted to aid the jury in answering Special Issue No. 1, which asks whether Getty and Pennzoil intended to be bound to an agreement at the end of the January 3, 1984 meeting. Texaco asserts that because a good faith obligation to perform does not arise unless there is a binding contract, this instruction was unnecessary surplusage.

The cases cited by Texaco are inapposite. In each instance, the court condemned the requested instruction because it deviated from or elaborated upon (1) court-promulgated instructions or (2) standard instructions.

In *Fleishman v. Guadiano,* 651 S.W.2d 730, 731 (Tex.1983), cited by Texaco, the court endorsed its previous instruction, promulgated in *Turner v. General Motors Corp.,* 584 S.W.2d 844 (Tex.1979), and held that a requested additional instruction on "sole cause" would deflect the jury's attention to contributory negligence when it was considering whether a ladder in question was defectively designed.

In *Acord v. General Motors Corp.,* 669 S.W.2d 111, 116 (Tex.1984), the Texas Supreme Court held that although the contested instruction given was a correct statement of the law, it constituted harmful error because it was a direct comment on the weight of the evidence. The *Acord* court indicated that the singling out of the law in such a way as to favor one side constitutes a comment on the weight of the evidence and is harmful error.

In *Lemos,* 680 S.W.2d at 801, the court found that an appended instruction to a previously-approved definition of "unavoidable accident" was wrong. The court indicated that its reversal and remand was based upon (1) the incorrectness of the instruction, and (2) the fact that it impermissibly titled or nudged the jury "one way or the other."

In *First International Bank v. Roper Corp.,* 686 S.W.2d 602, 604 (Tex.1985), a products liability case cited by Texaco, the trial court embellished the standard definition of "producing cause" by adding a definition of "sole cause." The Texas Supreme Court held that the additional instruction, although correct as to the definition of "sole cause," was improper surplusage in this type of case, because it placed undue emphasis on the parents' negligence when the jury was considering the existence of a defect and its relationship to the injurious event.

In our case, Instruction No. 5 to Special Issue No. 1 advises the jury of a post-contractual duty; Special Issue No. 1 inquires into the existence of a contract. Thus, it seems that Instruction No. 5 was unnecessary to enable the jury to determine this

contract element. However, even though the instruction was unnecessary, we find that its inclusion was not so prejudicial as to require reversal. Tex.R.App.P. 81(b)(1).

The "character" of the negotiations between Pennzoil and Getty after the January 3 board meeting is hotly contested by both sides. Pennzoil asserts that the negotiations after January 3 were merely to formalize the implementing details of the contract already reached. Texaco contends that the fact that the parties continued to negotiate after January 3 on allegedly essential issues showed that no binding agreement had been reached.

Instruction No. 4 to Special Issue No. 1 advised the jury that the parties may not have intended to be bound until all negotiations were resolved. On the other hand, Instruction No. 5 advised the jury that the subsequent negotiations may have been exemplary of the parties' post-contractual duty of good faith effort to complete the details of what had been agreed to before. Consequently, the combined effect of Instructions 4 and 5 was to focus the jury upon the controlling issue, whether the parties had an intent to be bound.

■ Texaco further complains that the instruction was a comment on the weight of the evidence, because it assumes the existence of a binding contract and negates Texaco's evidence that the on-going negotiations indicate that there no intention to be bound. By its use of the conditional language, "If Pennzoil and the Getty entities intended to be bound ...," Instruction No. 5 does not assume the existence of any agreement; thus, it is not an improper judicial comment aimed at negating Texaco's evidence.

■ Finally, Texaco contends that Instruction No. 5 was offered for the purpose of neutralizing the January 4, 1984 Getty press release. This contention was not raised at trial. A party may not enlarge on appeal the objections made at trial. *Conner*, 630 S.W.2d at 701.

However, even if this argument had been preserved, it is without merit. Specifically,

Texaco contends that by using the identical "definitive merger agreement" language, in Instruction No. 5, the court neutralized the language, allegedly favorable to Texaco's position, of the press release ("the agreement in principle is subject to execution of a definitive merger agreement").

Throughout the trial, the phrases "definitive merger agreement," "formal agreement," and "definitive agreement" were used repeatedly to refer to the document that would be the final written agreement between the parties. There was some evidence that "definitive merger agreement" could also refer to a formal boilerplate merger document required under Delaware law in all mergers. In its discretion, the court chose to use the phrase "definitive merger agreement" rather than one of the other terms used. We do not find that the use of this term was so prejudicial as to require reversal.

Texaco's Points of Error 15 and 31 are overruled.

In its 16th and 17th points of error, Texaco urges that Instruction No. 6 to Special Issue No. 1 (intent to be bound) improperly assumes the existence of an "agreement" and an "original agreement."

Instruction No. 6 states:

Modifications or discussions to modify an agreement may not defeat or nullify a prior intention to be bound. Parties may always, by mutual consent and understanding, add new provisions spelling out additional terms that were not included in their original agreement.

Texaco objected to Instruction No. 6 at trial as follows:

Instruction No. 6 is a direct comment on the weight of the evidence because it uses the term "do," rather than "may" and it fails to include a balancing instruction to the effect that modifications or discussions to modify may show an intention not to be bound. In this regard the Instruction unduly and unfairly comments on the weight of the evidence and favors Pennzoil's evidence. There is no

need to submit any such issue to aid the jury in their answer to Special No. 1. If Instruction No. 6 is to be given in some form, Texaco requests that the following be added as the last sentence to the instruction: "On the other hand, such modifications or discussions to modify an agreement may show an intent not to be bound."

Texaco first contends that Instruction No. 6 was "surplus" and assumes the existence of an "agreement," thereby directly commenting on the weight of the evidence. It asserts that the trial court should have changed the instruction to include alternative directions that modifications could indicate an intent not to be bound. Specifically, Texaco contends that this instruction signaled the jury that it could find an intent to be bound even though there was on-going discussion regarding the purchase of the Museum shares.

Tex.R.Civ.P. 277 authorizes the court to submit explanatory instructions that are "proper" to enable the jury to reach a verdict. An instruction is "proper" if there is support for it in the evidence or the inferences to be drawn therefrom and if the instruction might aid the jury in answering the issues. *Mejia v. Liberty Mutual Insurance Co.*, 544 S.W.2d 690, 691 (Tex.Civ.App.—Houston [14th Dist.] 1976, no writ).

■ In the instant case, evidence was presented that indicated that following the January 3 meeting, the parties discussed modifying details of the agreement, for example that Pennzoil rather than Getty Oil should would purchase the Museum shares. Consequently, this instruction aided the jury in answering Special Issue No. 1 by explaining the possible significance of the post-January 3 negotiations.

■ Additionally, even if Instruction No. 6 were surplus or unnecessary, its submission was not so prejudicial as to require reversal. To be an improper comment, the court must indicate an opinion as to the verity or accuracy of the facts. *Samsel v.* *Diaz*, 659 S.W.2d at 147. Instruction No. 6 refers to no facts; therefore, it is not a comment on the weight of the evidence. *Id.*

■ Texaco additionally argues in Point of Error 16 that Instruction No. 6 directly comments on the weight of the evidence by assuming the existence of an "agreement." Pennzoil correctly points out that this objection is not the same lodged at trial. As such, it is waived. Tex.R.Civ.P. 274.

Even if Texaco's objection had been properly preserved, its alleged error is without merit. Instruction No. 6 was submitted to aid the jury in determining whether the evidence proved an intent to be bound. The instruction correctly states the significance of post-agreement modifications on the question of the parties' prior intent to be bound, which prior intent was the subject of Special Issue No. 1. Additionally, throughout the remainder of the charge, the term "agreement" was modified with the conditional language "if any" or "if you have so found" numerous times. Consequently, it is unlikely that a juror would believe that the trial court assumed the existence of an agreement in Instruction No. 6. *See Texas Employers Insurance Association v. McKay*, 210 S.W.2d at 148–49.

Additionally, we note that Texaco's requested addition to Instruction No. 6 uses "agreement" in the same manner as now complained of, and that contrary to Texaco's contention, Instruction 6 uses "may" rather than "do."

■ Texaco also argues that because the trial court charged the jury that modifications may not defeat the agreement, it should have charged the jury that "a realization by the parties that modifications have to be made to *material* terms *will* defeat the formation of an 'agreement,'" and that "a realization by the parties that new *material* terms have to be added to which the parties have not agreed, *can* defeat the formation of such an 'agreement.'"

This argument is waived for two reasons: (1) Texaco made no objection at trial on this ground ("[the instruction] fails to include a balancing instruction to the effect that modifications or discussion to modify may show an intent not to be bound"), Tex.R. Civ.P. 274; and (2) Texaco failed to request such explanatory instruction, Tex.R.Civ.P. 279.

Finally, Texaco argues that the trial court erred in denying its requested additional language to Instruction No. 6: "On the other hand, such modifications or discussions to modify an agreement may show an intention not to be bound."

In issuing explanatory instructions, the trial court is given wide discretion to determine the sufficiency of the explanations. *K–Mart Corp. Store No. 7441 v. Trotti,* 677 S.W.2d 632, 636 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). In deciding whether there has been an abuse of discretion, this Court may not substitute its judgment for that of the trial court but must decide only whether the court's action was arbitrary or unreasonable. *Id.*

■ Texaco's requested addition to Instruction No. 6 was not correct. Under New York law, negotiations on new provisions of an agreement do not defeat the agreement. *Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 397 N.Y.S.2d 922, 928, 366 N.E.2d 1279 (1977). Parties may vary the terms of the agreement or add new ones by mutual agreement. "[T]his has *no effect* upon the validity of any contract, formal or informal." Corbin on Contracts, § 30 at 111–12 (1963) (emphasis added). Texaco's requested addition to Instruction No. 6 was properly denied.

Points of Error 16 and 17 are overruled.

■ Texaco next alleges that Instruction No. 1 to Special Issue No. 2 (knowing interference) improperly marshals Pennzoil's evidence on inducement and signals the jury that an "agreement" existed.

Special Issue No. 2 asks:

Do you find from a preponderance of the evidence that Texaco knowingly inter-

fered with the agreement between Pennzoil and the Getty entities, if you have so found?

Answer: "We do" or "We do not."

The accompanying Instruction No. 1 states:

Knowledge of a fact can be shown either by direct evidence of what it knew or what it was told, or by indirect or circumstantial evidence. A fact may be established by indirect or circumstantial evidence when the fact is fairly and reasonably inferred from other facts proven in the case.

*In order to find that Texaco interfered with the agreement, if any, inquired about above, it must be shown by a preponderance of the evidence that Texaco wanted to cause the breach, or to prevent the performance of this agreement, or that Texaco knew that a breach or failure to perform would occur as a result of its actions.* (Emphasis added.)

Texaco complains of the underlined portion of the instruction. Texaco asserts that the use of the demonstrative adjective "this" before "agreement" aggravated the harmful effect of this allegedly improper instruction, because it instructed the jury that the court believed that an enforceable agreement did exist. Texaco's argument regarding the implications of the court's use of "this" is (1) waived (because there was no such objection made at trial, Tex.R. Civ.P. 274), and (2) erroneous, both conceptually and grammatically. In this context, the use of "this" did not instruct the jury that the court believed an enforceable contract did exist. As used, "this" is a demonstrative adjective modifying the noun "agreement." The function of a demonstrative adjective is to "designate" or "point out" something close at hand, near in thought, or something that has just been mentioned.

■ Texaco next argues that Instruction No. 1 constituted a direct comment on the weight of the evidence in that it mar-

shaled the evidence for the jury and individualized the instruction to Texaco's conduct. In support of this argument, Texaco relies exclusively upon *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449 (Tex. 1978), but that case does not support Texaco's contention.

*Gulf Coast* involved an action to recover funds that proved to be uncollectible. The trial court submitted four special instructions in which it recited the duties of a collecting bank, stated the legal effect of certain facts, directed the jury to find for the defendants if it believed certain facts, and asked the jury whether it "found for defendants." The reviewing court stated that it was "not permissible for the trial court to marshal the facts or parties' contentions in an instruction, *and then* instruct the jury to find for one party if they believed certain facts to be true." *Id.* at 453 (emphasis added). Reversal was required, because the court repeatedly instructed the jury that if it found certain facts, then it should find for the defendants. Individualization of the parties was never discussed in that case.

In the instant case, Instruction No. 1 advised the jury of the law and the burden of proof in assessing Special Issue No. 2 (knowledge). Actually, this instruction favored Texaco by informing the jury of Pennzoil's burden of proof, i.e., Pennzoil had to prove, by a preponderance of the evidence, that Texaco's interference was intentional. "The Court, in its charge to the jury, must so present its charge as to make the law contained in the charge applicable to the facts in the case." *Herrera v. Balmorhea Feeders, Inc.*, 539 S.W.2d 84, 88 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.). This is what the trial court did.

Texaco's 18th point of error is overruled.

In Texaco's 19th point of error, it complains that Instruction No. 2 to Special Issue No. 2 (knowing interference) improperly emphasizes Pennzoil's evidence on knowledge of a contract.

Instruction No. 2 to Special Issue No. 2 states:

In order to find that Texaco had knowledge of the agreement, if any, it is not necessary that Texaco had an accurate understanding of the legal significance of the facts which produced the agreement. If Texaco knew the facts that gave rise to the agreement, then it knew of the agreement, even if it did not believe that those facts gave rise to an agreement, and even if it believed that any agreement that did exist violated the law. You may also find that Texaco knew of the agreement, if any, if you find that Texaco intentionally or willfully refused to ascertain the facts or if it exercised bad faith. Texaco is also charged with all the knowledge, if any, of its agents and representatives, whether communicated to each other or not.

At trial, Texaco objected to Instruction No. 2 in pertinent part, as follows:

The first two sentences of Instruction 2 are an incorrect statement of the law. Texaco requests that the following instruction be included in the charge to the jury in lieu of these sentences:

In order to find that Texaco knowingly interfered with the contract between the Getty Oil Company, the Trust, the Museum and Pennzoil, if any, it is necessary that Texaco had actual knowledge of the existence of such a contract. In order to have "actual knowledge" of a contract, a party must know that a contract exists. If a party should have known that a contract exists, he does not have "actual knowledge" of that contract.

The first two sentences of Instruction No. 2 are a direct comment on the weight of the evidence in that they imply that Texaco did not have an accurate understanding of the legal significance of the facts in its possession and that Texaco did know of the existence of the agreement.

Texaco contends that a portion of the second sentence in Instruction No. 2 ("[i]f Texaco knew the facts that gave rise to the agreement, then it knew of the agreement. . . .") is incomplete, misleading,

and a direct comment on the weight of the evidence. It contends that the court should have given a "balanced" instruction "that if there were facts required for a binding contract that were not known to Texaco then Texaco did not have actual knowledge of the contract."

Under New York law, to recover on its claim of tortious interference with contract, Pennzoil had to establish that Texaco had knowledge of the agreement between the Getty entities and Pennzoil. But it was not necessary that Texaco have full knowledge of the detailed terms of the contract, *Gold Medal Farms, Inc.,* 10 A.D.2d 584, 9 A.D.2d 473, 195 N.Y.S.2d 179. The instruction reflects the description of the knowledge requirement articulated in the Restatement (Second) of Torts § 766. The tort of inducing a breach of contract is a developing area of tort law, and New York courts have looked to the Restatement (Second) for guidance in this area. Section 766, comment i, focuses on the knowledge requirement, providing that although the defendant must know the facts giving rise to the contractual duty, it need not necessarily have an accurate understanding of the legal significance of those facts.

In the instant case, the first and second sentences of Instruction No. 2 instructed the jury that in order for Texaco to be liable, Texaco must have had "knowledge" of the facts giving rise to the contract and not necessarily of the legal ramifications of those facts. We find this to be an acceptable instruction on the element of knowledge.

■ Texaco's argument, that the instruction should have been balanced, is without merit. This argument is made for the first time on appeal and is therefore waived. Tex.R.App.P. 274. Even if this argument could be inferred from Texaco's trial objections, it is without merit, because there is no requirement that a negative instruction be given in addition to the affirmative one the trial court gave. Tex.R. Civ.P. 277; *Saint Paul Mercury Indemnity Co. v. Tarver,* 272 S.W.2d 795, 799 (Tex. Civ.App.—Eastland 1954, writ ref'd n.r.e.).

■ Texaco also asserts, for the first time on appeal, that the instruction's use of the article "the" in the phrase "the agreement" in the first two sentences of Instruction No. 2 is a signal to the jury that the court believed there was an agreement.

In the contested first two sentences of Instruction No. 2, the phrase "the agreement" is used four times. The first time it is used, it is conditioned by the phrase "if any." The latter part of the second sentence uses the indefinite phrases "an agreement" and "any agreement." The entire charge states the conditional "the agreement, if any" numerous times. It is unlikely that the jury rendered an improper verdict because the court here failed to qualify "the agreement."

■ Finally, Texaco contends that Instruction No. 2 "nudges" the jury toward favoring Pennzoil by emphasizing the significance of the evidence concerning Texaco's investigation of the contract. Texaco presents no argument on this point. Additionally, as noted by Pennzoil, at trial this "nudges" objection was made to the third sentence of Instruction 2; the substance of the argument presented in point 19 refers to the second sentence of the instruction. In its reply brief, Texaco counters Pennzoil by alleging that this "nudges" trial objection was aimed at the *whole instruction.* However, the trial objection states: "The *third sentence* in Instruction No. 2 'nudges'...." Texaco's argument presents nothing for review. Point of Error 19 is overruled.

■ In its 20th and 21st points of error, Texaco claims that Instruction No. 3 to Special Issue No. 2 (knowing interference) improperly emphasizes Pennzoil's evidence on inducement and virtually directs an affirmative answer to Special Issue No. 2.

Instruction No. 3 to Special Issue No. 2 states:

A party may interfere with an agreement by persuasion [sic] alone, by offering better terms, by giving an indemnity against damage claims to the party or parties

induced to breach, or by any act interfering with the performance of a legal duty arising from the agreement, such as the duty of good faith performance.

Texaco argues that the court erred in submitting Instruction No. 3, because (1) as written in the disjunctive, the court made it possible for the jury to answer Special Issue No. 2 negatively only if it found that Texaco committed none of the actions, and (2) it is "tailored to dovetail" with Pennzoil's evidence supporting inducement by Texaco. Texaco points out that it offered better terms and gave an indemnity; consequently, this instruction is in effect a direction by the court to the jury to return an affirmative answer.

What is missing in Texaco's argument is any allegation that the instruction, listing possible ways of interfering with an agreement, is a misstatement of the law. Indeed, each of the four acts has been identified as constituting tortious interference under New York law: (1) persuasion (*Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445; Restatement (Second) of Torts, § 768, Comment "e" (1979)); (2) offering better terms (*Gold Medal Farms*, 195 N.Y.S.2d at 185); (3) indemnity (*American Law Book Co. v. Edward Thompson Co.*, 41 Misc. 396, 84 N.Y.S. 225, 226 (Sup.Ct.1903)); (4) interference with performance of a legal duty arising from the agreement (*Morris v. Blume*, 55 N.Y.S.2d 196, 199 (Sup.Ct.), *aff'd*, 269 A.D. 832, 56 N.Y.S.2d 414 (App.Div.1945)).

Texaco has failed to cite any authority to suggest the court erred in listing four possible specific acts of tortious interference. The only case cited, *Lemos*, 680 S.W.2d 798, is not supportive. The court there found reversible error in the use of an instruction defining "unavoidable accident," because (1) the instruction was incorrect, and (2) it was appended to an already correct definition as set forth in a prior decision and the *Texas Pattern Jury Charges*. In the instant case, the instruction is a correct statement of the law.

Points of Error 20 and 21 are overruled.

In Points of Error 22, 23, 24, and 25, Texaco claims that Instruction Nos. 4 and 5 to Special Issue No. 2 (knowing interference) improperly emphasize Pennzoil's evidence in response to Texaco defenses, are unnecessary to the issue presented and constitute direct comments on the weight of the evidence.

Instruction No. 4 to Special Issue No. 2 states:

A competitor has no privilege and is not permitted to interfere with the agreements of those with whom it is in competition. Also, a party is not justified in interfering with the agreement of another simply because it is advancing its own business interests.

Texaco objected to Instruction No. 4 on the following grounds:

Instruction No. 4 is an incorrect statement of the law, since a party is fully justified in interfering with an agreement with another party that is voidable or is terminable at will.

Instruction No. 4 is a direct comment on the weight of the evidence in that it unduly emphasizes evidence which may be relevant to Texaco's intent and does so in a negative manner.

Texaco first contends that this instruction seeks "to collapse the pre-contractual and post-contractual New York torts" by forcing the jury to find liability for the post-contractual tort based on proof of a pre-contractual tort, thus depriving Texaco of the defenses it could have asserted to the pre-contractual tort. It also urges that this instruction was obviously unhelpful in answering Special Issue No. 2.

Pennzoil responds that this instruction was essential to "undo any confusion" presented by Texaco's evidence of business competition because "competition" is only a defense to interference with prospective contractual relations.

Instruction No. 4 is a correct statement of the law. A party's status as a competi-

tor does not protect him from the consequences of interference with an *existing* contract. *Guard-Life Corp.*, 428 N.Y.S.2d at 631, 406 N.E.2d at 448; *see also* Restatement (Second) of Contracts § 768(2):

> The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

 Additionally, because the evidence raised the issue of the ramifications of business competition, it was proper to instruct the jury regarding the law in this area. Tex.R.Civ.P. 277. Finally, there were no pleadings seeking relief for interference with a prospective contract, or alleging that the contract was terminable at will; thus the omission of these two exceptions to the general rule was correct.

Instruction No. 5 to Special Issue No. 2 states:

> You may find that Texaco knowingly interfered with the Pennzoil agreement, if any, even though the Getty Oil directors, the Museum's President, and Gordon P. Getty, Trustee, were fiduciaries. If those fiduciaries intended to be bound to an agreement with Pennzoil on January 3, they could not avoid that agreement by later seeking or accepting a higher price or a more beneficial arrangement with a third party.

 Texaco contends that this instruction is incomplete, misleading, and constitutes a direct comment on the weight of the evidence. Specifically, it contends that the instruction erroneously uses the language "even though," which serves as a direct comment by the court that it did not approve Texaco's argument that the alleged agreement between Pennzoil and Getty violated all fiduciary obligations of the parties and was therefore unenforceable.

Where a breach of fiduciary obligation occurs, the contract entered is valid and enforceable where the bona fide purchaser takes without notice of fraud or misuse by the directors. *See Cross Properties, Inc. v. Brook Realty Co.*, 37 A.D.2d 193, 322 N.Y.S.2d 773, 781 (App.Div.1971), *aff'd* 31 N.Y.2d 938, 340 N.Y.S.2d 928, 293 N.E.2d 95 (1972); *see also* Restatement (Second) of Trusts § 284 (1959):

> (1) If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust and is under no liability to the beneficiary.

In its reply brief, Texaco asserts that any agreement entered into by a board to foreclose bidding is unenforceable, citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986). However, the facts in *Revlon* are distinguishable. The Revlon board, having before it two bids, rejected the latest offer of one entity and authorized negotiations with the other parties interested in acquiring Revlon. One bidder was privy to certain financial data. The court determined that the board breached its primary duty when it entered into a lock-up agreement on the basis of impermissible considerations at the expense of the shareholders. Consequently, the lock-up agreement could not be sustained.

In our case, the negotiations and alleged agreement with Pennzoil occurred prior to Texaco's offer, so the *Revlon* case does not control. A reasonable construction of Instruction No. 5 would be that the court sought to advise the jury that the parties' fiduciary obligations were not relevant to the "interference" issue.

 Additionally, Texaco's argument, that the use of the "even though" language was an impermissible comment, is without merit. While the use of "even though" language was held to be an impermissible comment in *Gulf Insurance Co. v.*

*Vela*, 361 S.W.2d 904, 906–907 (Tex.Civ. App.—Austin 1962, writ ref'd n.r.e.), the error was mitigated with the 1973 amendment to Rule 277 that liberalized the practice of giving explanatory instructions. The court in *Forney v. Memorial Hospital*, 543 S.W.2d 705, 708 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.), in allowing such "even though" language, articulated that "the test by which an instruction is measured is ... whether it is a misstatement as to the law applicable to the facts." *Id.*

In the instant case, Instruction No. 5 is a correct statement of the law applicable to the facts of the case, i.e., fiduciaries cannot breach a binding contract for a better offer.

Points of Error 22, 23, 24, and 25 are overruled.

In Point of Error No. 26, Texaco claims that Instruction No. 2 to Special Issue No. 3 improperly directs the jury to consider Pennzoil's evidence on damages.

Instruction No. 2 to Special Issue No. 3 states:

Pennzoil must prove its damages, if any, with a reasonable degree of certainty. This does not, however, require proof as to an absolute mathematical certainty if a wrong has been done from which monetary loss results, you *may* make a just and reasonable estimate of damages based on relevant data, *including opinion evidence*, even if the extent of injury cannot be proven precisely. Damages cannot be remote or contingent. (Emphasis added.)

Texaco asserts that the instruction constitutes a direct comment on the weight of the evidence by directing the jury to consider "opinion evidence," that was presented by Pennzoil only.

█ The charge to the jury must be sufficient to enable the jury to make an assessment of damages on the proper grounds and legal principles. *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 90

(Tex.1973); *Osoba v. Bassichis*, 679 S.W.2d 119, 121–22 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Instruction No. 2 is a correct statement of the applicable principles, i.e., the fact that damages in a tort action cannot be ascertained with absolute mathematical certainty does not bar recovery if they can be approximately fixed. *See Steitz v. Gifford*, 280 N.Y. 15, 19 N.E.2d 661 (1939). Additionally, in the highly specialized field of oil and gas, expert testimony that is free of conjecture and speculation is proper and necessary to determine and estimate damages. *Amoco Production Co. v. Alexander*, 594 S.W.2d 467, 477, 622 (Tex.Civ.App.—Houston [1st Dist.] 1979), *modified on other grounds*, 622 S.W.2d 563 (Tex.1981).

█ The instruction here does not mandate that the jury accept the expert opinion testimony. Rather, by its use of "may" (meaning "have permission to"), the instruction allows the jury to consider all of the evidence, opinion or otherwise.

Point of Error No. 26 is overruled.

Texaco's remaining points of error pertaining to the charge argue that the charge contains numerous errors of substantive law. Its first grouping of points of error complains of the failure to submit special issues on essential elements.

Specifically, Texaco urges that Pennzoil failed to submit a special issue that would support a finding of a valid, binding contract (Points of Error Nos. 27–28); and that Pennzoil failed to submit a special issue on actual knowledge of the alleged contract (Point of Error Nos. 29–30, 35).

█ Texaco contends that Special Issue No. 2 failed to submit the element of "knowledge" to the jury. Special Issue No. 2 asked:

Do you find from a preponderance of the evidence that Texaco knowingly interfered with the agreement between Pennzoil, and the Getty entities, if you have so found?

Texaco contends that this issue collapses the second and third elements of Pennzoil's

cause of action—knowledge and inducement.

Texaco again presents a grammar argument, insisting that as framed ("knowingly" modifies "interfered"), the "knowledge" element is converted into knowledge of the acts of interference, rather than knowledge of the contract with Pennzoil. This argument is without merit. As used in this issue, "knowingly" is an adverb modifying the verb "interfered," and answering the question "how?" [did Pennzoil interfere with the agreement?]. A reasonable reading is that the issue asks about interference, with knowledge of the agreement.

 Texaco also argues that, even if properly worded, Instruction No. 2 to Special Issue No. 2 erroneously tells the jury that it can answer affirmatively, without a finding of "knowledge" as defined by New York law. Instruction No. 2 states:

> In order to find that Texaco had knowledge of the agreement, if any, it is not necessary that Texaco had an accurate understanding of the legal significance of the facts which produced the agreement. If Texaco knew the facts that gave rise to the agreement, then it knew of the agreement, even if it did not believe that those facts gave rise to an agreement and even if it believed that any agreement that did exist violated the law. You may also find that Texaco knew of the agreement, if any, if you find that Texaco intentionally or willfully refused to ascertain the facts or if it exercised bad faith. Texaco is also charged with all the knowledge, if any, of its agents and representatives, whether communicated to each other or not.

Texaco contends that this instruction presents a "should have known" standard that is insufficient under New York law. *Roulette Records, Inc. v. Princess Production Corp.*, 15 A.D.2d 335, 338, 224 N.Y. S.2d 204, 207 (App.Div.), *aff'd*, 12 N.Y.2d 815, 236 N.Y.S.2d 65, 187 N.E.2d 132 (1962). Because of such argument, Texaco requested the following Special Issue No. 105 and Instruction F, which were denied:

### Special Issue No. 105

Do you find from a preponderance of the evidence that at the time of the execution of the Texaco Museum Stock Purchase Agreement, Texaco had actual knowledge of a contract among the Getty Oil Company, the Museum, the Trust, and Pennzoil?

Answer "Texaco had actual knowledge" or "Texaco did not have actual knowledge."

### Texaco Instruction: F

In order to find that Texaco knowingly interfered with the contract between the Getty Oil Company, the Trust, the Museum, and Pennzoil, if any, it is necessary that Texaco had actual knowledge of the existence of such a contract. In order to have "actual knowledge" of a contract, a party must know that a contract exists. If a party should have known that a contract exists, he does not have "actual knowledge" of that contract.

The requested issue and instruction were properly denied because Instruction No. 2 to Special Issue No. 2 adequately describes the knowledge requirement of the tort of inducing a breach of contract. *See Gold Medal Farms, Inc.*, 195 N.Y.S.2d at 185; Restatement (Second) of Torts § 766, comment i. Points of Error 27 through 30, and 35 are overruled.

 In Points of Error 32, 33, and 34, Texaco argues that Special Issue No. 2 and the accompanying instructions conflict with applicable New York law. It contends that the third sentence of Instruction No. 2 creates a "duty to investigate" that is contrary to New York law. Appellant requested an instruction that would have told the jury that a party had no duty to investigate concerning the existence of a contract beyond the information in its possession and any representations by parties to the contract.

In *Kelly v. Central Hanover Bank*, 11 F.Supp. 497 (S.D.N.Y.1935), *rev'd on other*

*grounds,* 85 F.2d 61 (2d Cir.1936), the court held that a negligent failure to investigate further would not lead to liability for interference with a contract, but did imply that a willful refusal to ascertain the facts would be more culpable.

I need not now determine whether knowledge that there were outstanding debentures would have led an ordinarily prudent man of [the defendant's] financial experience, ... to inquire whether they contained any, and if so what, restrictive covenants. Even if an ordinarily prudent man would have made such inquiry, [the defendants'] failure so to do cannot be attributed and is not charged to be due to *any intentional or willful refusal to ascertain the facts.*

At the best, there would be a negligent interference with contractual rights which, unlike an intentional invasion thereof, does not evidence bad faith and therefore does not call for an extension of equity jurisdiction beyond that heretofore established. In all of the cases cited in which specific performance of a contract was decreed against a third person, full knowledge on the part of the defendant of the plaintiff's contractual rights was proved. In granting such relief, the courts ordinarily stress the defendant's lack of good faith.

*Kelly,* 11 F.Supp. at 513 (emphasis added); *see also Entertainment Events v. MGM,* No. 74 Civ. 2959.

In this case, the court did not submit a charge on "negligent interference." Rather, it submitted an "intentional or willful refusal to ascertain the facts" or "lack of good faith" factor, as implied in *Kelly.* As such, the charge is an acceptable description of New York law.

Finally, Texaco contends that the third sentence comments on the weight of the evidence, because there is no evidence to support its submission. This argument is waived because there was no corresponding trial objection. Points of Error 32 through 34 are overruled.

In Points of Error 36 through 39, Texaco claims that Instruction No. 2 to Special Issue No. 2 conflicts with applicable law, which would not attribute to Texaco knowledge possessed by the Getty entities or Getty agents. It attacks the fourth sentence of Instruction No. 2 to Special Issue No. 2: "Texaco is also charged with all the knowledge, if any, of its agents and representatives, whether communicated to each other or not." Texaco fails to argue or cite to any supporting authority as to why the fourth sentence allegedly misstates the law. Consequently, that contention is waived. Tex.R.App.P. 74(f); *Richardson v. Office Buildings,* 704 S.W.2d 373, 375–76 (Tex.App.—Houston [14th Dist.] 1985, no writ).

Texaco next argues that because the words "agents" and "representatives" are not defined or qualified in Instruction No. 2, confusion is created as to "whose" knowledge can be attributed to appellant, i.e., alleging that knowledge of the Getty entities can also be attributed to Texaco. It urges that the harm in this was manifested when, on November 18, during jury deliberations, the jury asked whether "Texaco [was] liable for the actions of Lipton [the Museum's attorney], Winokur [Getty Oil's attorney], and Boisi [Getty Oil's investment banker]."

In response to this inquiry, the court instructed the jury as follows:

The court is unable in any way to specifically answer your question other than to advise you that you are to follow the Instruction of the Court, the Special Issues as encompassed in the Court's charge and the evidence as received in your court.

Texaco initially agreed to this instruction, ("This is fine with us Your Honor"), but the following day, requested the following instruction, which was denied:

The Court now instructs you that a party is only responsible for the actions of its own employees, agents or representatives acting within the scope of their employment.

Tex.R.Civ.P. 285 concerns the jury's communication with the court. Tex.R.Civ.P.

286 provides that the jury may receive further instructions, "but no instruction shall be given except in conformity with the rules relating to the charge." Tex.R.Civ.P. 274 is such a rule "relating to the charge."

Tex.R.Civ.P. 274 provides that a party objecting to the charge must point out the objection or it is waived. In the instant case, Texaco failed to object to the instruction given until one day later. Consequently, such failure to object constitutes a waiver. *See George Pharis Chevrolet, Inc. v. Polk,* 661 S.W.2d 314, 317–18 (Tex.App.—Houston [1st Dist.] 1983, no writ).

Finally, Texaco argues that the harm of Instruction No. 2 is magnified by Pennzoil's statements during voir dire and closing argument, that Texaco could be held liable for the knowledge and conduct of the Getty entities or agents. The complained of statements during voir dire are:

> You may be curious as to why Texaco is the only party here.... It's because they have indemnified Getty. They own Getty. They are the only necessary party to this action.

> Whatever would befall Getty under the indemnity, it's Texaco's responsibility.

The complained of statements in closing argument are:

> [Y]ou are to consider not just Texaco but also the circumstances and I suggest to you, these Getty people. And there was only one way that Texaco acquired Getty Oil Company. Indemnities. They were essential.

> They [Texaco] bought and paid for this lawsuit when they gave the indemnities.

> And they ask, you know, you don't see Getty in here, you don't see the Museum in here, you don't see the Trust in here. For what purpose?

> For what purpose, Jury?

> After they've guaranteed them and protected them from this very contingency, Pennzoil's lawsuit.

> Well, why would there by any question in having them here, or for what reason?

Except for the voir dire shown above, Texaco failed to object to the argument.

Where no objection is made, the general rule is that any impropriety is waived. *Standard Fire Insurance v. Reese,* 584 S.W.2d 835 (Tex.1979).

Furthermore, Texaco did not object to the voir dire argument until almost one week later. In both instances, however, reversal must come from an evaluation of the entire case, *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 120 (Tex.1984), and reversal is mandated only when the argument was so prejudicial that an instruction to disregard would not have removed the prejudice produced. *Southern Pacific Co. v. Hubbard,* 297 S.W.2d 120, 125 (Tex.1957).

The Texas Supreme Court set out the test for evaluating jury argument in *Standard Fire Insurance Co. v. Reese,* 584 S.W.2d at 839. The complainant must prove:

> (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. 3 McDonald, Texas Civil Practice sec. 13.17.2 (1970). There are only rare instances of incurable harm from improper argument. The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. The record may show that the cause is weak, strong, or very close. From all of these factors, the complainant must show that the probability that the improper argument caused harm is

greater than the probability that the verdict was grounded on the proper proceedings and evidence. *Aultman v. Dallas Ry. & Term. Co.*, 152 Tex. 509, 260 S.W.2d 596 (1953). Rules 434, 503, Tex. R.Civ.P.

▇▇▇▇ Texaco has failed to show how it was harmed by the complained-of argument. In all practicality, these few statements, buried within 4½ months of testimony, had little or no effect on the jury's verdict. We also disagree that the reference to charging Texaco with the knowledge of *its* agents confused the jury to such an extent that reversal is required.

Points of Error 36, 37, 38, and 39 are overruled.

▇▇▇▇ In Points of Error 40–41, Texaco contends that Special Issue No. 3 and the accompanying instructions do not present the proper measure of damages. It contends that the proper measure was the stock price differential.

Special Issue No. 3 asks:

What sume of money, if any, do you find from a preponderance of the evidence would compensate Pennzoil for its actual damages, if any, suffered as a direct and natural result of Texaco's knowingly interfering with the agreement between Pennzoil and the Getty entities, if any?

Instruction No. 1 to Special Issue No. 3 states:

1. The measure of damages in this case is the amount necessary to put Pennzoil in as good a position as it would have had if its agreement with the Getty entities, if any, had been performed.

The instruction as given is a correct statement of the benefit of the bargain measure of damages for breach of contract under New York law. *Dillon v. Magner*, 29 A.D.2d 759, 760, 287 N.Y.S.2d 519, 521 (App.Div.1968); *Hutchins v. Bethel Methodist Home*, 370 F.Supp. 954, 964 (S.D.N.Y. 1974). Additionally, Texaco requested practically the same language in Requested Instruction J: "The measure of damages in

this case is the amount necessary to put Pennzoil in as good a position as it would have had if its agreement, if any, with the Getty Oil Company, the Museum, and the Trust had been performed." Consequently, Texaco may not complain on appeal, when the instruction given is substantially the same as that requested. *Dailey v. Wheat*, 681 S.W.2d 747, 757 (Tex.App.— Houston [14th Dist.] 1984, writ ref'd n.r.e.). Nor may Texaco invite error by encouraging the court to submit an instruction and then complain on appeal. *New Trends, Inc. v. Stafford-Lowdon Co.*, 537 S.W.2d 778, 783 (Tex.Civ.App.—Fort Worth 1976, writ ref'd n.r.e.).

Texaco next complains of the denial of the following Requested Instruction K:

The measure of damages in this case is the difference, if any, between the fair market value of ³/₇ of the stock of Getty Oil Company, less $112.50 per share. Fair market value is the price a willing buyer would pay a willing seller.

▇▇▇▇ An instruction is proper if it finds support in any evidence or inferences therefrom and if it would aid the jury in answering the special issues. *Atlantic Mutual Insurance Co. v. Middleman*, 661 S.W.2d 182, 187 (Tex.Civ.App.—San Antonio 1983, writ ref'd n.r.e.); *Mejia v. Liberty Mutual Insurance Co.*, 544 S.W.2d 690, 691 (Tex.Civ.App.—Houston [14th Dist.] 1976, no writ). Texaco's requested instruction K contains the measure of damages for breach of contract to purchase stock, but it is an incorrect measure of damage in a tortious interference case.

Points of Error 40 and 41 are overruled.

▇▇▇▇ In Points of Error 42–45, Texaco claims that Special Issue No. 4 and instructions to Special Issue Nos. 4 and 5 conflict with the standards for punitive damages under applicable law.

Special Issue Nos. 4 & 5, relating to punitive damages, ask:

#### No. 4

Do you find from a preponderance of the evidence that Texaco's actions, if any,

were intentional, willful and in wanton disregard of the rights of Pennzoil, if any?

If and only if you have answered Special Issue No. 4 "We do", then you are to answer Special issue No. 5.

### No. 5

What sum of money, if any, is Pennzoil entitled to receive from Texaco as punitive damages?

The accompanying instruction states:

Punitive damages means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount you may have found as actual damages.

It is not necessary to show that Texaco was motivated by ill will or hatred of Pennzoil.

In assessing punitive damages, if any, you may take into account not merely the act or acts of Texaco itself. You may also take into account all the circumstances, including Texaco's motives and the extent of damages, if any, suffered by Pennzoil.

Pursuant to a jury request, the following definition of "wanton disregard" was given:

Wanton is used in its ordinary sense and synonymous with reckless or heedless disregard of the rights of others.

Texaco objected to Special Issue Nos. 4 and 5 and the accompanying instructions and requested the following:

You are instructed that you should find no punitive damages if you believe that Texaco acted on advice of counsel.

You are instructed that a party acts "maliciously" if its conduct was morally culpable, was motivated by evil and reprehensible motives, or was outrageous.

Texaco contends that Special Issue No. 4 is an incorrect statement of New York law, because under said law, before there can be an award of punitive damages, there must be a finding of actual malice or ill will, and moral culpability or reprehensible motives. For support of this assertion, Texaco relies upon *Guard-Life Corp.*, 67 A.D.2d at 659, 412 N.Y.S.2d at 625. Pertinent here is the following language from the Appellate Division's decision in *Guard-Life*:

There is no evidence here of "actual malice or ill will" (*Anthony v. George T. Bye, Inc.*, 243 App.Div. 390, 391, 217 N.Y.S. 222, 223), a wrong "morally culpable" or "actuated by evil and reprehensible motives" (*Walker v. Sheldon*, 10 NY2d 401, 404, 223 N.Y.S.2d 488, 490, 179 N.E.2d 497, 498) or a wrongful act "done willfully, wantonly or maliciously" (*Huschle v. Battelle*, 33 A.D.2d 1017, 308 N.Y.S.2d 235). To the contrary, the record shows that defendant's motive was to secure an advantageous business relationship for itself.

Texaco contends that in addition to finding a willful, wanton act, the jury must also find (1) actual malice or ill will and (2) a wrong, morally culpable or actuated by evil and reprehensible motives.

Texaco's interpretation of the Appellate Division's opinion in *Guard-Life* is erroneous. *Guard-Life* does not mandate a finding of each of the above. In *Universal City Studios, Inc. v. Nintendo Co.*, 615 F.Supp. 838, 863 (D.C.N.Y.1985), the court upheld an award of punitive damages pursuant to a finding of tortious interference with a contract. The court wrote:

In New York:

exemplary damages are recoverable in all actions *ex delicto* based upon tortious acts which involve ingredients of malice, fraud, oppression, insult, wanton or reckless disregard of the plaintiff's rights, or other circumstances of aggravation, as a punishment of the defendant and admonition to others.

36 N.Y.Jur.2d sec. 176 (1984); *Giblin v. Murphy*, 97 A.D.2d 668, 469 N.Y.S.2d 211, (3d Dept.1983). *See also Le Mistral, Inc. v. Columbia Broadcasting System*, 61 A.D.2d 491, 402 N.Y.S.2d 815

(1st Dept.1978). Punitive damages are awarded "not for the unintended result of an intentional act, but for the conscious disregard of the rights of others ..." *Hartford Acc. v. Village of Hempstead,* 48 N.Y.2d 218, 422 N.Y.S.2d 47, 53, 397 N.E.2d 737, 743 (Ct.App.1979). The court later referred to the defendant's "reckless disregard" of plaintiff's rights and the "wantonness of the conduct involved." *See also Hornstein v. Podwitz,* 254 N.Y. 443, 173 N.E. 674.

It appears that there is no requisite "laundry list" of adjectives defining a defendant's behavior in a tortious interference action, but a jury finding that the defendant's conduct was intentional, willful, and in wanton disregard of appellee's rights is sufficient to support a punitive damages award.

■ Texaco next argues that the jury should have been instructed that no punitive damages are recoverable where a defendant acted on the advice of counsel. Under New York law, acting on the advice of counsel is only one factor to be considered "in the context of the totality of the circumstances." *Universal City Studios, Inc.,* 615 F.Supp. at 862 (citing *Central Soya Co. v. George A. Hormel & Co.,* 723 F.2d 1573, 1577 (Fed.Cir.1983)). Pennzoil asserts that Texaco failed to present evidence of its advice of counsel and punitive damages and that the court thus did not err in refusing the requested instruction. *See Atlantic Mutual Insurance Co. v. Middleman,* 661 S.W.2d 182. There was other evidence of Texaco's reliance on advice of counsel, but, in any event, the instruction was not required because it incorrectly stated New York law.

Points of Error 42 through 45 are overruled.

## ALLEGED ERRORS IN THE COURT'S EVIDENTIARY RULINGS

Texaco's Points of Error 70 through 79 complain of the trial court's wrongful admission of evidence and of its wrongful exclusion of admissible evidence. To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show error that was calculated to cause and probably did cause rendition of an improper judgment. Tex.R. App.P. 81(b)(1). Reversible error does not usually occur in connection with rulings on questions of evidence unless the whole case turns on the particular evidence admitted or excluded. *Atlantic Mutual Insurance Co. v. Middleman,* 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

■ Texaco's 70th point of error complains that Pennzoil's witness, Dr. Thomas D. Barrow, was allowed to give improper legal opinions. It specifically alleges that Dr. Barrow was allowed to testify that a binding agreement had been reached between the Getty entities and Pennzoil, as follows:

Based on the evidence that I have seen and only as an experienced executive who served on boards, I would come to the conclusion that the Getty board had reached an agreement with Pennzoil.

\* \* \* \* \* \*

It would appear to me that the intent of the parties was clearly evidenced by their agreement and that I've seen nothing in what I have read that would indicate anything to the contrary.

Before either of the above statements were made, Dr. Barrow testified that he had read the "Copley notes," the Memorandum of Agreement between Getty Oil, the Museum, the Trust, and Pennzoil, and the press release issued by Getty Oil on January 4. Dr. Barrow qualified his testimony by stating that "his opinions were given only as an experienced executive who served on boards," based on what he had read in the aforementioned documents.

Rule 702, Texas Rules of Evidence, concerning testimony by experts, provides:

**Testimony by Experts**

If scientific, technical, or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under the rule, given the limitations the witness placed on his testimony, we find no reversible error.

■■■ Texaco's Point of Error 71 contends that Pennzoil's CEO, Liedtke, was allowed to testify, in a purely conclusory manner, that Pennzoil had reached a binding contract with Getty Oil, even though the bulk of his testimony was not based on personal knowledge.

Texaco argues that Liedtke's following testimony about the Copley notes was inadmissible: (1) that the words "accept the Pennzoil proposal provided that the amount being paid relating to ERC be $5 per share" meant acceptance of everything in the Memorandum of Agreement except the price term, and (2) provisions in the notes relating to executive compensation "means Getty Oil thought they had a deal with us."

Contrary to Texaco's contention, Liedtke did not testify that Getty Oil and Pennzoil had a binding contract, nor did he testify about events of which he had no knowledge. He testified to what certain parts of the Copley notes, which he had read, meant to him. In fact, many witnesses, both for Texaco and Pennzoil, gave their opinion of whether there was a binding agreement based on their interpretation of statements or events.

We find that the testimony complained of was admissible under rule 701, Tex.R. Evid.[1]

■■■ In its 72nd point of error, Texaco complains of the exclusion of testimony relating to a January 5 conference between Getty Oil and Pennzoil lawyers. In its bill of exceptions, Getty's lawyer Winokur testified that at the meeting, Getty's lawyers told Pennzoil lawyers that Pennzoil "can't buy the Museum shares because of Rule 10b–13."[2]

When Pennzoil's lawyer Cialone asked if rule 10b–13 applied, Winokur said that one of Getty Oil's lawyers responded:

Yes, because it applies not only to transactions which actually take place while there is a tender but to purchases that are arranged while a tender is in progress. And if you were to arrange now to buy the Museum shares that arrangement would have been made during the time the tender offer was outstanding.

Cialone asked if that was correct, and Pennzoil lawyer Hertz responded, "Yes, I think he's right. I think he's right as to what the rule says." He then asked Getty Oil attorney Katz what he would do; Katz answered that he would call his partner (a former SEC lawyer) to see what could be done. Cialone then asked him to call his partner.

Texaco also offered deposition testimony relating to this same discussion from Pennzoil attorney Hertz and Getty Oil attorney Katz.

Pennzoil attorney Hertz's testimony concerning the January 5 lawyers' meeting essentially consisted of the following questioning by Texaco lawyers:

Question: Did you volunteer information to any other representative of Pennzoil concerning the matter of Pennzoil offering to purchase shares of a stockholder during the existence of the tender offer but outside the tender offer?

---

1. Rule 701 provides: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."

2. SEC Rule 10b–13 provides that once a party has publicly announced a tender offer, the tender offeror is prohibited from directly or indirectly purchasing or arranging to purchase securities of the target company, other than through the tender offer, so long as the tender offer remains open. 17 C.F.R. § 240.10b–13 (1985).

Answer: I did not volunteer it.

Question: Did you discuss that with any representatives of Pennzoil?

Answer: Yes.

Question: With whom?

Answer: I think it was Mr. Cialone.

Getty attorney Katz's testimony was somewhat more detailed. He related his memory of the January 5 conversation with Cialone as follows:

Answer: In addition to having substantive business objections to an acquisition of the Museum's shares by Pennzoil, I raised the question with Joe (Cialone) as to how Pennzoil could agree to acquire— Pennzoil or the Company acting basically at the request of Pennzoil—could agree to acquire the Museum shares as part of the overall transaction, which was what had been suggested by both Pennzoil, as well as the Museum and the Trust.

In view of the pending tender offer, I told Joe that in my view it was a clear violation of Rule 10(b)13 for Pennzoil or for the company acting at the behest of Pennzoil to agree to acquire the Museum shares during the pendency of this tender offer.

Question: What was Mr. Cialone's response?

Answer: At first, it didn't seem to worry him and we raised this concern, but he didn't seem troubled.

Later he came back and he asked me, 'Are you really concerned about this?' And I said, 'Literally, it would be doing exactly what the rule on its face prohibits,' and he said to me, 'Well, what would you do?'

And I said, 'I would call Harvey Pitt, who is my partner in the Washington office who is general counsel to the SEC and who is very familiar with this type of regulation, and I would get his advice, but I would not go ahead without consulting with more people in my firm and do a transaction which, to me, violated the rule.'

I said to Joe, 'Do you want me to call Harvey? I will call him if you want me to,' and he said, 'Fine.'

\* \* \* \* \* \*

Question: Did you say anything about going ahead with the transaction without some analysis of this problem?

Answer: I had previously communicated to Joe that, putting aside 10(b)13 concerns, that we did not believe that the board would authorize a transaction where the Museum would be treated differently than the other shareholders of the company, and that meant not only in terms of the consideration the Museum would receive, but when they would receive it.

Texaco contends that this evidence was offered to negate Pennzoil's intent to be bound, and was improperly excluded. It argues that the. testimony was offered to prove that Pennzoil believed it had not yet entered and could not enter a binding agreement until its pending tender offer was withdrawn. The agreement and intent to be bound, if there was such an intent, had been formed two days previously.

The testimony does not support a conclusion that the Pennzoil lawyers by reason of the above after-the-fact conversations, did not consider Pennzoil to be bound by the agreement. The testimony only shows only that Pennzoil lawyers were alerted by Getty Oil lawyers to the possibility that while the tender offer was in effect, the purchase of the Museum stock by Pennzoil might violate an SEC rule. Rule 403, Tex. R.Evid., authorizes exclusion of testimony that is not, on balance, sufficiently probative to justify admissibility. The trial judge properly excluded the proffered evidence.

In Point of Error 73, Texaco complains of the exclusion of the complaint Pennzoil filed in the Delaware Chancery Court in which Pennzoil sought equitable relief. Texaco argues that paragraph 16 of the complaint explicitly recognizes that a Getty Oil board meeting would have had to be held on Friday, January 6, before a definitive merger agreement could have been executed.

Paragraph 16 of the complaint provides:

During the evening of January 3 and through the day of January 4, lawyers

for Pennzoil and the Trustee prepared a draft of an implementing agreement. Discussions concerning the draft implementing agreement were held between representatives of all parties throughout the day. On the evening of January 4, Pennzoil and the Trustee submitted their draft implementing agreement to the Museum and Getty. During the late afternoon and evening of January 5, lawyers for the Trustee, Getty and Pennzoil met and revised the draft implementing agreement. These efforts were concluded at 1:00 a.m. Friday, January 6. At no time did any of the lawyers or any of the parties suggest any modification of any of the substantive terms regarding the number of shares to be purchased, the price or the form of consideration agreed to by the Getty board on Tuesday, January 3. Thus, by 1:00 A.M., Friday, January 6, the implementing agreement was substantially complete, except for certain technical matters that Pennzoil's and Getty's representatives agreed could be resolved in time for board meetings and execution before the end of the day Friday.

Texaco's specific complaint concerns the last sentence in the paragraph. It contends that this sentence confirms Texaco's position that additional action by the Getty directors was necessary before the parties would be bound.

Pleadings in other actions that contain statements inconsistent with the party's present position are receivable as admissions. *St. Paul Fire & Marine Insurance Co. v. Murphree*, 357 S.W.2d 744, 747 (Tex. 1962). Rule 801(e)(2), Tex.R.Evid., provides that admissions by a party-opponent are not hearsay statements and thus are admissible.

■ The Pennzoil complaint filed in Delaware is not inconsistent with Pennzoil's position that a binding agreement was effected on January 3. A reasonable reading of the sentence suggests that work was being done on an "implementing agreement" and that the only matters left to be

resolved prior to board meetings were "certain technical matters." Additionally, earlier in the paragraph, there is an express qualification: "At no time did any of the lawyers or any of the parties suggest any modifications of any of the substantive terms regarding the number of shares to be purchased, the price or the form or consideration agreed to by the Getty board on Tuesday, January 3." This is consistent with Pennzoil's position. Thus it is not an admission. The trial judge properly excluded the complaint.

■ Additionally, error, if any, would be harmless under rule 81(b)(1), Tex.R. App.P., because the same evidence contained in the petition, i.e., that the parties were doing additional work on an implementing contract with a view toward formally executing it on January 6, was presented to the jury throughout the trial.

In Texaco's 74th through 78th points of error, it claims that Pennzoil was allowed to introduce inadmissible hearsay to prove the existence of a contract.

■ First, it claims that the trial court improperly admitted affidavits of Martin Siegel, the Trust's investment banker, and Charles Cohler, a Trust lawyer, and the transcribed oral argument of Cohler, all from a California temporary injunction suit. We find no merit to this claim because both Cohler and Siegel testified at the trial of this case, and their trial testimony did not conflict with that previously given during the California hearing. Texaco correctly contends that the documents came within no exception to the hearsay rule and were thus inadmissible. But rather than prejudice Texaco, it appears to have reinforced its contention that there were other matters to attend to before the contract between Pennzoil and the Getty entities would become binding. There is no harmful error. Tex.R.App.P. 81(b)(1).

■ Texaco next claims that notes made by Getty Oil general counsel Ralph Copley of the January 3 Getty Oil board of

directors meeting were improperly admitted.

Pennzoil initially offered only that part of the notes pertaining to the 15–1 vote of the board on the Pennzoil proposal. Texaco properly objected to the notes being admitted into evidence, but after its objection was overruled, it offered the remaining portion of the notes into evidence. Thereafter, Texaco read the unoffered part of the notes to the jury, and had several of its officers testify about their impressions of the notes.

During voir dire, Texaco's counsel told the jury panel of the notes' existence, explained the significance of the notes, and promised the jury that they would be informed of the notes' contents. Finally, in his closing argument, Texaco's counsel vouched for the veracity and reliability of the notes.

A party to an appeal may not complain of improper evidence offered by the other side when it introduced the same or similar evidence. *McInnes v. Yamaha Motor Corp. U.S.A.,* 673 S.W.2d 185, 188 (Tex.1984), *cert. denied,* 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). There is no error.

 Texaco next complains of the admission into evidence of a handwritten note regarding the January 3 Getty board meeting made by C. Stedman Garber, Getty Oil treasurer. The note was allegedly made by Garber during or after a phone conversation with Copley or Bland (Getty vice-president). The note contains the Pennzoil proposal as approved by the Getty Board on January 3. This evidence is in the record from many different witnesses, and is particularly cumulative of part of the Copley notes. The Garber note does not say or indicate that the agreement was complete or binding, but merely that the board, with the exception of Chauncy Medberry, agreed that the "deal should be done." Any error was harmless. *Id.* at 188.

 Texaco urges that the trial court erred in allowing Sidney Petersen, Getty

Oil CEO, to testify that a Saudi Arabian businessman told him that "Gordon Getty told him (the Saudi) that it was a 'done deal,'" implying that Pennzoil and the Getty entities had a binding agreement. Though Texaco claims that it lodged an objection that was overruled, we can find neither an objection nor a court ruling. In absence of an objection, the complaint is waived. *Wilfin, Inc. v. Williams,* 615 S.W.2d 242, 244 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.).

Texaco next urges that a Fortune magazine article written by reporter Peter Nulty was hearsay and that its admission into evidence was error. In the article, Nulty quotes Getty CEO Petersen as saying "[w]e thought there was a better deal out there, but it was a bird-in-the-handish situation. We approved the deal but we didn't favor it."

 We agree with Texaco's contention that the magazine article was hearsay. However, such articles may become admissible if properly verified. In *Sherrill v. Estate of Plumley,* 514 S.W.2d 286 (Tex. Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.), an authority relied on by Texaco, this Court held an obituary appearing in a newspaper to be hearsay and inadmissible under the business records act, Tex. Rev.Civ.Stat.Ann. art. 3737e (Vernon 1964), because it was not shown at trial that the author had personal knowledge of the matters contained in the article.

By contrast, in this case, the article's author testified that he interviewed Petersen and that even though he could not swear that the quote contained the exact words of Petersen, it was essentially correct. Petersen admitted that he may have said, "yes, we have an agreement in principle with Pennzoil but we thought there were better things around."

In *Southern Savings & Loan Association v. Lewis,* 536 S.W.2d 677 (Tex.Civ.App. —Waco 1976, writ ref'd n.r.e.), the court held that exhibits that were otherwise inadmissible as hearsay were properly admitted

after a witness who was familiar with the data contained in them had testified about the correctness of the information in the documents.

Rule 803(5), Tex.R.Evid., adopted September 1, 1983, changed the existing rule regarding past recollection recorded, by providing that a memorandum or record may be read into evidence, but may not be received as an exhibit unless offered by the adverse party. Apparently the rules committee felt that there was a danger that the jury would give undue weight or credence to the written document if it were admitted as an exhibit.

 We are of the opinion that oral evidence of the Petersen statement was admissible to impeach Petersen and as a past recollection recorded, but that the court erroneously admitted the article itself into evidence. However, we perceive no error because the same evidence as the Petersen quote was admitted and used extensively in questioning other witnesses, without objection by Texaco. An objection to evidence is waived by permitting other witnesses to testify without objection to the same complained of evidence. *City of Houston v. Riggins*, 568 S.W.2d 188, 190 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r. e.).

 Texaco's final complaint of the evidentiary rulings claims that the court erred in excluding testimony of William Weitzel, Texaco's general counsel, that he and Morris Kramer, outside counsel to Texaco, advised the Texaco board and management before Texaco contracted with Getty Oil that there was no binding agreement between Pennzoil and the Getty entities. The record is replete with testimony of Texaco management (DeCrane, president; McKinley, CEO; Kinnear, vice-chairman of the board) that each, as well as the board of directors as a body, was advised, before they entered into the Getty merger, that Pennzoil had no binding contract with the Getty entities.

The exclusion of evidence is harmless where the evidence is merely cumulative of other evidence in the record. *Reina v. General Accident Fire & Life Assurance Corp.*, 611 S.W.2d 415, 417 (Tex.1981).

If there was any error, it was harmless. Tex.R.App.P. 81(b)(1).

Texaco's Points of Error 70 through 79 are overruled.

## ALLEGED DENIAL OF A FAIR TRIAL

In Points of Error 80 through 85, Texaco claims that it was denied due process and was denied a fair trial because of the posture or actions of the trial judges.

In its Point of Error 80, Texaco contends that:

> The trial court and Judge Jordan erred in denying Texaco's motion to recuse or disqualify Judge Farris, letting stand an impermissible appearance of bias and depriving Texaco of its right to a fair trial.

 On March 7, 1984, after the filing of the lawsuit, Pennzoil's lead counsel, Joseph Jamail, contributed $10,000 to presiding Judge Farris' campaign fund. On or about October 1, 1984, Texaco filed its motion for recusal or disqualification, asserting that such campaign contribution coupled with Jamail's services on Judge Farris' steering committee created an "appearance of impropriety." Judge Farris declined to recuse himself, and pursuant to rule 18a, Tex.R.Civ.P., the matter was assigned to Judge E.E. Jordan to determine whether Judge Farris should preside over the case. After conducting a hearing, Judge Jordan refused to recuse or disqualify Judge Farris. Texaco first argues that the failure to recuse Judge Farris was error under Texas law.

Under Texas law, the basis for the disqualification of a judge is contained in Article V, Section 11 of the Texas Constitution, which prohibits a judge from sitting in a case where he may be interested, or where he is related to a party by affinity or consanguinity in a degree prescribed by law, or where he was counsel in the case. In

the instant case, neither Texaco's trial motion nor its argument on appeal contains any of these constitutional grounds. Rather, it argues that the grounds for recusal rest in Canon 3C of the Code of Judicial Conduct (reprinted in Tex.Rev.Civ.Stat. Ann. Appendix B to Title 14 [Vernon Supp. 1987]), which provides:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including, but not limited to, instances where:

(a) he has a personal bias or prejudice concerning a party....

In support of this argument, Texaco relies upon *McLeod v. Harris*, 582 S.W.2d 772 (Tex.1979). This reliance is misplaced because *McLeod* dealt exclusively with the *procedural* method to be followed when a motion to recuse has been filed. The court held that in all instances where a motion to recuse has been filed in a suit, it is mandatory that the judge in whose court the motion is filed must request the administrative judge to assign another judge to hear the motion for recusal.

Texaco argues that, on *McLeod's* authority, at least two courts have held that Canon 3C provides the grounds for judicial disqualification: *Robb v. Robb*, 605 S.W.2d 390 (Tex.Civ.App.—El Paso 1980, no writ), and *Manges v. Garcia*, 616 S.W.2d 380 (Tex.Civ.App.—San Antonio 1981, no writ). Neither case supports Texaco's argument.

In *Robb*, the court was presented with a situation in which a trial judge refused to appoint another judge to hear a motion for recusal. The motion was based upon allegations of bias and prejudice due to campaign contributions by attorneys representing appellee. Without addressing the merits of the motion, the appellate court concluded that based upon *McLeod*, the trial judge erred procedurally in failing to obtain another judge to rule on the motion.

In *Manges*, the trial court judge had recused himself from all matters involving relator Manges. Manges asserted that the judge was under a duty to act in the case

unless he was precluded from so doing because of one of the impediments enumerated in Article V, Section 11 of the Texas Constitution. The appellate court held that Canon 3C contemplates that a judge's refusal to sit may be based upon a reason not included in the constitution. To force a litigant before a judge who maintained a personal bias against the litigant would raise significant due process question.

However, the exact question presented here, whether campaign contributions constitute the "appearance of impropriety" such that recusal is warranted under Canon 3C, has been considered by the San Antonio Court of Appeals and the Texas Supreme Court.

In *River Road Neighborhood Association v. South Texas Sports, Inc.*, 673 S.W.2d 952 (Tex.App.—San Antonio 1984, no writ), and *Rocha v. Ahmad*, 662 S.W.2d 77 (Tex.App.—San Antonio 1983, no writ), motions to recuse were filed against appellate justices because they had accepted campaign contributions from one of the litigant's attorneys. In *River Road*, the contributions amounted to 21.7% and 17.1% of the total campaign contributions received by the justices. Speaking from an en banc court in *Rocha*, Chief Justice Cadena stated:

It is not surprising that attorneys are the principal source of contributions in a judicial election. We judicially know that voter apathy is a continuing problem, especially in judicial races and particularly in contests for a seat on an appellate bench. A candidate for the bench who relies solely on contributions from nonlawyers must reconcile himself to staging a campaign on something less than a shoestring. If a judge cannot sit on a case in which a contributing lawyer is involved as counsel, judges who have been elected would have to recuse themselves in perhaps a majority of the cases filed in their courts. Perhaps the next step would be to require a judge to recuse himself in any case in which one of the lawyers had refused to contribute or,

worse still, had contributed to that judge's opponent.

*Rocha,* 662 S.W.2d at 78.

Additionally, both parties before this Court cite *Manges v. Guerra,* 673 S.W.2d 180 (Tex.1984), a case in which the appellee filed motions to recuse against three Texas Supreme Court justices. The opinion does not specify that the basis on which the recusal was sought was the receipt of political contributions. *See* Kilgarlin & Bruch, *Disqualification and Recusal of Judges,* 17 St. Mary's L.J. 599, 638 (1986); Calvert, *Disqualification of Judges,* 47 Tex.B.J. 1330, 1337–38 (1984). In denying the motions, the supreme court noted that the challenged justices were qualified under Article V, Section 11 of the Texas Constitution. *Manges v. Guerra,* 673 S.W.2d at 185. In interpreting the *Manges* opinion, former Chief Justice Calvert articulated at page 1337:

> The opinion seems to the writer to leave not the slightest doubt that the only grounds for disqualification of a judge are those listed in art. 5, sec. 11, of the Constitution, and the grounds set out in Canon 3C(1) should not be considered in the future as grounds for disqualification.

Texaco's Canon 3C argument is overruled.

Texaco next argues that the failure to recuse Judge Farris was error under the Due Process Clause of the United States Constitution.

The United States Supreme Court has recognized that most matters relating to judicial disqualification do not rise to a constitutional level, and that only in extreme cases would disqualification on the basis of bias and prejudice be constitutionally required. *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 1585, 89 L.Ed.2d 823 (1986). Yet, Texaco argues that disallowing recusal of Judge Farris, because Article V, Section 11 of the Texas Constitution provides the sole basis for judicial disqualification in Texas, violated Texaco's due process rights.

The due process clause entitles a person to neutrality in adjudicative proceedings in both civil and criminal cases. *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980). This neutrality helps to guarantee "that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law" while preserving "both the appearance and reality of fairness." *Id.*

Fairness requires an absence of actual bias, and our legal system has always endeavored to prevent even the probability of unfairness. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). As articulated by the *Murchison* court:

> To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "Every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." *Tumey v. State of Ohio,* 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weight the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct., 11, 13 [99 L.Ed. 11].

*Id.*

In the instant case, Texaco argues that Jamail's $10,000 campaign contribution presented the appearance of bias and prejudice; therefore, the refusal to recuse Judge Farris was a violation of Texaco's constitutional rights. In support of this argument, Texaco relies heavily upon *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968), asserting that the "re-

fusal to disqualify Judge Farris is in direct conflict with that Supreme Court authority." However, *Commonwealth* is distinguishable from the present case.

*Commonwealth* was an appeal from an arbitration award rendered by a three-member panel. One of the arbitrators had a "sporadic" business relationship with the prime contractor, which relationship went so far as *to include the rendering of services on the very projects involved in the lawsuit.* These facts were never revealed to the petitioner until after the award was made. 393 U.S. at 146, 89 S.Ct. at 338.

In holding that the award should be set aside, the *Commonwealth* court based its decision upon *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), a case also cited by Texaco. In *Tumey*, the court reversed convictions rendered by a mayor of a town because a small part of the mayor's income consisted of court fees and costs collected by him acting in a judicial capacity. The *Tumey* court held that the due process clause would not permit any "procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused." *Tumey*, 273 U.S. at 532, 47 S.Ct. at 444. The *Tumey* court also noted that a decision should be set aside where there is "the slightest pecuniary interest" on the part of the judge. 273 U.S. at 524, 47 S.Ct. at 441.

> Finally, the *Commonwealth* court noted:
> It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be ever more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review.

393 U.S. at 148–149, 89 S.Ct. at 339.

The facts of the instant case do not parallel *Commonwealth*. Judge Farris neither participated with Pennzoil in the case being tried nor enjoyed even "the slightest pecuniary interest" in the outcome of the trial as did the arbitrator in *Commonwealth.*

The instant case presents mere allegations of bias and prejudice. As in *Aetna*, these allegations "are insufficient to establish any constitutional violation." 106 S.Ct. at 1586. There is no evidence in the record that Judge Farris was either biased or prejudiced in any manner or that he was acting as judge in his own case or enjoyed any pecuniary interest in the outcome of the case. Texaco's Point of Error 80 is overruled.

In its Point of Error 81, Texaco alleges that:

> [t]he trial court abused its discretion in denying Texaco's Motion for Mistrial and in allowing Texaco's Motion for New Trial to be overruled by operation of law because the substitution of Solomon Casseb, Jr., for Judge Farris denied Texaco its due process right to a fair trial.

Texaco first argues that the trial disruption caused by Judge Farris' ill health violated Texaco's right to a due and orderly trial under Article I, Section 15 of the Texas Constitution. This argument is not presented in a point of error; consequently, it is waived. *Kirkman v. City of Amarillo*, 508 S.W.2d 933 (Tex.Civ.App.—Amarillo 1974, writ ref'd n.r.e.).

■■■■ Judge Farris presided over the trial from July 9 to October 22, 1985, at which time he was forced to step down because of ill health. Judge Casseb presided over the remainder of the trial proceedings. This included the preparation of the charge, attention to Texaco's motions for judgment and judgment n.o.v., and to its motion for new trial.

Texaco first argues that Judge Casseb's late substitution and his denial of Texaco's motion for mistrial constitute error under Texas law. It argues that because Judge Casseb was unfamiliar with the previous testimony given in the preceding three

months' worth of testimony, i.e., all of Pennzoil's evidence and a portion of Texaco's, his unfamiliarity with the evidence prejudiced the preparation of the charge and the post-trial motions.

Tex.R.Civ.P. 18 provides for the substitution of judges:

If the judge dies, resigns, or becomes unable to hold court during the session of court duly convened for the term, and the time provided by law for the holding of said court has not expired, such death, resignation, or inability on the part of the judge shall not operate to adjourn said court for the term, but such court shall be deemed to continue in session. If a successor to such judge shall qualify and assume office during the term, or if a judge be transferred to said district from some other judicial district, he may continue to hold said court for the terms provided, and all motions undisposed of shall be heard and determined by him, and statements of facts and bills of exception shall be approved by him. If the time for holding such court expires before a successor shall qualify, and before a judge can be transferred to said district from some other judicial district, then all motions pending, including those for new trial, shall stand as continued in force until such successor has qualified and assumed office, or a judge has been transferred to said district who can hold said court, and thereupon such judge shall have power to act thereon at the succeeding term, or on an earlier day in vacation, on notice to all parties to the motion, and such orders shall have the same effect as if rendered in term time. The time for allowing statement of facts and bills of exception from such orders shall date from the time the motion was decided.

Appellate courts in Texas have repeatedly approved the substitution of judges. In *Bickham v. Herrin Transportation Co.,* 344 S.W.2d 953 (Tex.Civ.App.—Houston 1961, no writ), this Court approved a substitution and the resulting actions by the court's denial of appellant's motion for new trial. The first judge heard most of the evidence, and the second judge, over objection of the appellant, heard the balance of the evidence and presided over the preparation of the charge and argument of counsel. Then the first judge returned and accepted the verdict from the jury and ruled on the motion for new trial. This Court noted that the record failed to indicate (1) that appellant requested the first judge to read the testimony that he had not heard; (2) that he was presented with a transcript thereof; or (3) that he heard the testimony. This Court held that in the absence of such showing, "it will be presumed that he became sufficiently familiar with the testimony of witnesses whom he did not hear...." Furthermore, the appellant failed to show any abuse of discretion or harm because the court of appeals "is required to pass upon the same and has the same power as the trial judge to do so. Rule 434, T.R.C.P." *Id.* at 959.

In *Weiser v. Hampton,* 445 S.W.2d 224, 229 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.), the appellant urged that it was error for the presiding judge, who did not sit at trial, to overrule appellant's motion to disregard jury findings. The court held "while it is obvious that the judge who heard the evidence would be in a better position to pass on the motion, it would not be unreasonable to suppose that another judge would be able to do so after hearing the arguments of counsel." *Id.*

Although appellate courts have repeatedly approved of the substitution of judges, Texaco argues that the case of *Rutherford v. Rutherford,* 554 S.W.2d 829 (Tex.Civ.App.—Amarillo, no writ), is supportive of its contention that a substitution here was error. *Rutherford* involved a *bench trial* in which the first judge heard part of the evidence and made known the judgment he would render. The second judge, as finder of fact, heard part of the evidence and rendered judgment based thereon. The court held that it was reversible error to render a final judgment "without a consid-

eration of all of the evidence adduced on the matter." *Id.* at 832.

In the instant case, the jury was the finder of facts, not Judge Casseb. Judge Casseb heard much of Texaco's evidence, and although he admitted at the charge conference that he "did not read the full parts of this evidence," he did have available to him a transcription of all the evidence adduced prior to his appointment to which he could refer for confirmation of relevant and material matters upon which the parties disagreed. Judge Casseb heard extensive preliminary argument by both parties of the evidence taken prior to his assignment. He presided over the preparation of the charge, and the charge does properly present the applicable law and is supported in the evidence.

Texaco has failed to show any abuse of discretion or harm caused by Judge Casseb's substitution. Texaco's argument, that the substitution and denial of the mistrial were error under Texas law, is without merit.

 Texaco next argues that if the Texas Rules of Civil Procedure allow for this substitution, then the rules are unconstitutional under the due process clause.

For support, Texaco relies upon *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), in which the Supreme Court identified three factors that must be weighed in determining whether a state procedural rule, in this case rule 18, comports with the requirement of due process:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903.

Texaco argues (1) that its private property interest at stake here is its very right to

exist; (2) that Judge Casseb's substitution created a risk of deprivation because of his unfamiliarity with large portions of the testimony, and (3) that a new trial in this case is the only "additional procedural safeguard" that would eliminate the risk of deprivation created by the late substitution.

Texaco's due process argument centers on the court's denial of its new trial motion, asserted in its Points of Error 82–84. Such a motion is addressed to the sound discretion of the court, and the court's action thereon will not be disturbed absent a showing of abuse. *Alkas v. United Savings Association,* 672 S.W.2d 852 (Tex. App.—Corpus Christi 1984, no writ); *Neunhoffer v. State,* 440 S.W.2d 395 (Tex.Civ. App.—San Antonio 1969, writ ref'd n.r.e.).

In *Bickham,* this Court held that appellant failed to show harm as a result of a substituted judge's passing on the sufficiency of the evidence because this Court "is required to pass upon the same and has the same power as the trial judge...." 344 S.W.2d at 959. In the instant case, there is no harm because Texaco's allegations of error in its new trial motion are now under review by this Court. We find no denial of due process. Texaco's Point of Error 81 is overruled.

In its next three points of error, Texaco asserts that:

The trial court erred in refusing to hear Texaco's motion for new trial unless Texaco waived its rights to a qualified judge because that condition violates the Due Process Clause of the United States Constitution, amend. V (applicable to Texas through Amend. XIV, § 1), and the Texas Constitution, Art. I, § 19.

The trial court erred in allowing Texaco's motion for new trial to be overruled by operation of law because that action violated the Due Process and Equal Protection Clauses of the United States Constitution.

The trial court erred in denying Texaco a hearing on the motion for new trial with regard to Texaco's complaints of newly discovered evidence and jury misconduct.

On January 9, 1986, Texaco filed its motion for new trial alleging, in part, that Judge Casseb's qualifications as a retired judge were in question. On February 13, Texaco applied for a hearing on the motion for new trial, and additionally alleged jury misconduct. The hearing was set for February 20, at which time the following occurred:

THE BAILIFF: All rise. The 151st District Court is now in session, the Honorable Solomon Casseb, Jr., presiding.

THE COURT: Good morning, ladies and gentlemen.

ALL COUNSEL: Good morning, Your Honor.

THE COURT: You may be seated.

In Cause No. 85–05905, Pennzoil Company versus Texaco, Inc. in the 151st Judicial District Court of Harris County, Texas, this Court would like to ascertain at this time and would like a reply from each of the respective firms of record representing Texaco, Incorporated if they still at this time question and challenge the right and authority of Solomon Casseb, Jr. to preside over—as a Judge to preside over any hearings at this time in this cause.

MR. McMAINS: Your Honor, I'm Russell McMains with the firm of Edwards, McMains, Constant and Terry.

We have not intended by setting or requesting the setting of this motion for hearing or by any of the other papers that we filed with the Court to waive our challenge on the disqualification issue which, in point and in fact, is part of the Newly Discovered Evidence Complaint that is contained in our Motion for New Trial and supported by the affidavits for which we requested an evidentiary hearing today.

THE COURT: And you're taking the position—

MR. McMAINS: The answer to your question is yes.

THE COURT: All right. Any other firms?

MR. BOIES: Your Honor, David Boies from Cravath, Swaine and Moore. We likewise continue our challenge.

MR. SALES: Jim Sales of Fulbright and Jaworski. We do continue the challenge.

THE COURT: Any others?

MR. PETERSEN: Your Honor, Michael Petersen for Miller-Keeton. Mr. Miller and Mr. Keeton are on their way and should be here shortly. We join in the motion of our co-counsel and continue the challenge.

MR. JAMAIL: We have no challenge to the qualifications of this Judge.

THE COURT: As I understand, you still challenge the qualifications of Solomon Casseb as a Judge or otherwise to preside over this cause and to hear all motions on file in this cause at this time?

MR. McMAINS: That is our position, but we have been repudiated at this point.

THE COURT: I understand that.

That still being your position, this Court then is going to let the law take its course and y'all are excused.

On February 24, four days later, Texaco's motion for new trial was overruled by operation of law.

Texaco argues that Judge Casseb's refusal to conduct a hearing on the new trial motion contravened Texas case law and the due process and equal protection clauses of the U.S. Constitution. Texaco therefore requests that this Court remand for a hearing on the motion for new trial.

In its Point of Error 84, Texaco first argues that the trial court erred in not conducting an evidentiary hearing and in denying its new trial motion when juror misconduct was alleged and supported by affidavit. Specifically, Texaco urges that the following statements by juror Shannon shows that juror Shannon conducted an independent investigation into issues not in evidence and that the trial court considered an annual report that was not in evidence:

Well, in point of fact, Texaco never made this argument [that the damage claim

was exorbitant] until the very end of the trial in final arguments because it could be easily rebutted *by their own annual report. Texaco's worth, when you subtract liabilities from assets, is still in excess of twenty-three billion dollars.* This figure they're getting that the verdict is more than the company's worth is when you take the number of shares of stock and multiply it times the current stock price and that is somewhat less than ten billion but they have assets over liabilities [of] twenty-three billion dollars. *Their own annual reports give these figures and if that would have been brought into court it could have been easily proven.* (Emphasis added.)

The sole accompanying affidavit of Richard E. Miller, counsel for Texaco, states in pertinent part:

Neither Texaco's annual report nor Shannon's net worth calculation, as expressed by him in this interview, was in evidence. Shannon has stated to me that he did not consult any source outside the evidence.

10. During the deliberations on the afternoon of November 18, 1985, the jury asked the following question: "Was the Texaco annual report put into evidence, and if so, can we have a copy?" The parties then agreed that the annual report was not in evidence. This question, coupled with Shannon's statement quoted in Paragraph 9 above, indicates that the jury considered the annual report or information from the annual report even though it was not in evidence.

11. I have attempted to interview the jury members with regard to whether the Texaco annual report or information from that report was considered by the jury in its deliberations. I have not been able to reach all jurors; several have refused to speak to me or my partners about anything relating to the trial; those to whom I have spoken deny that information from the annual report was discussed during the deliberation of the jury.

It is within the discretion of the trial court to conduct a hearing on a new trial motion when the motion presents solely questions of law. *Moore v. Mauldin,* 428 S.W.2d 808 (Tex.1968); *University of Texas v. Morris,* 163 Tex. 130, 352 S.W.2d 947 (1962), *cert. denied,* 371 U.S. 953, 83 S.Ct. 511, 9 L.Ed.2d 503 (1963). However, Texaco asserts that the following are questions of fact requiring an evidentiary hearing: (1) Judge Casseb was not qualified as a retired judge, and (2) there was jury misconduct during voir dire and in deliberation.

The argument regarding Judge Casseb's qualifications is addressed under Point of Error 85.

## JURY MISCONDUCT

Texaco's allegations do not constitute jury misconduct as a matter of law, pursuant to the 1983 amendment to Tex.R.Civ.P. 327 and Tex.R.Evid. 606(b). Prior to the adoption of the new rules of evidence in Texas and specifically amended rule 327(b), a party complaining of jury misconduct had to show (1) that the misconduct occurred; (2) that it was material; and, (3) that based on the record as a whole, the misconduct probably resulted in harm to the complaining party. *See Redinger v. Living, Inc.,* 689 S.W.2d 415, 419 (Tex.1985). Only overt acts of the jury were considered, and any testimony concerning the jury's mental processes was disregarded. *Strange v. Treasure City,* 608 S.W.2d 604, 606 (Tex.1980). However, the new rule 327(b), and Tex.R. Evid. 606(b), prohibit jurors from testifying as to matters or statements that occurred during jury deliberations.

Tex.R.Evid. 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matters or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, *except that a ju-*

*ror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.*

(Emphasis added.)

Likewise, Tex.R.Civ.P. 327(b) provides:

A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, *except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.*

(Emphasis added.)

■■■ Under both rules, all testimony is now excluded when juror misconduct is alleged, unless it can be shown that an "outside influence" was brought to bear. *Robinson Electric Supply v. Cadillac Cable Corp.*, 706 S.W.2d 130 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

The "outside influence" requirement is so new that there is very little Texas case law interpreting it. In *Robinson*, the Texas Fourteenth Court of Appeals declined to hold the jury's consideration of matters not in evidence, the calculation of prejudgment interest during deliberations, to be "outside influence." In *Clancy v. Zale Corp.*, 705 S.W.2d 820, 828 (Tex.App.—Dallas 1986, no writ), the court declined to hold certain statements made by jurors during deliberations to be "outside influence." The *Clancy* court noted several instances in which "outside influence" had been found pursuant to rule 606(b), Fed.R.Evid.; for example, tampering with evidence, conversation between the judge and a juror, and a threat

to a juror. *Id.* at 829. The *Clancy* court held that by its wording, Tex.R.Evid. 606(b) mandates that an "outside influence" "must emanate from outside the jury and its deliberations." *See Clancy*, 705 S.W.2d at 829.

■■■ In the instant case, Texaco fails to allege such "outside influence" in its new trial motion or on appeal. Rather, Texaco relies upon the 1979 Texas Supreme Court case of *Hensley v. Salinas*, 583 S.W.2d 617 (Tex.1979), in which the court held that it was error for the trial court to deny a hearing where questions of fact were alleged in a motion for new trial, which questions, if true, would entitle the movant to a new trial. The question of fact alleged in *Hensley* was *not* juror misconduct but whether the new trial movant had actually "completely rejected" an agreed judgment. *Hensley* is not on point.

The new trial motion here fails as a matter of law to demonstrate any "outside influence." The sole supporting affidavit of Texaco's trial counsel concedes that the jurors that were contacted denied that the annual report was ever considered during deliberations. This presents no evidence of juror misconduct during deliberations. Consequently, the trial court was under no duty to conduct a hearing. *See Caterpillar Tractor Co. v. Boyett*, 674 S.W.2d 782, 793 (Tex.App.—Corpus Christi 1984, no writ).

■■■ Furthermore, the affidavit in support of Texaco's allegation of juror misconduct during deliberation is insufficient as a matter of law. Tex.R.Civ.P. 327(a) provides:

When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury, or that a juror gave an erroneous or incorrect answer on voir dire examination, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or

the communication made, or the erroneous or incorrect answer on voir dire examination, be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

Rule 327(a) mandates that the court hear evidence of juror misconduct if it is properly presented. In the instant case, the sole affidavit in support of juror misconduct during deliberations was provided by Texaco's counsel. This affidavit was insufficient under rule 327(a). "An affidavit by a non-juror is insufficient to establish material jury misconduct because the affidavit is based upon hearsay." *Clancy*, 705 S.W.2d at 828.

Likewise, Texaco's allegation of juror misconduct during voir dire is without merit. Texaco first asserts juror misconduct in juror Shannon's failure to respond to Texaco's question "If you have any reason to believe, whether its [sic] philosophical or whether its [sic] political, whether it's religious, for whatever reason whether I've asked the question or not, any reason to believe that you could not sit in this important case and sit as a fair juror ... then you need to let us know." Juror Shannon failed to inform the court that his wife had lost her job as a result of a corporate takeover; Texaco asserts this is juror misconduct.

■■■■■■ For erroneous or false answers given on voir dire to entitle a party to a new trial, there must be a concealment by the juror. *Dunn v. Sears Roebuck & Co.*, 371 S.W.2d 731, 735 (Tex.Civ.App.—Houston 1963, writ ref'd n.r.e.). Before there can be concealment, the questions asked must call for disclosure; the questions asked must be direct and specific. *Id.; Roy L. Jones Truck Line v. Johnson*, 225 S.W.2d 888, 896 (Tex.Civ.App.—Galveston 1949, writ ref'd n.r.e.). A catch-all question asking "was there anything in" the juror's experience "that would cause [them] to lean one way or the other in this type of case" does not meet the requirement of specificity. 4 R. McDonald, *Texas Civil Practice in District & County Courts* § 11.10.3 (1983); *see also Roy L. Jones Truck Line*, 225 S.W.2d at 896.

■■■■ In the instant case, the question asked was not so direct or specific as to require juror Shannon to reveal the fact that his wife had lost her job in a corporate takeover. Although harm is suggested, no harm has been shown. In addition, as a matter of law, the question was insufficient to elicit the information Texaco complains it should have received. *Id.*

Texaco next alleges juror misconduct in juror Lawler's failure to answer the following questions: "Is anybody here on the panel that's left or any member of your family that's ever had any business dealings with Texaco? ... Any business relationship with Texaco? You or your employers or members of your family?" Texaco asserts that juror misconduct occurred because juror Lawler failed to inform the court that his father-in-law was a Texaco employee.

The affidavit in support of Texaco's new trial motion states:

6. After the jury's verdict was returned, Texaco learned for the first time that the jury's presiding juror, Richard Lawler, was related by marriage to a long-time Texaco employee, Jimmie R. Paull. I interviewed Mr. Paull on December 9, 1985, and learned for the first time that he is the father of Cheryl Paull, Mr. Lawler's wife, that he and his daughter are estranged, and that he has not seen his daughter since 1977, when Mr. Lawler and his daughter were married. He has neither seen nor spoken to his son-in-law during this period and he has never seen or spoken to his two grandchildren. Attached hereto in support of these points is the affidavit of Jimmie R. Paull.

7. Juror Lawler should have divulged this information in the voir dire examination of the jury panel in response to the following question from Mr. Jamail:

Is anybody here on the panel that's left or any member of your family that's ever had any business dealings with Texaco? ... any business relationship with Texaco? You or your employers or members of your family?

8. Lawler responded but only that his employer had a "lot of business with Texaco." He did not mention his father-in-law's long-time employment. When I interviewed Mr. Lawler after the verdict and asked him about his father-in-law, he told me he did not learn his father-in-law was a Texaco employee until two months into the trial or later, and that this was the reason he did not disclose his relationship with Texaco. This relationship between Lawler and his father-in-law was relevant to Texaco's consideration of whether Juror Lawler was qualified to serve on the jury. Had Texaco been aware of this information, which would have a tendency to bias Lawler against Texaco, it would have moved to excuse Lawler for cause. Had that motion not been granted, Texaco would have used one of its preemptory [sic] challenges to excuse Lawler.

 The affidavit fails as a matter of law to establish concealment. By its own wording, the affidavit establishes that juror Lawler did not know the work relationship between his father-in-law and Texaco until the trial was two months old. Failure to disclose information about which a juror had no knowledge or had forgotten at the time of voir dire does not constitute concealment. *McDonough Brothers v. Lewis*, 464 S.W.2d 457, 466 (Tex.Civ.App.—San Antonio 1971, writ ref'd n.r.e.); *see also Childers v. Texas Employers Insurance Association*, 154 Tex. 88, 273 S.W.2d 587, 588 (1954).

Texaco's Point of Error 84 is overruled.

 In its Points of Error 82 and 83, Texaco argues that Judge Casseb violated Texaco's constitutional rights of due process and equal protection in failing to hold a hearing on its new trial motion and by announcing his intention to allow Texaco's motion to be overruled by operation of law.

The United States Supreme Court has consistently held that the fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). However, due process is flexible and calls for procedural protections as a particular situation demands. *Id.* at 334, 96 S.Ct. at 902.

Tex.R.Civ.P. 329b(c) provides:

In the event an original or amended motion for new trial or a motion to modify, correct or reform a judgment is not determined by written order signed within seventy-five days after the judgment was signed, it shall be considered overruled by operation of law on expiration of that period.

Pursuant to this rule, Texaco's right to be heard at "a meaningful time and in a meaningful manner" is not obviated. Rather, by its time constraints, rule 329(b) in fact "expedites" Texaco's right to be heard on appeal by automatically overruling a new trial motion on which there has been no ruling made. By this procedural method, Texaco's rights have been preserved and transferred to this Court for consideration. *See James v. Appel*, 192 U.S. 129, 24 S.Ct. 222, 48 L.Ed. 377 (1904). Texaco's Points of Error 82 and 83 are overruled.

In its Point of Error 85, Texaco asserts that:

The presiding judge erred in denying Texaco an evidentiary hearing on its motion to disqualify Solomon Casseb Jr., denying Texaco its constitutional and statutory rights to a qualified judge.

Texaco contends that in derogation of rule 18a, it was not afforded a hearing on its motion to disqualify Judge Casseb, which motion alleged that Judge Casseb was not properly qualified to preside as judge in this action and that he had not taken the oath of office. To understand

Texaco's contention, we briefly review the procedural history of this area of the case.

When Judge Farris became ill, Judge Stovall, Presiding Judge of the Second Administrative Judicial District, assigned Judge Casseb to preside over the remainder of the trial, which ended with a judgment on December 10, 1985. On January 9, 1986, Texaco filed its motion to disqualify based upon a New York Times article quoting Judge Casseb's son, who allegedly stated that Judge Casseb had not met the judicial service time requirement to be eligible for retirement in Texas before he was assigned this case.

When the motion to recuse was filed, Judge Casseb refused to voluntarily recuse himself, but forwarded the motion to Judge Stovall, as mandated by rule 18a of the Texas Rules of Procedure. Texaco requested Judge Stovall to hear the motion himself or assign another judge and to authorize discovery of documents relevant to the motion. On January 21, 1986, the matter was presented to Judge Stovall at a status conference, at which time copies of Chief Justice Hill's certification of Judge Casseb were presented. This documentation established that Judge Casseb had completed the necessary 12 years of credited service and was entitled to retire and receive pension. This certificate was dated May 20, 1985, several months before Judge Casseb's assignment to the case.

Texaco proceeded to seek discovery of the supporting documentation leading up to Judge Casseb's certification. Pennzoil opposed the discovery, contending that it exceeded the bounds of rule 18a. Pennzoil asserted then and asserts on appeal that the attack on Judge Casseb's qualifications to serve on this case on the grounds that he had not met the certification requirements (12 years of service) could only be brought in a *quo warranto* proceeding in which the State would be a party.

On January 27, Judge Stovall denied the recusal motion, noting that Judge Casseb was assigned as a "retired judge on October 22, 1985. The grounds for disqualifica-

tion asserted only the question of his qualification as a retired judge. Because the date of his certification as a retired judge was May 1985, no further hearing is necessary or appropriate." Texaco then sought leave to file a writ of mandamus with the Texas Fourteenth Court of Appeals and the Texas Supreme Court, requesting the courts to require Judge Stovall to hold another hearing on the recusal motion. Both courts denied Texaco's motions.

Under Texas law, because Judge Casseb was not holding judicial office at the time of his retirement in May 1985, he could qualify as a retired judge only if he had accrued 12 years service time. Tex.Rev. Civ.Stat.Ann. Title 110B § 44.101(a)(2) (Vernon 1987). This service credit could come from two sources: (1) "membership service"; and (2) "military service." §§ 41.001(6) and 43.001.

Judge Casseb served as judge of the 57th District Court for eight years and three months in the 1960's; he served in the military during World War II. Texaco asserts that based upon his son's comments in the New York Times, the addition of these two "credits" will not equal 12 years, despite the certification by Chief Justice Hill.

Texaco argues that this is a situation authorizing a collateral attack on Judge Casseb because: (1) *quo warranto* is not an exclusive remedy; (2) rule 18a provides for recusal based upon "any disability"; and (3) the *de facto* officer doctrine, related to Pennzoil's *quo warranto* assertion, is not applicable because Judge Casseb was not holding "an office."

Tex.Government Code §§ 74.031 and 74.-032 (Vernon 1987) (formerly Tex.Rev.Civ. Stat.Ann. art. 200a, §§ 5 and 5a) provide for the assignment of a retired judge to fill a district court:

### § 74.031. *Assignment of Judges*

Judges may be assigned in the manner provided by this Chapter to hold district court when:

(1) the regular judge of the district court is absent or is disabled or disqualified for any cause;

(2) the regular judge of the district court is present or is trying cases as authorized by the constitution and laws of this State, or

(3) the office of district judge is vacant.

§ 74.032. *Judges Subject to Assignment*

The following judges may be assigned as provided by this chapter by the presiding judge of the administrative district in which the assigned judge resides:

(1) a regular district judge in this state;

(2) a district judge who is a retiree under Subtitle E, Title 110B, Revised Statutes, and who has consented to be subject to assignment; and

(3) a former district judge who:

(A) is not more than 70 years of age;

(B) was elected at a general election or appointed by the governor, and has not been defeated for reelection or removed from office by impeachment, the supreme court, the governor on address of the legislature, the State Commission on Judicial Conduct, or the abolishment of the judge's court by the legislature; and

(C) certifies to the presiding judge a willingness to serve and to comply with the prohibitions relating to the practice of law imposed on a retired judge by Section 44.005, Title 110B, Revised Statutes.

Furthermore, Tex.Rev.Civ.Stat.Ann. Title 110B § 41.001(4) (Vernon Supp.1987) defines a "retiree" as "one who receives an annuity based on service that was credited to the persons."

Texaco first argues that a *quo warranto* proceeding would not be a proper vehicle here because pursuant to Tex.R.Civ.P. 782, *quo warranto* is not exclusive and is to be cumulative of any existing remedy, i.e., a rule 18a recusal proceeding. However, Texaco cites no authority allowing for such a collateral attack where the qualifications of the judge to function as a judge, i.e., a retired judge, are challenged in a rule 18a proceeding.

In Texas, it has been held consistently that a collateral attack upon the qualifications of a district judge cannot be sustained. When a judge is holding office under color of title by appointment and discharging the duties of the office, his "acts are conclusive as to all persons interested and cannot be attacked in a collateral proceeding, even though the person acting as judge lacks the necessary qualifications and is incapable of legally holding the office." *Tart v. State*, 642 S.W.2d 244, 246 (Tex.App.—Houston [14th Dist.] 1982, no pet.) (citing *Ex parte Lefors*, 171 Tex.Crim. 229, 347 S.W.2d 254 (1961). "If the appellant desires to challenge such authority, he must bring a direct action through a *quo warranto* proceeding." *Id.*, 642 S.W.2d at 246; *see also Keen v. State*, 626 S.W.2d 309 (Tex.Crim.App.1981); *Archer v. State*, 607 S.W.2d 539 (Tex.Crim.App.1980), *cert. denied*, 452 U.S. 908, 101 S.Ct. 3037, 69 L.Ed.2d 410 (1981). The State is an indispensable party in a *quo warranto* proceeding, which must be brought in the State's name. *Lewis v. Drake*, 641 S.W.2d 392 (Tex.App.—Dallas 1982, no writ). The basis for this rule of law is a matter of public policy.

> Public officers should be free to perform their duties without their authority questioned incidentally in litigation between other parties. They should not be called on to defend their authority unless a proper legal officer of the State has determined that the question raised is serious and deserves judicial consideration. . . .

*Id.*, at 395.

In the instant case, the certification by Chief Justice Hill establishes Judge Casseb's retirement status. An attack on this certification is an attack on Judge Casseb's authority to function as a retired

judge. Consequently, such authority can only be challenged by a *quo warranto* proceeding, which is beyond the capacity of a rule 18a proceeding.

 Texaco also argues that Judge Casseb is not protected from collateral attack because he did not hold an office. As such, the *de facto* officer doctrine related to the *quo warranto* theory is not applicable. Furthermore, Texaco argues that where there is a *de jure* officeholder (Judge Farris), there can be no *de facto* officeholder. Finally, Texaco contends that the record fails to establish that Judge Casseb ever took the oath of office upon resumption of his duties as a retired judge.

Texaco cites no applicable authority for any of the preceding assertions. First of all, Texaco's entire *de facto* argument is refuted in the case of *Tart v. State*, 642 S.W.2d at 244, which involved a retired judge. In *Tart*, the appellant challenged the validity of the authority of the retired judge, who presided at the trial, on the basis that he had been assigned to another district court and therefore, had no authority to hold a hearing or enter an order in the court of record. In relying upon *Ex parte Lefors* and the cases cited therein, the Texas Fourteenth Court of Appeals held that such attack could only be brought through a *quo warranto* hearing. The Fourteenth Court of Appeals declined to make a distinction between retired judges and duly-elected judges, noting that the assignment of the retired judge to the district court gave him "all the powers of a judge thereof."

 Furthermore, Texaco's oath of office claims are without merit. The cases cited by Texaco concern the appointment of "special judges" who are required to take the oath of office before assignment. "A retired district judge who elects to continue in his judicial capacity is not a 'special judge,' but is still a district judge." *Olivares v. State*, 693 S.W.2d 486, 489 (Tex.Civ.App.—San Antonio 1985, writ dism'd); *Tart*, 642 S.W.2d at 246; Tex.

Gov't Code § 74.032 (Vernon 1987). Absent some showing to the contrary, it will be presumed that the assignment was properly made pursuant to all statutory requirements. *Buchanan v. State*, 471 S.W.2d 401 (Tex.Crim.App.), *cert. denied*, 405 U.S. 930, 92 S.Ct. 984, 30 L.Ed.2d 804 (1972).

We hold that the proper method to attack the judicial qualifications of a retired judge is through a *quo warranto* proceeding, not a collateral attack under rule 18a that provides for a recusal procedure.

The remaining question is whether Judge Stovall erred in failing to conduct a hearing on the recusal motion.

Judge Stovall held a "status conference" with all counsel on January 21, 1986. Judge Casseb's certification was presented to Judge Stovall, who ultimately determined that no additional hearing was merited.

 Texaco argues that in addition to the January 21 status conference, Judge Stovall should have conducted a further hearing, pursuant to rule 18a, citing *McLeod v. Harris*, 582 S.W.2d 772 (Tex. 1979). In *McLeod*, the supreme court held that pursuant to the following language from Tex.Rev.Civ.Stat.Ann. art. 200a, § 6 (Vernon 1977), the trial court has a *mandatory duty* to request that the presiding judge assign another judge to hear the motion to recuse:

> A district judge shall request the Presiding Judge to assign a judge of the Administrative District to hear any motions to recuse such district judge from a case pending in his court.

While rule 18a does mandate a hearing on a motion to recuse, such requirement is not triggered unless the recusal motion states valid grounds for disqualification. In *Gaines v. Gaines*, 677 S.W.2d 727, 731 (Tex.App.—Corpus Christi 1984, no writ), the court held that the contentions raised were without merit because "[o]n his motion to disqualify, appellant does not establish enough information to warrant referral of the motion to the presiding judge," cit-

ing *McClenan v. State*, 661 S.W.2d 108 (Tex.Crim.App.1983).

In the instant case, the challenge to Judge Casseb's qualification as judge on this case was a challenge to his qualification to serve as a retired judge on any case; the only proper proceeding for review of such was a *quo warranto* proceeding. Consequently, Texaco's rule 18a motion was inadequate. Therefore, no additional hearing was mandated.

Furthermore, no due process violation is evidenced. Texaco has been afforded a hearing on its allegations by Judge Stovall, the Texas Fourteenth Court of Appeals, the Texas Supreme Court, and this Court. The procedure chosen by appellant was not the proper proceeding; Texas law does not permit such a collateral attack on a judge's qualifications.

Texaco's Point of Error 85 is overruled.

## ALLEGED CONSTITUTIONAL ERRORS

In Points of Error 86 through 90, Texaco claims that it was denied certain rights under the supremacy clause, the commerce clause, the full faith and credit clause, and the due process clause of the United States Constitution.

Texaco's points of error that the judgment violates the supremacy, commerce, full faith and credit, and due process clauses of the United States Constitution were not raised until its motion for judgment n.o.v. Pennzoil asserted in its reply to the motion for judgment n.o.v. and asserts on appeal that appellant has waived these defenses because they were not timely pled. Texaco responds that because Pennzoil's claim was based in tort and not on a statute, there was no pleading requirement to raise a constitutional issue. We note that Texaco's sole authority for such proposition, *Pennington v. Singleton*, 606 S.W.2d 682 (Tex.1980), is distinguishable from our case.

In *Pennington*, plaintiff brought suit alleging common law fraud. The trial court held that although plaintiff failed to prove common law fraud, he did prove a cause of action under the Texas Deceptive Trade Practices Act. On appeal, the court of appeals initially affirmed the judgment. However, in his motion for rehearing, defendant alleged that the treble damages provision of the DTPA could not be constitutionally applied because it had not been pled. The court of appeals agreed and reversed the judgment and rendered judgment that plaintiff take nothing.

On appeal to the Texas Supreme Court, petitioner Pennington alleged that Singleton should not be entitled to challenge the constitutionality of the DTPA because he did not raise the argument until his motion for rehearing, citing cases that hold that the unconstitutionality of a statute is an affirmative defense that is waived if not pled at trial. The supreme court noted that "because Pennington's petition alleged common law fraud and did not mention the DTPA, the applicability of these cases is questionable." *Id.* at 688.

Texaco asserts that such holding means that "when a plaintiff's claim is *not* based on a statute, there is no pleading requirement to raise a constitutional issue"; consequently, it argues that it has not waived its complaint.

The constitutionality of a statute is an affirmative defense that must be timely pled; otherwise, it is waived. *State v. Scott*, 460 S.W.2d 103, 107 (Tex.1970), *cert. denied*, 402 U.S. 1012, 91 S.Ct. 2188, 29 L.Ed.2d 435 (1971). The instant case does not involve constitutional objections to a statute, it involves constitutional objections to the judgment rendered. The initial question to be answered is whether the Texaco timely asserted its constitutional objections.

Constitutional objections may be waived by a failure to raise them at a proper time. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 144, 87 S.Ct. 1975, 1985, 18 L.Ed.2d 1094 (1967). In *Michel v. State*, 350 U.S. 91, 99, 76 S.Ct. 158, 163, 100

L.Ed. 83 (1955), the Supreme Court held that the test for making a claim to a constitutional right is whether the defendant has had a reasonable opportunity to have the issue heard and determined by the court. "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of that right." *Michel v. State,* 350 U.S. at 99, 76 S.Ct. at 163 (quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944)).

However, in some instances, "the mere failure to interpose such a defense prior to the announcement of a decision that might support it cannot prevent a litigant from later invoking such a ground." *Curtis Publishing Co.,* 388 U.S. at 143, 87 S.Ct. at 1985 (1967). An effective waiver must be one of a known right or privilege. Almost without exception, this requirement of a *knowing* and *intelligent waiver* has been applied only to those rights that the constitution guarantees to a criminal defendant in order to preserve a fair trial. *Schneckloth v. Bustamonte,* 412 U.S. 218, 236–237, 93 S.Ct. 2041, 2052, 36 L.Ed.2d 854 (1973). However, in *Curtis,* the United States Supreme Court applied this standard in a civil action.

*Curtis* involved the defamation of a public figure. The defendant-petitioner had asserted no constitutional defenses prior to the verdict. However, after the plaintiff obtained a verdict, the Supreme Court announced its decision in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which for the first time held that the first amendment requires proof of actual malice before a public official is entitled to recover damages for a defamatory falsehood. Consequently, the defendant presented this constitutional defense to the trial court, which rejected the claim as did the court of appeals.

Plaintiff-respondent made two arguments before the United States Supreme Court in support of his contention that petitioner-defendant's failure to raise the

constitutional defense, articulated in *New York Times,* amounted to a knowing waiver: (1) the general state of the law at the time of the *Curtis* trial was such that the defendant should have seen "the handwriting on the wall," i.e., that *New York Times* merely drew from earlier precedents in state law and that there were intimations in an earlier opinion that some applications of libel law might be in conflict with the first amendment; and (2) some of defendant's lawyers were involved in the *New York Times* litigation and should have been alerted to the constitutional contentions.

In rejecting these arguments, the Supreme Court noted several factors that pointed to the justice of its decision. Primary to this consideration was the fact that the constitutional objection raised was a *previously unrecognized constitutional right.* Furthermore, the constitutional objection was raised early enough so that the United States Supreme Court was given an opportunity to observe the attitude of the courts below regarding these issues, noting that although the *New York Times* decision was before the trial judge, he found it inapplicable, and that "[i]t was almost certain that he would have rebuffed any effort to interpose general constitutional defenses at the time of trial." 388 U.S. at 145, fn. 10, 87 S.Ct. at 1986, fn. 10. Finally, the Supreme Court noted that the constitutional protection that was allegedly waived,

> safeguards a freedom which is the 'matrix, the indispensable condition, of nearly every other form of freedom.'
>
> Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom [of speech], we are unwilling to find waiver in circumstances which fall short of being clear and compelling.

*Id.* at 145, 87 S.Ct. at 1986.

The present case is distinguishable from the *Curtis* case. Texaco has alleged no previously unrecognized constitutional objection and there is no first amendment objection lodged. Rather, the arguments presented are as follows: (1)

*Supremacy Clause:* the agreement violated SEC Rule 10b–13; such a void agreement will not support a cause of action for tortious interference; the judgment redefines New York law, bringing it into conflict with the federal regulatory scheme under the Williams Act; (2) *Commerce Clause:* the judgment will "chill" interstate tender offers and therefore restrain interstate commerce; (3) *Full Faith and Credit Clause:* Texas failed to respect the basic policy decisions of New York whose substantive law was applicable here; and (4) *Due Process Clause:* the judgment amounts to an "arbitrary assertion of power."

Many of these assertions encompass previously made arguments on appeal but now are couched in constitutional terms. Texaco's supremacy clause, commerce clause, and due process clause arguments are waived because these assertions could have been pled timely. However, we consider Texaco's full faith and credit clause argument because it could not have been addressed until judgment was entered.

The full faith and credit clause, article IV, § 1 of the United States Constitution, requires each state to give effect to the official acts of the other states. *Nevada v. Hall,* 440 U.S. 410, 421, 99 S.Ct. 1182, 1188, 59 L.Ed.2d 416 (1979). A judgment that is entered in one state must be respected in another, provided that the first state had subject matter jurisdiction and jurisdiction over the parties. In certain limited situations, the courts of one state must apply the statutory laws of another state, subject to the forum's own interest in furthering its public policy. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 2979, 86 L.Ed.2d 628 (1985).

In the instant case, there is no dispute that the governing substantive law was New York law. The sole objection here is that the court erroneously applied and often misstated the governing law. This argument is simply a re-urging of Texaco's previous assertions that are now couched in constitutional terms. Since we have determined that the trial court properly applied New York law, Texaco's argument is without merit.

Finally, Texaco argues that the judgment rendered undermines federal interests by deterring the initiation of contests for corporate control across the country. Texaco argues that such resulting restraint on interstate commerce is in derogation of the commerce clause.

Texaco relies solely upon *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), which is not on point. In *MITE,* the United States Supreme Court struck down an Illinois statute that required a tender offeror to notify the secretary of state and the target company of its intent to make a tender offer and the material terms of the offer 20 business days before the offer expired. *Id.* at 636, 102 S.Ct. at 2637. During that 20–day period, the offeror could not communicate its offer to the shareholders, but the target company could disseminate information to its shareholders, many of whom lived out of state, regarding the pending offer.

The court held that for several reasons, the statute was unconstitutional under the commerce clause. The court noted that because only 27% of the target company shareholders lived in the state, any transaction regarding communication of the offer to its shareholders would be interstate commerce; thus, the statute sought to prevent MITE from making its offer and concluding interstate transactions not only with the Illinois shareholders, but also with those out of state. If Illinois could impose such regulations on interstate commerce, so might other states, which would "thoroughly stifl[e]" interstate commerce in securities transactions generated by tender offers. *Id.* at 642, 102 S.Ct. at 2640.

The court determined also that on its face, the Illinois statute applied even if not one of the target company's shareholders lived in Illinois; the commerce clause precludes the application of a state statute to commence wholly outside the state's borders. Finally, the court held the Illinois

statute imposed an excessive burden on commerce in relation to the local interests served by the statute. The court noted:

> The effects of allowing the Illinois Secretary of State to block a nationwide tender offer are substantial. Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced.

*Id.* at 643, 102 S.Ct. at 2641.

The instant case does not involve a statute by which the State attempts to regulate tender offers. This cause of action is for tortious interference with a contract. Judgment was not rendered because Texaco won in a competitive tender offer situation. Rather, it was rendered pursuant to the jury's finding that Texaco had tortiously interfered with a binding agreement. A judgment based upon such a finding will not deter the "invitation of contests for corporate control throughout the country"; however, it should deter tortious interference with a binding agreement between parties.

Additionally, Texaco's commerce clause argument is one that could have been pled prior to judgment. Texaco had full knowledge of the cause of action filed against it. Its position throughout trial and this appeal has been that the facts prove a competitive tender offer situation only, and any judgment rendered against Texaco would "chill" corporate tender offers. The fact that the jury accepted Pennzoil's position rather than Texaco's does not afford Texaco an opportunity to belatedly assert new defenses. Because Texaco waited until after judgment to urge this argument, it is waived.

Points of Error 86, 87, 88, 89, and 90 are overruled.

## DAMAGES

In its 57th through 69th points of error, Texaco claims that the evidence was legally and factually insufficient to support the jury's compensatory and punitive damage awards.

Texaco attacks Pennzoil's use of a replacement cost model to prove its compensatory damages. It urges that: (1) the court should have instructed the jury that the correct measure of Pennzoil's compensatory damages was the difference between the market price and contract price of Getty stock at the time of the breach; (2) the punitive damages award is contrary to New York law and public policy; (3) the punitive and compensatory damages are excessive; (4) and prejudgment interest should not have been allowed.

In a cause involving a tortious interference with an existing contract, New York courts allow a plaintiff to recover the full pecuniary loss of the benefits it would have been entitled to under the contract. *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). The plaintiff is not limited to the damages recoverable in a contract action, but instead is entitled to the damages allowable under the more liberal rules recognized in tort actions. *Id.*

New York courts have cited and relied extensively on the Restatement (Second) of Torts in deciding damages issues, compensatory as well as punitive.

Section 774A of the Restatement (Second) of Torts (1977), reads in pertinent part:

> (1) One who is liable to another for interference with a contract ... is liable for damages for
>
> (a) the pecuniary loss of the benefits of the contract ...; [and]
>
> (b) consequential losses for which the interference is a legal cause....

Comment (a) under the above section provides that since the tort is an intentional one, punitive damages are recoverable in these actions under appropriate circumstances. Although section 908 of the Restatement (Second) of Torts provides gener-

al guidelines, the particular circumstances under which a plaintiff is entitled to punitive damages are not clearly defined under New York law; there seem to be different tests, depending on the tort. A frequently cited New York Court of Appeals opinion, *Walker v. Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961), sets forth the theory for favoring the awarding of punitive damages and lists many examples of actions in which New York courts have allowed punitive damages. We will discuss those standards under our punitive damages section.

Pennzoil relied on two witnesses to prove the amount of its damages: Dr. Thomas Barrow and Dr. Ronald Lewis. Dr. Barrow holds a Ph.D. in petroleum engineering from Stanford University, and a bachelor's and master's degree from the University of Texas in geology and petroleum engineering. He has been president of Humble Oil & Refining Company, a senior vice-president of Exxon Corporation, chairman and chief executive officer of Kennecott Corporation, and president of Standard Oil of Ohio. He sits on the board of directors of many major corporations and charitable institutions.

Dr. Lewis is employed by Pennzoil as a vice-president in charge of offshore operations. He holds a bachelor of science degree and a master of science degree in petroleum engineering from Colorado School of Mines, and a Ph.D. with emphasis on petroleum engineering from the University of Texas. He has held responsible positions with the government, Mobil Oil Company, and Pennzoil, and taught petroleum engineering for seven years.

Texaco presented no witnesses to refute the testimony of Dr. Barrow or Dr. Lewis.

Dr. Barrow prepared three damages models, as follows:

(1) a replacement cost model,

(2) a discounted cash flow model, and

(3) a cost acquisition model.

Because the jury based its award of damages on the replacement cost model, the other two models will not be discussed. By Dr. Barrow's testimony, Pennzoil showed that because of Texaco's interference with its Getty contract, it was deprived of its right to acquire ³/₇th's of Getty's proven reserves, amounting to 1.008 billion barrels of oil equivalent (B.O.E.), at a cost of $3.40 a barrel. Pennzoil's evidence further showed that its cost to find equivalent reserves (based on its last five years of exploration costs) was $10.87 per barrel. Therefore, Pennzoil contended that it suffered damages equal to 1.008 billion B.O.E. times $7.47 (the difference between $10.87, the cost of finding equivalent reserves, and $3.40, the cost of acquiring Getty's reserves) or $7.53 billion. The jury agreed.

Texaco first alleges that the trial judge should have instructed the jury that the measure of Pennzoil's damages was the difference between the market value of Getty Oil stock and its contract price at the time of the breach. We reject this contention. The Getty/Pennzoil agreement contemplated something more than a simple buy-sell stock transaction. Pennzoil's cause of action against Texaco was in tort, not in contract, and Pennzoil's measure of damages was the pecuniary loss of the benefits it would have been entitled to under the contract. *Guard-Life Corporation,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445. There was ample evidence that the reason Pennzoil (and later, Texaco) wanted to buy Getty was to acquire control of Getty Oil's reserves, and not for any anticipated profit from the later sale of Getty stock. There was evidence that such fluctuations in market price are primarily of interest to holders of small, minority share positions.

The court in Special Issue No. 3 correctly instructed the jury that the measure of damages was the amount necessary to put Pennzoil in as good a position as it would have been in if its agreement, if any, with the Getty entities had been performed. If the measure of damages suggested by Texaco was correct, then there would have been no necessity to submit an issue at all,

because no issue of fact would have existed, there being no dispute about the market value of the stock or the contract price of the stock at the time of the breach.

Texaco next contends that the replacement cost theory is based on the speculative and remote contention that Pennzoil would have gained direct access to Getty's assets. Texaco strongly urges that Pennzoil had a "good faith" obligation under its alleged contract to attempt to reorganize and restructure Getty Oil rather than to divide its assets. We agree. Under New York law, a duty of fair dealing and good faith is implied in every contract. *Teachers Insurance & Annuity Association of America v. Butler*, 626 F.Supp. 1229, 1231–32 (S.D.N.Y.1986) (citing *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978)). But a duty of good faith and fair dealing does not require that Pennzoil completely subordinate its financial well-being to the proposition of reorganization or restructuring.

The directors of Pennzoil would have had a duty to the company's shareholders to obtain the greatest benefit from the merger assets, by either restructuring, reorganizing, or taking the assets in kind. If taking the assets in kind would be the most advantageous to Pennzoil, its directors would, in the absence of a great detriment to Getty, have a duty to take in kind. So the acquisition of a pro rata share of Getty Oil's reserves would be more than a mere possibility, unless the restructuring or reorganization of Getty would be just as profitable to Pennzoil as taking the assets in kind.

Next, Texaco urges that the jury's use of the replacement cost model resulted in a gross overstatement of Pennzoil's loss because:

(a) Pennzoil sought to replace Getty's low value reserves with reserves of a much higher value;

(b) Pennzoil based its replacement cost on its costs to find oil only during the period from 1980 to 1984, rather than over a longer period;

(c) Pennzoil improperly included future development costs in its exploration costs;

(d) Pennzoil used pre-tax rather than post-tax figures; and

(e) Pennzoil failed to make a present value adjustment of its claim for future expenses.

Our problem in reviewing the validity of these Texaco claims is that Pennzoil necessarily used expert testimony to prove its losses by using three damages models. In the highly specialized field of oil and gas, expert testimony that is free of conjecture and speculation is proper and necessary to determine and estimate damages. *Amoco Production Co. v. Alexander*, 594 S.W.2d 467, 477 (Tex.Civ.App.— Houston [1st Dist.] 1979), *modified on other grounds*, 622 S.W.2d 563 (Tex.1981). Texaco presented no expert testimony to refute the claims but relied on its cross-examination of Pennzoil's experts to attempt to show that the damages model used by the jury was flawed. Dr. Barrow testified that each of his three models would constitute an accepted method of proving Pennzoil's damages. It is inevitable that there will be some degree of inexactness when an expert is attempting to make an educated estimate of the damages in a case such as this one. Prices and costs vary, depending on the locale, and the type of crude found. The law recognizes that a plaintiff may not be able to prove its damages to a certainty. But this uncertainty is tolerated when the difficulty in calculating damages is attributable to the defendant's conduct. *Whitney v. Citibank, N.A.*, 782 F.2d 1106 (2d Cir.1986).

In his replacement cost model, Dr. Barrow estimated the cost to replace 1.008 billion barrels of oil equivalent that Pennzoil had lost. Dr. Barrow admitted that some of Getty's reserves consisted of heavy crude, which was less valuable than lighter crude, and that he had made no

attempt to determine whether there was an equivalency between the lost Getty barrels and the barrels used to calculate Pennzoil's exploration costs. Dr. Barrow also testified that there was no way to determine what grade of reserves Pennzoil would find in its future exploration; they could be better or worse than the Getty reserves. Finally Dr. Barrow testified that in spite of his not determining the value equivalency, the replacement cost model was an accepted method of figuring Pennzoil's loss. Dr. Lewis testified that with improved refining technology, the difference in value between light and heavy crude was becoming less significant.

Texaco next urges that Pennzoil should have calculated replacement cost by using a longer time period and industry wide figures rather than using only its own exploration costs, over a five year period. Dr. Lewis admitted that it might have been more accurate to use a longer period of time to estimate exploration costs, but he and Dr. Barrow both testified that exploration costs had been consistently rising each year and that the development cost estimates were conservative. Dr. Barrow testified that in his opinion, Pennzoil would, in the future, have to spend a great deal more than $10.87 a barrel to find crude. Dr. Lewis testified that industry wide exploration costs were higher than Pennzoil's, and those figures would result in a higher cost estimate than the $10.87 per barrel used by Pennzoil.

Next, Texaco claims that Pennzoil inflated its exploration costs by $1.86 per barrel by including "future development cost" in its historical exploration costs. Both Dr. Lewis' and Dr. Barrow's testimony refuted that contention. Texaco neither offered evidence to refute their testimony, nor did its cross-examination reveal that this was an unwarranted cost.

Texaco also claims that Pennzoil should have used post-tax rather than pre-tax figures in figuring its loss calculations. First, it contends that there are large tax incentives for exploration and development that are not applicable to acquisition of reserves. Second, it contends that there was a $2 billion tax penalty attached to the Pennzoil/Getty agreement, and Pennzoil's $900 million share of that penalty would have increased its $3.40 pre-tax acquisition cost by nearly a dollar.

Dr. Barrow testified that the fact that Pennzoil included $997 million as recapture tax in its costs of acquiring the Getty reserves, made the pre-tax comparison between the $3.40 per barrel to acquire Getty reserves and the $10.87 per barrel for Pennzoil to find new oil, "apples and apples"; in other words, the $997 million tax adjustment compensated for the tax benefits reaped when discovering, as compared with purchasing, reserves. Further, there was no conclusive proof that the Internal Revenue Service would have assessed a $2 billion penalty to Getty's purchase of the Museum's shares under the Pennzoil/Getty agreement, as alleged by Texaco. Several witnesses, familiar with tax law, testified that it was unlikely that such a tax would be imposed; therefore it was for the jury to decide when assessing damages, whether Pennzoil's pro rata share of the speculative tax penalty should reduce the amount of its damages.

Texaco's contention that Pennzoil's cost replacement model should be discounted to present value ignores the fact that Pennzoil's suit is not for future damages but for those already sustained. Pennzoil would have had an interest in the Getty reserves immediately if the agreement had been consummated, and it did not seek damages for reserves to be recovered in the future. The cases cited by Texaco are inapposite here because all involve damages that the plaintiff would incur in the future, such as lost wages or future yearly payments. Also, Texaco requested no jury instruction on a discount or a discount rate; therefore, any complaint of the court's failure to submit the issue or instruction is waived. *See* Tex.R.Civ.P. 279. Nor was Texaco entitled to an omitted finding by the court under rule 279, because

the omitted discount and discount rate were not issues "necessarily referable" to the damages issue. *Id.*

Texaco's Points of Error 57 through 60 are overruled.

■ In its 69th point of error, Texaco claims that the court erroneously applied New York Law when it allowed prejudgment interest, because most of the damages are to compensate for expenses to be incurred over the next 25 years. We have previously considered and rejected Texaco's contention that Pennzoil's recovery, or any part thereof, was for future damages.

Under New York law, a plaintiff in an action for inducing a breach of contract is entitled as a matter of right to interest on the amount of recovery, measured from the date of the accrual of the cause of action. *De Long Corp. v. Morrison-Knudsen Co.,* 14 N.Y.2d 346, 251 N.Y.S.2d 657, 200 N.E.2d 557 (1964).

Point of Error 69 is overruled.

## PUNITIVE DAMAGES

Texaco alleges five legal reasons why punitive damages were not available to Pennzoil in this case.

■ First, Texaco incorrectly claims that punitive damages are not available to a plaintiff in an inducement of breach of contract cause, where the alleged tortfeasor acted for its own economic benefit rather than gratuitously to injure the defendant, citing *Guard-Life Corp.,* 67 A.D.2d 658, 412 N.Y.S.2d 623 (App.Div. 1979), *modified on other grounds,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445. The *Guard-Life Corp.* court disallowed punitive damages because there was no evidence of malice, ill will, or a wrongful act done willfully or maliciously. The court there noted that the defendant's motive was to secure an economic advantage and merely contrasted that fact with the absence of evidence of malice or ill will. On appeal, New York's highest court stated that the defendant's status as a competi-

tor would not protect it from the consequences of interfering with an existing contract, though it might excuse him from interfering with a prospective contract or a contract terminable at will.

■ Second, Texaco says that New York law prohibits punitive damages where the defendant was acting pursuant to the advice of counsel and believed its actions were proper. Texaco incorrectly, for the purposes of this argument, states that the court wrongfully excluded evidence proffered by Texaco concerning the legal advice it was given and its consequent belief that its conduct was proper. The court specifically informed Texaco that it could offer this testimony for the limited purpose of disproving that Pennzoil was entitled to punitive damages, but Texaco refused to make the limited offer. Further, there is much testimony in the record that Texaco's attorneys advised it that there was no binding contract between the Getty entities and Pennzoil, and that Texaco's management acted pursuant to that advice. The jury could have considered that testimony together with the other evidence when determining whether to assess punitive damages.

We agree that a good faith reliance on the advice of counsel is an important factor in determining whether a defendant's conduct is willful, wanton, or reckless, but we are of the opinion that such reliance would not necessarily preclude an award of punitive damages under New York law. Texaco cites *Russian Church of Our Lady of Kazan v. Dunkel,* 67 Misc.2d 1032, 326 N.Y.S.2d 727 (Sup.Ct.1971), *modified on other grounds,* 41 A.D.2d 746, 341 N.Y. S.2d 148 (App.Div.1973), *aff'd,* 33 N.Y.2d 456, 354 N.Y.S.2d 631, 310 N.E.2d 307 (1974), in support of its contention, but in that case, the court held that plaintiff's proof of punitive damages was deficient because the evidence failed to show that the defendants' conduct was wanton, willful, or reckless. The court then commented that the defendants had been acting pursuant to the advice of counsel, and

that such conduct was not tantamount to criminality justifying punitive damages. We do not consider this language to announce a general rule that acting pursuant to the advice of counsel precludes punitive damages, any more than we consider that a showing of criminal conduct is necessary to such an award.

Third, Texaco claims that New York law precludes an award of punitive damages absent a showing that Texaco's conduct constituted morally culpable conduct aimed at the public. Where the conduct of a party is of such a nature that similar behavior should be discouraged, the court can award punitive damages. 14 N.Y.Jur., Damages, § 176 et seq. We are of the opinion that *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976), and *Whitney v. Citibank, N.A.*, 782 F.2d at 1118, both refute Texaco's contention that a showing of conduct aimed at the public generally is necessary to support a punitive damage award. Even if there were such a requirement, Texaco's conduct, as found by the jury, could be considered conduct aimed at the public that punitive damages are designed to deter.

Fourth, Texaco claims that the culpable conduct that the jury had in mind in awarding punitive damages was not even attributable to Texaco, but instead was the conduct of the Getty entities. Texaco contends that the argument of counsel and the court's instruction in Special Issue No. 2 allowed the jury to punish Texaco for the acts of the Getty's entities. There is no testimony to support this allegation. We have no way, other than speculation, of knowing what specific acts the jury considered when assessing punitive damages.

Texaco's fifth contention is that the amount of punitive damages awarded is unreasonable. This contention will be discussed with the following points of error wherein Texaco requests a remittitur.

## REMITTITUR

In its 65th through 68th points of error, Texaco claims that the jury's award of both compensatory and punitive damages are grossly excessive and prays that we remand on that basis or grant a remittitur. Though the size of the award was indeed large, so were the stakes.

Although the verdict is large and the trial court, in the exercise of its sound discretion, could have set it aside, an appellate court will not disturb the verdict in the absence of circumstances tending to show that it was the result of passion, prejudice, or other improper motive; or that the amount fixed was not the result of a deliberate and conscientious conviction in the minds of the jury and the court; or that the amount was so excessive as to shock a sense of justice of the appellate court.

Under former rule 440, Texas Rules of Civil Procedure, the appellate court could suggest a remittitur if it was of the opinion that the verdict was excessive. If the remittitur was not filed, the court could reverse the judgment. Effective September 1, 1986, Tex.R.Civ.P. 440 was repealed and replaced by rule 85, Texas Rules of Appellate Procedure. The successor rule reads in pertinent part:

[I]f such court [Court of Appeals] is of the opinion that the trial court abused its discretion in refusing to suggest a remittitur and that said cause should be reversed for that reason only, then said appellate court shall indicate to such party, or his attorney, within what time he may file a remittitur of such excess.

Because appellate review occurs after September 1, 1986, we are of the opinion that we are required to apply the "abuse of discretion" test set forth in rule 85, Tex.R. App.P. But we are also of the opinion that the result on the question of remittitur in this case would be the same under either rule.

Under the new rule, we may order a remittitur only if we find that the trial judge abused his discretion in refusing to suggest a remittitur. In reviewing remittitur points to determine whether the amount of damages awarded is excessive,

we consider only the evidence that is favorable to the award. *Wharf Cat, Inc. v. Cole,* 567 S.W.2d 228 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.).

▮ Though the compensatory damages are large, they are supported by the evidence, and were not the result of mere passion, prejudice, or improper motive. We have received many amicus curae briefs suggesting that the verdict should be greatly reduced or overturned because of the adverse economic impact it would have, if allowed to stand, on certain states and industries, and on Texaco's many shareholders. Though we are mindful of the economic effect the judgment might have on some individuals and institutions, and we are sympathetic with those who might be affected by the verdict through no fault of their own, we are not authorized by law to substitute our judgment for that of the jury, and to make redress as we deem appropriate. Because we are of the opinion that the evidence supports the jury's award of compensatory damages, we do not consider a remittitur of those damages appropriate.

In New York, punitive damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him as well as others from indulging in similar conduct in the future. *Walker v. Sheldon,* 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497. It is not the form of the action that gives the right to punitive damages, but the moral culpability of the defendant. *Id.* Punitive damages are recoverable in tort actions where there exist ingredients of malice, fraud, oppression, insult, wanton or reckless disregard of plaintiff's rights, or other circumstances of aggravation. Such damages are also recoverable for intentional torts committed wantonly or maliciously. *Rupert v. Sellers,* 65 A.D.2d 473, 411 N.Y.S.2d 75 (App.Div.1978) (J. Cardamone concurring), *aff'd,* 50 N.Y.2d 881, 430 N.Y.S.2d 263, 408 N.E.2d 671, *cert. denied,* 449 U.S. 901, 101 S.Ct. 272, 66

L.Ed.2d 132 (1980); *Oehlhof v. Solomon,* 73 A.D. 329, 76 N.Y.S. 716 (App.Div.1902). In *Rupert,* the court upheld an award of punitive damages in an action for tortious interference with a contractual relationship, and impliedly held that the interference by an insurance broker with a group insurance contract between a medical society and a competing broker constituted a tort aimed at the public. In *Russian Church of Our Lady of Kazan,* 67 Misc. 1032, 326 N.Y.S.2d 727, the court stated that "[w]here the conduct of a party is of such a nature that similar behavior should be discouraged, the court can award punitive or exemplary damages. However, the court or the jury must be satisfied that such conduct was wanton, willful or malicious." *Id.,* 326 N.Y.S.2d at 757.

▮ The jury in our case found that Texaco's actions were intentional, willful, and in wanton disregard of the rights of Pennzoil. We consider this a sufficient finding under New York law to support an award of punitive damages in a tortious inducement of a breach of contract cause of action.

The amount of exemplary or punitive damages to be awarded depends on the facts of the case and rests largely within the sound discretion of the jury. *Carr v. Galvan,* 650 S.W.2d 864 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Toomey v. Farley,* 2 N.Y.2d 71, 156 N.Y.S.2d 840, 138 N.E.2d 221 (1956). Under Texas law, exemplary damages must be reasonably proportioned to actual damages. *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981). Factors to be considered in determining whether an award of exemplary damages is reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.* at 910.

▮ The proportion of punitive damages to actual damages presents no prob-

lem. The punitive damages awarded only amount to approximately 40% of actual damages, which in itself is not excessive. Under New York law, punitive damages need bear no ratio to compensatory damages. *Hartford Accident & Indemnity Co. v. Village of Hempstead,* 48 N.Y.2d 218, 422 N.Y.S.2d 47, 397 N.E.2d 737 (1979).

But when considering the other factors listed above, our task is more difficult. From the evidence, the jury could have concluded that Texaco deliberately seized upon an opportunity to wrest an immensely valuable contract from a less affluent competitor, by using its vast wealth to induce the Museum, Gordon Getty, and Getty Oil to breach an existing contract. The evidence shows that the wrongful conduct came not from servants or mid-level employees but from top level management. Apparently the jury believed that the conduct of Texaco's top level management was less than the public was entitled to expect from persons of such stature. There is no evidence that Texaco interfered with the contract to injure Pennzoil, but the jury could reasonably conclude from the evidence at trial that Texaco cared little if such injury resulted from its interference. Points of Error 61 through 66 and Point 68 are overruled.

Considering the type of action, the conduct involved, and the need for deterrence, we are of the opinion that the punitive damages are excessive and that the trial court abused its discretion in not suggesting a remittitur. Though our Texas guidelines are similar to those of New York, New York courts have adopted a more conservative stance on punitive damages. There is a point where punitive damages may overstate their purpose and serve to confiscate rather than to deter or punish. In this case, punitive damages of one billion dollars are sufficient to satisfy any reason for their being awarded, whether it be punishment, deterrence, or encouragement of the victim to bring legal action. We conclude that the award of punitive

damages is excessive by two billion dollars. Point of Error 67 is sustained.

If within 30 days from the date of this opinion, Pennzoil files in this Court a remittitur of two billion dollars, the judgment of the trial court will be reformed, and the award of one billion dollars punitive damages will be affirmed; otherwise, the cause will be reversed and remanded.

Finally, we respectfully refuse to certify to the Texas Supreme Court the question of the judgment's propriety under New York law. We are of the opinion that this question is not an appropriate one for certification.

Texaco's Points of Error 1 through 66, and 68 through 90 are overruled. Point of Error 67 is sustained.

If within thirty days from the date of this judgment, Pennzoil files in this Court a remittitur of two billion dollars, as suggested above, the judgment will be reformed and affirmed as to the award of $7.53 billion in compensatory damages and $1 billion in exemplary damages; otherwise the judgment will be reversed and remanded.